```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

              CASE NO.:  1:21-cv-23021-KMW



EVELYN E. GUZMAN,

       Plaintiff,

v.

HOLIDAY CVS, LLC,

       Defendant.
_____




            DEPOSITION OF ANGELA LEVITAN, PH.D.

          TAKEN ON BEHALF OF THE PLAINTIFF

                   MAY 27, 2022
              10:38 A.M. TO 12:55 P.M.

            ALL PARTIES APPEARED REMOTELY
                    PURSUANT TO
         FLORIDA SUPREME COURT ORDER AOSC20-23




REPORTED BY:
NATALIE PUELLES, CER, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
```



877.291.3376
www.UCRinc.com

Levitan, Angela, PH.D  05-27-2022

**Page 2**

```
 1              APPEARANCES OF COUNSEL
 2  ON BEHALF OF THE PLAINTIFF:
 3      CARLOS A. JORDI, ESQUIRE
        RUBENSTEIN LAW
 4      9130 S DADELAND BOULEVARD, PENTHOUSE
        MIAMI, FLORIDA 33156
 5      305-661-6000
        CJORDI@RUBENSTEINLAW.COM
 6      (REMOTELY VIA ZOOM)
 7  ON BEHALF OF THE DEFENDANT:
 8      MICHAEL L. MCCOY, ESQUIRE
        WICKER SMITH
 9      2800 PONCE DE LEON BOULEVARD
        CORAL GABLES, FLORIDA 33134
10      305-448-3939
        MMCCOY@WICKERSMITH.COM
11      (REMOTELY VIA ZOOM)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2  WITNESS: Angela Levitan, Ph.D.
                                    PAGE
 3  DIRECT EXAMINATION
        By Carlos A. Jordi, Esquire        5
 4
    CROSS EXAMINATION
 5      By Michael L. McCoy, Esquire       96
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX OF EXHIBITS
 2
    EXHIBIT        DESCRIPTION        PAGE
 3
    1      DEPOSITION AND TRIAL LIST      8
 4
    2      REPORT                 23
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1      DEPOSITION OF ANGELA LEVITAN, PH.D.
 2              MAY 27, 2022
 3  Thereupon:
 4          ANGELA LEVITAN, PH.D.,
 5  was called as a witness, and after having been first
 6  duly sworn, testified as follows:
 7          THE WITNESS:  Yes.
 8          THE COURT REPORTER:  Thank you.  You may put
 9      your hand down.  We're on the record.
10              DIRECT EXAMINATION
11  BY MR. JORDI:
12      Q   Good morning, Ms. Levitan.  My name is Carlos
13  Jordi; I represent a woman by the name of Evelyn Guzman
14  in a lawsuit against CVS.  Have you ever been deposed
15  before, ma'am?
16      A   Yes.
17      Q   Okay.  About how many times?
18      A   Maybe a couple of dozen.
19      Q   Okay.  All right.  When was the last time you
20  were deposed?
21      A   Without looking, I would approximate a month
22  ago.
23      Q   Okay.  Let's discuss some ground rules.  Some
24  of this is stuff you might already know but I like to do
25  it at the beginning just to get it out of the way so
```



Levitan, Angela, PH.D  05-27-2022

6

1  that we have a smooth deposition.  So, this deposition
2  is being conducted through Zoom, which means that we
3  might have some kind of technical difficulty along the
4  way this morning.  If you can't hear me or you can't see
5  me or you're having trouble maybe seeing anything that
6  I'm trying to show you, please stop and let me know and
7  I'll be happy to help fix whatever the problem might be.
8      A   Okay.
9      Q   If during the course of the deposition you can
10 hear me but you don't understand my question, maybe you
11 think my question is vague, maybe you think it's
12 confusing, please let me know so that I can rephrase the
13 question in a different way.
14     A   Okay.
15     Q   I'm going to assume that if you answer the
16 question it's because you understood the question.  Is
17 that fair?
18     A   Yes.
19     Q   You understand you took an oath to tell the
20 truth this morning.  Correct?
21     A   Yes.
22     Q   Is there any reason why you wouldn't be able
23 to do that this morning?
24     A   No.
25     Q   All right.  So let's just jump right in,

7

1  Doctor. Doctor, have you ever been known by any other
2  name?
3      A   Yes.
4      Q   What name would that have been?
5      A   My maiden name is DiDomenico, and I was
6  married once before and it was Astin.
7      Q   Could you spell Aston for me please?
8      A   A-S-T-I-N.
9      Q   When was it that you carried the last name
10 Astin?
11     A   The dates?
12     Q   You could just give me a rough -- was it
13 before -- so, DiDomencio is your maiden name you said.
14 Right?
15     A   Yes.
16     Q   So then you were Astin after you were
17 DiDomencio but before you were Levitan.  Is that fair?
18     A   Correct, with DiDomencio in between there
19 also.
20     Q   Got you.  Okay.  All right.  Doctor, I'm going
21 to show you my screen.  I see you -- I see you up there
22 looking, Doctor.  Did you need something?  And I should
23 tell you, if you ever need a minute throughout the
24 course of the depo, please let me know.  I'll be happy
25 to stop and give you time if you need time.

8

1      A   No, I was still trying to figure out the
2  dates, and it was graduate school if that helps you.
3      Q   Got you.  Got you.  I just wanted a general
4  timeline.  That's fine.  What you gave me is good.  So,
5  I'm going to share with you something that was provided
6  to me.  This is going to be Plaintiff's Exhibit 1.
7          (Thereupon, Plaintiff's Exhibit 1 was entered
8          into the record.)
9  BY MR. JORDI:
10     Q   This is the list of cases that you have been
11 involved in.  Can you see my screen here, Doctor?
12     A   Yes, I can.
13     Q   Give one moment.  Okay.  Doctor, I'm just
14 going to leaf through this quickly.  And as I do that,
15 have you recently seen this list?
16     A   Seen it?  Yes.  I don't study it, though, but
17 I did see it at the last deposition that I had.
18     Q   Okay.  That deposition would've been in March
19 29th of 2022?
20     A   Yes.  So I guess a little more than a month
21 there.
22     Q   Is this list up-to-date?
23     A   It's my understanding.  I don't keep it, but
24 it's my understanding that it is.
25     Q   Okay.  So there is a possibility that there

9

1  might be some cases that you were involved in that
2  aren't reflected in this list?
3          MR. MCCOY:  Form.
4          THE WITNESS:  I don't know of any that are
5      missing.  I'm just mentioning that my project
6      manager keeps it up-to-date.  I have no reason to
7      believe that she would've forgotten any, but I
8      haven't actually checked it for accuracy.
9  BY MR. JORDI:
10     Q   All right.  Well, let's do that this morning.
11 Let's just, I'm going to leaf through it, it's pretty
12 short, it's only two pages.  I'm just going to leaf
13 through the two pages, and if you can just read along
14 and if anything sticks out to you, please let me know.
15     A   I'm sorry.  I don't know what you're asking.
16 I won't know from this if something is missing.
17     Q   Okay.  All right.  So it won't be possible for
18 you to review the list and to say, "Hey, actually,
19 there's a case that I forgot to list on there."
20 There's nothing that comes to mind, at least at this
21 point?
22     A   Correct.  I've never looked at this list and
23 noticed anything missing.
24     Q   Okay.  All right.  With respect to all the
25 cases on this list, which side of the V were you on?



Levitan, Angela, PH.D   05-27-2022

10

1  Does my question make sense?
2     A   Yes.  Do you -- can you clarify how you would
3  like me to answer that?
4     Q   Sure.  Yeah, yeah.  I could ask it a different
5  way.
6     A   Case by case?
7     Q   Yeah.  In all of these cases, did you
8  represent the person being sued?
9     A   No.
10    Q   Okay.  Approximately what percentage of cases
11 were you hired by the person being sued?
12    A   On this list?
13    Q   Throughout your career as a, you know, expert
14 being retained in legal matters?
15    A   I don't keep track of that.
16    Q   All right.  So you have, it looks like you
17 have one, two, three, four, five, ten, 11, 12, 13, 14,
18 15, so 15 cases by my counting.  Is that fair?
19    A   Yes.
20    Q   Within the last three years.  Right?
21    A   Yes.
22    Q   And your testimony is that you can't recall
23 what percentage of the time you've testified for the
24 person being sued?
25    A   No, that wasn't your question that I couldn't

11

1  recall.
2     Q   Okay.  Well, let me just ask it in a different
3  way.  So, it's your testimony that you can't recall the
4  percentage of the time that you've worked for the person
5  that's being sued?
6     MR. MCCOY:  Form.
7     THE WITNESS:  I don't keep track of the
8     percentage of cases that I work for the plaintiff
9     versus a defendant, in general.  And that was the
10    question that you asked.  I'd be happy to go
11    through this list with you and let you know, for my
12    testimony, which ones were plaintiff.
13 BY MR. JORDI:
14    Q   Okay.  Yeah, let's do that, if you'd like to
15 do it that way.  So, the first case Hoornstra versus AAA
16 Insurance, did you represent the defendant in that case?
17    A   No.
18    Q   Okay.  So you represented the plaintiff.  You
19 represented the plaintiff.  Right?  Is that fair?
20    A   Yes.
21    Q   Okay.  The second case, Gaines versus El Sol
22 Contracting, did you represent the defendant in that
23 case?
24    A   I represented one of the defendants, yes.
25    Q   Okay.  Third case, Cungachi versus Superior,

12

1  did you represent the defendant in that case?
2     A   I believe so, yes.
3     Q   DePinho versus -- oh, there sure is a lot of
4  folks on this one.
5     A   Defendant, one of the defendants.
6     Q   Got you.  Okay.  Next one.  Palantine?
7     A   Also one of the defendants.
8     Q   Okay.  Next one is Carrero.
9     A   I believe that was also defense.
10    Q   Next one is Waters.
11    A   Defense.
12    Q   Next one is Garcia.
13    A   Plaintiff.
14    Q   Next one is Saccenti.
15    A   Defendant.
16    Q   Next one is Heredia.
17    A   Defendant.
18    Q   Next one is Musto.
19    A   Defendant.
20    Q   Next one is Therrien.  I'm pronouncing it --
21    A   Plaintiff.
22    Q   -- so-so there.  Liss.
23    A   Defendant.
24    Q   Next one is Sanchez.
25    A   Defendant.

13

1     Q   Next one is Moore.
2     A   Plaintiff.
3     Q   Okay.  All right.  So you've testified for the
4  plaintiff four times, and you've testified for
5  defendants 11 times.  Is that fair?
6     A   In the past four years, yes.
7     Q   Okay.  Have you had any testimony that you've
8  done before the past four years?
9     A   Yes.
10    Q   All right.  With respect to those cases, how
11 many cases have you been retained as an expert before
12 the last four years?
13    A   Off the top of my head, I'm not going to be
14 able to give you an exact number.  I do know there were
15 other plaintiff cases, though.
16    Q   Okay.  Could you give me an estimate?  Are you
17 talking about maybe another 20, or are we talking about
18 another 100?
19    MR. MCCOY:  Form.
20    THE WITNESS:  Probably between an additional,
21    you know, 10 to 50.
22 BY MR. JORDI:
23    Q   Doctor, could you please identify all the
24 documents that you have in your possession that are
25 related to your work on this case?



Levitan, Angela, PH.D  05-27-2022

14

1    A   I'm sorry.  Could you clarify in my
2  possession, like in front of me right now?
3    Q   No, no, let me ask it this way.  Can you
4  please identify all the documents that you have seen
5  throughout the course of your work on this case?
6    A   May I reference my report?
7    Q   Certainly.  At any point in time today you can
8  reference your report, and I would imagine you have a
9  file there as well.  You can reference that as well.
10       MR. MCCOY:  Carlos, just for clarification,
11  are you including photographs and any videos she
12  may have taken in that?
13       MR. JORDI:  I'm going to ask a follow-up
14  question regarding that.
15       MR. MCCOY:  Okay.
16       MR. JORDI:  Yeah.  For this question, to
17  defense counsel's end, for this question, let's
18  just worry about documents and then we'll worry
19  about videos and photographs after, Ms. Levitan.
20       THE WITNESS:  Okay.  So, as far as documents
21  that I was provided, there were the summons and
22  complaint, other legal documents.  If you want
23  specifically the Plaintiff's verified answers to
24  Defendant's interrogatories, and the Defendant's
25  answers to Plaintiff's initial interrogatories, the

15

1  deposition transcript of Evelyn Guzman, some
2  medical records pertaining to Ms. Guzman, and some
3  deposition exhibits.  And that was the -- those
4  were the materials that are included in my report.
5  BY MR. JORDI:
6    Q   Got you.  Okay.  So let's go ahead and pull
7  that up because I have that here.  There's some other
8  documents as well.  There's some medical records
9  pertaining to my client that you reviewed.  Right?
10   A   Right.  I'd mentioned that, yes.
11   Q   I'm sorry.  I didn't hear it, then.  I
12  apologize.  Then there's the ARCCA site inspection
13  conducted on April 5th, 2022, and then there's the
14  publicly available literature, including but not limited
15  to the documents cited within this report, the cited
16  references you list in your footnotes.  Right?
17   A   Correct.
18   Q   Okay.  So outside of what we see here in your
19  report on page, this is what, page 3 of your report, did
20  you review any other documents during the course of your
21  work in this case?
22   A   I don't recall reviewing anything else that's
23  not listed.  As far as materials that I was provided, it
24  would be included here.
25   Q   Okay.  How about with respect to any video?

16

1  Did you review any video with respect to this case?
2    A   I reviewed video that was taken during the
3  site inspection.
4    Q   How about photographs?  Did you review any
5  photographs during the course of your work?
6    A   I reviewed the deposition exhibit that was a
7  photograph, and also photographs taken during the site
8  inspection.
9    Q   Okay.  Ms. Levitan, have you ever physically
10  been to the subject CVS location?
11   A   I haven't.  And may I ask that you refer to me
12  as Dr. Levitan, please?
13   Q   Yes, absolutely, Doctor.  I apologize.
14  Doctor, so you haven't been to the CVS.  Right?
15   A   I have not.
16   Q   Okay.  Doctor, who was it that went to the
17  site inspection?
18   A   One of my co-workers, Dr. Timothy Tresierras.
19   Q   Could you please spell his -- give me his full
20  name and spell that for me, please.
21   A   Timothy, T-I-M-O-T-H-Y Tresierras,
22  T-R-E-S-I-E-
23       R-R-A-S.
24   Q   Does Mr. Tresierras work for ARCCA?
25   A   Yes, he does.

17

1    Q   What is his role at ARCCA?
2    A   Similar to mine, he provides litigation
3  support among, I'm sure, other aspects of research and
4  items that ARCCA takes into account.  But he does do the
5  litigation support, which would be similar to what I'm
6  doing for this case.
7    Q   So he holds a role similar to yours, which is
8  basically litigation support?
9    A   Among other things, but yes.
10   Q   Why didn't you conduct the site inspection in
11  this case?
12   A   I don't recall why I wasn't available at that
13  time to do it, and he is located in Florida, so he
14  offered to perform the inspection on my behalf at my
15  direction.
16   Q   What information was gathered during the site
17  inspection?
18   A   Number of observations made which he -- not
19  only observations that were made while we FaceTimed
20  during the inspection, but also he took a number of
21  photographs, a number of measurements that he took
22  photographs of, and he also took a few videos.
23   Q   How long did the site inspection take?
24   A   I don't recall specifically.  My best
25  recollection would be between two and three hours.



Levitan, Angela, PH.D   05-27-2022

18

1    Q   Did you or Mr. Tresierras speak to any CVS
2  employees?
3        A   I am not aware of any conversations that he
4  had that he mentioned to me or data that he collected
5  from them.
6        Q   Okay.  So it's fair to say that you never had
7  a conversation with any CVS employees with relation to
8  this case.  Correct?
9        A   Correct.
10       Q   And that you are also unaware of any
11  conversation that Mr. Tresierras may have had with any
12  CVS employees with respect to this case.  Is that fair
13  as well?
14       A   Yes.
15       Q   Ms. -- I'm sorry, Dr. Leviton, I apologize.
16  It's been a long morning for me, Doctor.  I don't mean
17  to be rude, I promise.
18         So, Doctor, you mention in your report that
19  the pallet was a permanent fixture there at the end of
20  aisle
21  16.
22       A   Yes.
23       Q   How did you come to learn that?
24       A   In the Defendant's responses to the
25  Plaintiff's interrogatories.

19

1    Q   Did you or Mr. Tresierras do anything to
2  confirm whether or not that was true with any CVS
3  employee?
4        A   I was not -- I did not directly get that
5  information from the CVS employees.
6        Q   Okay.  So you got that information, basically,
7  from the written discovery that was written by the
8  Defense in this case.  Right?
9        A   Yes.
10       Q   Dr. Levitan who have you spoken to about this
11  case?
12       A   Besides Mr. McCoy?
13       Q   Yes, ma'am, besides Mr. McCoy and potentially
14  besides Mr. Liro as well.  I don't want to know -- and
15  before we go any further, I don't want to know anything
16  you talked about -- only want to talk -- I just want to
17  know who the characters are.
18         So, forget about Mr. Liro and Mr. McCoy,
19  outside of them, who have you spoken to?  We know that
20  you've spoken, obviously, to Mr. Tresierras.  Right?
21       A   Correct.
22       Q   So, outside of those three folks, who else
23  have you spoken to?
24       A   I don't recall any specific conversations with
25  anyone else.

20

1    Q   Doctor, how long have you worked at ARCCA?
2        A   Almost nine years.
3        Q   Okay.  Do you hold any leadership positions
4  there?
5        A   Official leadership positions as in
6  management, no.
7        Q   Okay.  Do you know if ARCCA does any
8  advertising?
9        A   I would assume they do but I don't -- I'm not
10  involved in that.
11       Q   Do you know who they advertise to?
12       A   Again, I would only be making guesses.  I'm
13  not involved in the marketing
14       Q   Doctor, do you currently hold any licenses?
15       A   I am a certified professional ergonomist.
16       Q   Okay.  And outside of that?
17       A   I've done a number of, you know, training
18  courses that I have received certifications, but as far
19  as cert- -- like the licensing, the CPE is the only one
20  that I have.
21       Q   Okay.  And the CPE, what is that?
22       A   That's the certified professional ergonomist.
23       Q   Understood.  Okay.  Doctor, so let's go here
24  to -- I'm just going to jump around a bit here.  I'm
25  going to show you your report here, and I want to show

21

1  you page 5 of your report, and we're going to look at
2  Figure 3.  So, in Figure 3, Doctor, I just want confirm,
3  are we looking at aisle 16 in Figure 3?
4        A   Yes, that should be aisle 16.
5        Q   Okay.  And the pallet would be way at the end
6  of this aisle towards the refrigerators.  Right?
7        A   Correct.
8        Q   Okay.  Do you know, do you have any
9  information as to where my client was walking when she
10  walked on aisle 16?  That is, do you know if she was
11  walking near the left side, near the center, or near the
12  right side of the aisle?
13       A   No, that information was not specified in her
14  testimony.
15       Q   All right.  Let's go now to another figure.
16  And I'm just going to go back now to page 4 and we're
17  going to look at Figure 2.  Now, this is a photograph of
18  the subject pallet that my client tripped on.
19         Do you know, Doctor, what area of the pallet
20  she actually made contact with when she tripped?
21       A   Based on her testimony, she was not able to
22  recall and did not provide specifics as to exactly where
23  she hit the pallet, but she did say her foot struck it.
24       Q   So you know her foot struck it but you can't
25  tell me exactly where on the pallet her foot made



Levitan, Angela, PH.D  05-27-2022

22

1 contact. Right?
2     A   No, she wasn't able to describe it, so I don't
3 have that information beyond the fact that she said she
4 was turning to the right.
5     Q   Continuing with that, we know that she had
6 testified that she was turning to the right.  Do you
7 know where she was located exactly, how far outside of
8 aisle 16 she was when she made that right turn?
9     A   No.  Unfortunately, she couldn't recall a lot
10 of details of the incident during her deposition.
11     Q   Let's go to page 5 and look at Figure 4.  And
12 here we're looking at a photograph taken during the site
13 inspection.  Correct?
14     A   Yes.
15     Q   All right.  And in this photograph, we see
16 some massaging and kind of therapeutic devices on the
17 shelves at the CVS location at aisle 16.  Right?
18     A   Yes.
19     Q   Do you know exactly where the back massager
20 was that my client got off the shelves on the day of the
21 fall?
22         MR. MCCOY:  Form --
23         THE WITNESS:  No.  Again --
24         MR. MCCOY:  -- clarification.  Are you
25     referencing in the store or in this particular

23

1     photograph?
2         MR. JORDI:  Yeah, let me elaborate.
3 BY MR. JORDI:
4     Q   So, Doctor, my question is with respect to
5 this specific store and also with respect to the day of
6 the fall.  Do you know where the back massager was
7 located on the day that my client fell when she picked
8 it up off the shelving in aisle 16?
9     A   Again, she did not provide specifics as to the
10 location of the back massager within the back massager
11 display.
12     Q   I'm going to pull up this Figure 6 now.  We're
13 looking at page 6, Figure 6, and here we're looking at a
14 photograph  -- and I should say, for the record, your
15 report will be Plaintiff's Exhibit 2.  I've got to keep
16 track of it.
17         (Thereupon, Plaintiff's Exhibit 2 was entered
18         into the record.)
19 BY MR. JORDI:
20     Q   Doctor, so here in Figure 6 we see another
21 angle of the same aisle 16, we see those therapeutic
22 devices. Can you see my screen here?
23     A   Yes.
24     Q   Do you know if on the day of the fall the
25 massagers and these therapeutic devices were located in

24

1 this same far end on aisle 16?
2     A   I have no -- there's no evidence that they
3 weren't there and it matched the testimony provided by
4 Ms. Guzman as far as her navigation throughout the
5 store.
6     Q   Confirm if I'm right on this, Dr. Levitan, my
7 client stated in her deposition that she was getting a
8 back massager from the aisle where she had fallen but
9 she didn't give any testimony specifically with respect
10 to where in the aisle the back massager was located.
11 Correct?
12     A   I don't believe that that's true.
13     Q   Okay.  Can you correct me with whatever I just
14 said that was wrong?
15     A   I believe that she testified that she turned
16 right into the aisle and walked down towards the end,
17 towards the -- where the refrigerated section is, and
18 the back massagers were on the right.
19     Q   Okay.  I understand that, and I think that
20 you're -- that is accurate.  But with respect to the
21 term "end", did she specify specifically where that
22 would be, if that would've been near the very end or if
23 it could have been, for instance, where we see these
24 supplements here located on Figure 6?
25         MR. MCCOY:  Form.

25

1         THE WITNESS:  No, she wasn't specific, and I
2     was still able to do my analysis.  But again, as
3     I've mentioned, her -- her recall was missing a lot
4     of details.
5 BY MR. JORDI:
6     Q   Right.  I think we can -- I think you and I
7 can both agree that it is fair that she's missing a lot
8 of details with respect to where she navigated when she
9 was walking in the CVS.  Is that fair?  Can you agree
10 with me with that?
11     A   I'm sorry.  Could you repeat that, please?
12     Q   Yeah.  Let me say it a different way.  It's
13 fair to say that she didn't recall very many exact
14 details with respect to the specific areas that she
15 navigated in the store before and during the fall.
16 Right?
17         MR. MCCOY:  Form.
18         THE WITNESS:  I would agree that she didn't
19     remember a lot of specifics about certain things,
20     but she did have enough information about her
21     general navigation in the area for me to be able to
22     do my analysis.
23 BY MR. JORDI:
24     Q   Doctor, did you or Dr. Tresierras ever confirm
25 with any Walmart employees whether the back massagers



Levitan, Angela, PH.D   05-27-2022

26

1 were located in the same area on the day of the fall as
2 they were on the day of the site inspection?
3        MR. MCCOY:  Form.
4        THE WITNESS:  I'm going to make an assumption
5     that you meant to say CVS employees and not
6     Walmart.
7 BY MR. JORDI:
8     Q   Oh, yeah.  I'm sorry.  You're right, I did.
9 It's CVS.
10    A   Because I did not talk to any Walmart
11 employees.
12    Q   Definitely, definitely.  No, no, we're talking
13 about CVS here, Doctor.
14    A   As I said earlier, I did not specifically ask
15 the employees, but it's my understanding that the --
16 that the dis- -- general display area had not changed
17 and it appeared to be, you know, it was similar to the
18 information I had based on the materials I reviewed.
19    Q   And that was going to be my question.  How did
20 you come to that understanding?  What led you to that
21 understanding?
22    A   Well, again, looking at her testimony as far
23 as the layout of the store and where she walked, there
24 was nothing that -- about this location that
25 contradicted that testimony, you know.  So, to a certain

27

1 extent, you know, by not having -- by taking the
2 information that we did know about her walking down the
3 center of the aisle after a number of aisles, she turned
4 right, she's walking, she's near the refrigerated
5 section; all of those pieces of information were
6 consistent with the fact that this was the area where
7 she fell.
8     Q   So, in your opinion, based on my client's
9 testimony, you were able to conclude that the back
10 massager is still located in the same area as it was on
11 the day that she fell?
12        MR. MCCOY:  Form.
13        THE WITNESS:  The information that I gathered
14     through her testimony and through the inspection
15     that Dr. Tresierras did was consistent with this
16     being the location, and there was no information
17     provided to me based on the inspection that the
18     display had moved.
19 BY MR. JORDI:
20    Q   But it is fair to say that neither you nor Dr.
21 Tresierras confirmed with anyone at CVS with respect to
22 whether those massagers were located in the same place
23 on the day of the site inspection as they were located
24 on the day of the subject fall?  Correct?
25        MR. MCCOY:  Form.  Mischaracterization of

28

1     prior testimony.
2        MR. JORDI:  Mr. McCoy, please, just form
3     objections will do, please.  Go ahead.  Ms.
4     Levitan-- Doctor, Doctor, I apologize.  Go ahead,
5     Doctor.
6        THE WITNESS:  At this point, I don't recall
7     specifically whether Dr. Tresierras had mentioned
8     if there was confirmation during the site
9     inspection specifically or not, or if Mr. McCoy
10    talked to any employees.
11 BY MR. JORDI:
12    Q   Doctor, would you agree with me that it would
13 be important to speak to CVS employees with respect to
14 the location of the items that are relevant for you to
15 come to your conclusion in this case?
16        MR. MCCOY:  Form.
17        THE WITNESS:  Well, not necessarily to speak
18     to the employees, I don't agree, especially when
19     the documentation that I had supported this
20     location.  And again, unfortunately, at this moment
21     I can't recall specifically what was communicated
22     to me at the time of the inspection but it's not to
23     say that it wasn't confirmed when they were there.
24 BY MR. JORDI:
25    Q   Okay.  I just want to try to understand that a

29

1 little better, Dr. Levitan, because I'm feeling like I'm
2 not getting a clear answer.  I just want to know -- let
3 me ask step-by-step questions.
4        So, it's fair to say that you never spoke to
5 any CVS employees with respect to anything involving
6 this case.  Correct?
7    A   I did not.
8     Q   And how about Dr. Tresierras, did he speak to
9 any CVS employees with respect to anything related to
10 this case?
11        MR. MCCOY:  Form.
12        THE WITNESS:  Since I wasn't at the
13     inspection, I cannot say for certain that he did or
14     he did not.  I testified earlier that he did not
15     specifically communicate to me specific information
16     about talking to a specific employee, but again,
17     that doesn't necessarily mean that there wasn't
18     communication to ascertain that this was actually
19     still where the displays are.
20 BY MR. JORDI:
21    Q   If Dr. Tresierras had spoken to a CVS
22 employee, would that have been something that he
23 would've told you about?
24        MR. MCCOY:  Form.
25        THE WITNESS:  Depending on the information,



30

1   and again, unfortunately, this is, you know, going
2   back to the beginning of April and I just can't
3   remember every specific thing that he told me. But
4   I do know that to do my analysis, based on the
5   inspection that he did at my -- at my direction and
6   then the consistency with the deposition testimony,
7   that I had no reason to believe that the display
8   wasn't in a similar location.
9   BY MR. JORDI:
10       Q   Did any of the notes or any of the materials
11   that were given to you by Dr. Tresierras, did they
12   indicate that he spoke to anyone at CVS about anything
13   related to this case?
14       A   I don't recall him writing anything down that
15   he provided to me beyond the photographs and the videos
16   that he took.
17       Q   How long were you FaceTiming with Dr.
18   Tresierras during the course of the inspection?
19       A   I don't recall.
20       Q   You mentioned that the inspection occurred in
21   April. Was that in April of this year?
22       A   Yes.
23       Q   So that was last month. Right?
24       A   April 5th, 2022.
25       Q   You don't recall whether it was a five minute

31

1   FaceTime or whether you were on FaceTime with him
2   throughout the duration of his whole entire site
3   inspection?
4       MR. MCCOY:  Form.
5       THE WITNESS:  It would've been impractical to
6   FaceTime at the time while he was trying to take
7   videos and measurements. So, it definitely wasn't
8   the whole time, but it was sufficient and we -- for
9   me to be able to get a layout of the store, for him
10   to talk to me about what he was doing, and we had
11   talked prior.
12   BY MR. JORDI:
13       Q   During the course of your FaceTime with him,
14   did you hear him speak with any CVS employees about
15   anything related to this case?
16       A   I don't specifically recall him having
17   conversations with employees while we were FaceTiming.
18       Q   Doctor, in your opinion, is it important to
19   conduct interviews of the business owners or the
20   employees after there's a trip-and-fall or slip-and-fall
21   that's been recorded?
22       MR. MCCOY:  Form.
23       THE WITNESS:  Can you please clarify?
24   BY MR. JORDI:
25       Q   Sure. I can just re-ask the question. Is it

32

1   you just don't understand the question?
2       A   No, I understand your question, I'm just not
3   clear if you're asking a general question or if you're
4   asking it specifically about someone.
5       Q   Got it. Okay. So let me ask it in both ways,
6   so now let's just ask generally. Generally, is it
7   important to conduct interviews of the employees of the
8   -- the property owner after a trip-and-fall has been
9   reported?
10       MR. MCCOY:  Carlos, can you clarify. Are you
11   asking as a property owner? I think that might be
12   the confusion, as like an employee, or are you
13   asking her as -- in an expert capacity?
14       MR. JORDI:  Oh, no, in your expert capacity,
15   in your expert capacity, Doctor.
16   BY MR. JORDI:
17       Q   So, is it important to conduct interviews of
18   the business owners or of the employees in your capacity
19   as a retained expert after there has been a trip-and-
20   fall that's been reported and you've been hired to help
21   them throughout the course of that litigation?
22       A   That doesn't generally happen.
23       Q   Okay. But is it something that's important?
24       A   If it was always necessary, then I would be
25   doing it regularly, and I do not.

33

1       Q   All right. Doctor, but to be fair, I don't
2   believe that that answers my question. Is it important
3   or not? I mean, I understand that you might not decide
4   to do it, but in your professional opinion, would it be
5   important?
6       MR. MCCOY:  Form.
7       THE WITNESS:  I think every case is different
8   and it depends what information you're provided and
9   what information that you need. But generally
10   speaking, I do not do interviews with the parties.
11   I rely on the information and the materials that
12   are provided to me.
13   BY MR. JORDI:
14       Q   So, generally speaking, you don't find it
15   important to reach out to the employees to ask them
16   questions?
17       MR. MCCOY:  Form.
18       THE WITNESS:  That is not generally part of
19   the scope of the expert work that I was taught to
20   do.
21   BY MR. JORDI:
22       Q   Give me a second, Doctor. Doctor, I may have
23   asked this question, and forgive me if I have, but while
24   my client was looking for the back massagers in aisle
25   16, do you know where she was standing?



34

1     A  I don't know specifically where she was
2 standing, although I do have information regarding the
3 span of the entire display and accounted for that in my
4 analysis, but the specific location, I do not.
5     **Q  Doctor, you mentioned in your report that a**
6 **person stepping around an obstacle must have an accurate**
7 **mental construct. Is there any proof that my client**
8 **ever walked around this pallet before she tripped on it?**
9     MR. MCCOY:  Form.
10     THE WITNESS:  The answer to the question is
11     that there isn't information that she necessarily
12     specific -- specifically walked by the pallet, but
13     she did testify to having already been at the
14     location of the display of the back massagers,
15     which it would have put her in the vicinity of it
16     on a previous occasion.
17 BY MR. JORDI:
18     **Q  And Doctor, you are aware that she also**
19 **testified that she had never seen a pallet on the floor**
20 **at this CVS during her previous visits to the store.**
21 **You are aware of that, correct?**
22     A  I am.
23     **Q  Okay. Doctor, I have a quick question about**
24 **one of your final opinions. And it says here that,**
25 **"Based on the materials reviewed, --" I'm just reading**

35

1 **right out of your report, "including the testimony of**
2 **Ms. Guzman, the pallet was within her visual field as**
3 **she walked down aisle 16 from the center of the store to**
4 **the display of the massagers, a distance greater than 10**
5 **feet."**
6     **So, I just want to bring up Figure Number 3**
7 **again, I'll share my screen. And I just want to**
8 **understand this opinion, Doctor. So, is your testimony**
9 **that as of this point of view that we see here in Figure**
10 **3, that as she is in this area of the store, that she**
11 **should be able to detect that there's a pallet at the**
12 **other end of aisle 16?**
13     MR. MCCOY:  Form.
14     THE WITNESS:  It is not my opinion that she
15     should have been able to detect it from where the
16     person is standing taking that photograph.
17 BY MR. JORDI:
18     **Q  At what point in time was my client supposed**
19 **to have detected the pallet?**
20     A  Well, based on human factors research and the
21 characteristics of the pallet that I talked about in my
22 analysis, we have information about sizes and detection
23 at different locations. So, the analysis is saying that
24 this aisle, which was over 30 feet long, that she had to
25 walk down to get to the back massagers and the -- the

36

1 area where the pallet is located, that this is greater
2 than 10 feet. And we know that at 10 feet, that
3 vertical characters of one inch can be identified.
4     So, it's not specifying exactly when she did
5 see it, but it's specifying that there was plenty of
6 opportunity, given the size of it, that she should have
7 seen it. It was big enough for her to see as she's
8 approaching and even at 10 feet. Of course where this
9 photograph is being taken, which is not included in the
10 report to try to illustrate a perspective of that aisle,
11 it's just a general identification of this is the aisle,
12 not that this is where she should have been able to
13 perceive it.
14     Q  Is there any way that -- strike that. Let me
15 see.
16     So, your opinion is that at about 10 feet
17 distance, she should have been able to perceive the
18 pallet. Is that fair?
19     A  Yes. At 10 feet she should have been able to
20 see it, but that doesn't mean that at other instances
21 she also wouldn't have been able to see it. The
22 reference is just to provide a reference to the citation
23 of the research to indicate the one inch at 10 feet.
24 There's also information, of course, of, at different
25 distances, what size vertical aspects can be seen.

37

1     But this was just an example to provide that
2 she had over 10 feet of an approach, and we know at 10
3 feet she should have been able to see something that was
4 an inch. The pallet is obviously bigger than an inch, so
5 given an unobstructed view at larger than 10 feet, she
6 could have been able to see it at a much further
7 distance also.
8     **Q  In your opinion, does the fact that the pallet**
9 **was on the other end of the aisle, does that have any**
10 **effect on her ability to perceive that pallet?**
11     A  I'm sorry. Can you clarify the other end as
12 reference -- relative to what?
13     **Q  Sure. Yeah. It might help me to bring up the**
14 **photo here. And I guess before I ask the question, I**
15 **should just say it looks like -- let's look at Figure**
16 **Number 5. So, it's fair to say that the pallet was**
17 **flushed against the end of aisle 16. Is that fair?**
18     A  No. The belief is that -- the understanding
19 is that the pallet was wider than the shelving and that
20 it stuck out a little bit. And Figure 2 is actually the
21 subject pallet, if you would prefer to reference that.
22     **Q  Yeah. Let's go to Figure 2.**
23     A  So I think that you can see in the figure that
24 the pallet guard and part of the pallet is actually
25 protruding into the aisle, because the pallet is wider



Levitan, Angela, PH.D  05-27-2022

38

1 than that shelving unit.
2    **Q   Can you tell me with any certainty as to how**
3 **much it was protruding into the aisle?**
4    A   Approximately three inches --
5    **Q   How did you come to --**
6    A   -- was the measurement.
7    **Q   And how did you come to that -- how did you**
8 **come to that conclusion?**
9    A   During the inspection, Dr. Tresierras made
10 sure that this pallet was lined up as the -- as the
11 subject pallet was, based on the photograph, and then a
12 measurement was taken.  How --
13    **Q   So -- go ahead.  I'm sorry.  Go ahead.  I**
14 **thought you were done.  Go ahead.**
15    A   To determine how far it was protruding into
16 the aisle and also other measurements and dimensions
17 that were necessary.  And if you could just give me one
18 moment. Yes, I confirmed from my report that the pallet
19 extended three inches into the aisle.
20    **Q   So, correct me if I'm wrong, Dr. Tresierras**
21 **basically recreated the condition of the pallet as it**
22 **was on the day of the fall during the site inspection?**
23    A   Yes.  He confirmed, based on the photograph
24 that we had, that everything was similar and the same
25 and that the pallet was positioned similarly.

39

1    **Q   Outside of this photograph that we see in**
2 **Figure 2, did he do anything in recreating the condition**
3 **of the day of the fall?**
4       MR. MCCOY:  Form.
5       THE WITNESS:  He removed the cases of water
6    that was on it, is my understanding.
7 BY MR. JORDI:
8    **Q   But outside of looking at this photograph, did**
9 **he use anything else in trying to determine how the**
10 **pallet was positioned during the fall?  Does the**
11 **question make sense, Doctor?  I just want to make sure**
12 **you understand the question.**
13    A   I mean, if -- I don't recall any additional
14 information that was needed.  I mean, obviously, when he
15 got there, there was a pallet in the same spot, because
16 as we were told and as is apparent two years later, they
17 still have pallets with cases of water in that same
18 spot. So, I can imagine that he made observations of the
19 pallet prior to actually doing anything to it, but
20 anything additional, I don't recall anything specific at
21 this moment.
22    **Q   You don't know if he reviewed any surveillance**
23 **footage from that day or another day where the pallet**
24 **was on the floor?**
25    A   It would be my understanding that if there was

40

1 surveillance footage provided, I would've had it, and I
2 didn't have any.  So, I don't have any reason to believe
3 that he had access to it without me having access to it.
4    **Q   So it's fair to say when Dr. Tresierras was,**
5 **you know, trying to set the condition as close to the**
6 **day of the fall, the only thing he had at his disposal**
7 **was the photograph.  Right?**
8    A   Well, that would be the main thing, but Ms.
9 Guzman did testify that she took that picture within 20
10 minutes and didn't give any indication that it was in
11 any condition different than when she had allegedly
12 tripped on it.
13    **Q   Doctor, when you set up the inspection with**
14 **CVS, did they receive notice before the day that Dr.**
15 **Tresierras showed up for the inspection?**
16    A   I don't recall the specifics as how it was set
17 up.  It was done with the help of Mr. McCoy.
18    **Q   But it's probably fair to say that Dr.**
19 **Tresierras didn't just show up one random day to CVS to**
20 **do the site inspection.  I'm sure it was coordinated**
21 **with some employees at CVS.  Is that fair?**
22    A   You'd have to ask Mr. McCoy, but I have no
23 belief that it was a surprise visit.
24    **Q   Doctor, do you have any information as to**
25 **whether or not there were customers walking in the area**

41

1 of the pallet around the time that my client fell on the
2 pallet?
3    A   I wouldn't have any information about that
4 beyond the testimony of Ms. Guzman.
5    **Q   So if she didn't testify and say that there**
6 **was anyone walking in that area, it's fair to say that**
7 **there was no one walking in that area?**
8       MR. MCCOY:  Form.
9 BY MR. JORDI:
10    **Q   Well, let me ask -- hold on.  Strike that.**
11 **Don't even answer that.  Let me ask it differently.**
12       Outside of the testimony of Ms. Guzman, is
13 there any evidence that would lead you to believe that
14 there was people walking in the area of the pallet
15 around the time that my client fell?
16    A   I don't have any specific evidence beyond the
17 general information that there are customers in the
18 store, but at that specific time, I don't have
19 additional evidence as to any specific locations of
20 other people beyond her testimony.
21    **Q   Doctor, you specialize in workplace safety.**
22 **Right?**
23    A   It is one of the things that I investigate,
24 yes.
25    **Q   Does the location of the subject pallet comply**



Levitan, Angela, PH.D   05-27-2022

42

1  with appropriate building code, standards and
2  guidelines?
3      A   For this case I did not look into, you know,
4  specific workplace safety standards as part of my
5  analysis.
6      Q   Would you agree that a pallet used for
7  merchandising in close contact with customers in retail
8  stores can be a dangerous condition?
9          MR. MCCOY:  Objection to form.
10         THE WITNESS:  Generally speaking -- generally
11     speaking, they're used very often.  To determine
12     whether a certain condition is in fact potentially
13     dangerous, you have to analyze each condition, but
14     I've seen them used numerous times in different
15     types of stores.  It's very common.
16  BY MR. JORDI:
17     Q   I understand that they're -- that you claim
18  that they're common, Doctor, but can they be dangerous?
19         MR. MCCOY:  Form.
20         THE WITNESS:  I think, given a situation,
21     almost anything can be, which is why we have to
22     analyze each situation in and of itself.
23  BY MR. JORDI:
24     Q   Would you agree that if a pallet is left on
25  the floor and it's unstocked that it can pose a

43

1  dangerous condition?
2          MR. MCCOY:  Form.
3          THE WITNESS:  Again, we have to look -- we
4      have to look at all the characteristics.  It's my
5      opinion that in this situation it was not, based on
6      the specific characteristics of this incident.
7  BY MR. JORDI:
8      Q   But generally speaking, Doctor, if a pallet is
9  left on the floor unstocked, would you agree that that
10  can pose a dangerous condition?
11         MR. MCCOY:  Form.
12         THE WITNESS:  Again, my answer is the same, is
13     that it's going to depend.  Every pallet is not the
14     same.  Every location of it is not the same.  We
15     have to actually analyze situations to be able to
16     determine whether something is dangerous or not.
17  BY MR. JORDI:
18     Q   With respect to this case, if this pallet had
19  been left unstocked, would that have posed a dangerous
20  condition?
21     A   Well, it's my opinion that in this incident it
22  did not pose a dangerous condition.
23     Q   Okay.  But specifically what I'm asking you
24  is, if this pallet was left unstocked, would it have
25  posed a dangerous condition?

44

1          MR. MCCOY:  Form.
2          THE WITNESS:  I'm sorry.  I don't understand
3      the difference between the question that you're
4      asking versus the question I'm answering, because
5      it's my understanding, based on the photograph,
6      that this pallet, according to Ms. Guzman, only had
7      one case of water on it.  And even with only one
8      case of water on it, my opinions are that, given
9      her testimony and given the situation, it didn't
10     pose a dangerous condition.
11         So, I apologize, but I don't understand the
12     difference of the question you are asking me.  I'm
13     assuming it's not the difference of one case of
14     water.
15  BY MR. JORDI:
16     Q   Sure.  Let me -- it might help if I kind of
17  share my screen here and let's look at Figure 2 again.
18  So, in my hypothetical, Doctor, let's say we remove this
19  yellow sign that we see in the photograph, and let's say
20  we remove this container of bottles of water, okay, so
21  that the pallet in Figure 2 is left completely
22  unstocked; nothing is on it.  Okay?  If that were the
23  case, in your professional opinion, would this pallet,
24  unstocked, no water, no yellow sign, would that pose a
25  dangerous condition?

45

1      A   Given for this incident for Ms. Guzman, it's
2  my understanding and belief that the sign and the case
3  of water, as it's located, would have made no
4  difference.  And the pallet, in and of itself, whether it
5  had the case of water and sign or not, did not pose a
6  dangerous condition.
7      Q   And why is that, Doctor?  Why wouldn't it pose
8  a dangerous condition, in your professional opinion?
9      A   Can you clarify?  Do you mean why does the
10  absence of the water and sign not make a difference?
11     Q   Yeah.
12     A   Given -- so, it's my opinion that given the
13  location, based on the photograph taken by Ms. Guzman,
14  that there was a case of water as it is in Figure 2 in
15  my report with a sign on it.  But given its location in
16  her approach to the back massagers, possibly, while
17  she's looking at the back massagers and then when she
18  starts to walk away, that she may not even have seen the
19  case of water and the sign.  Certainly, in her approach,
20  I don't have any reason to believe that the case of
21  water and the sign would've been in her line of sight or
22  her field of view, given the side of the shelving.
23         So, I looked at the incident in three
24  different sections.  So, the first is her approach, and
25  then, as I said, when she's looking at the back



Levitan, Angela, PH.D   05-27-2022

46

1  massagers, depending on where she's standing there is a
2  possibility that she may have noticed the case of water
3  and the sign, but I did not rely on that aspect for my
4  analysis.  I basically looked at her being able to see
5  the pallet and the characteristics of the pallet almost
6  as if it was empty.  I did not expect that she needed to
7  see the water or the sign to make it conspicuous.
8       And again, as she turned to walk away, it is
9  possible that she could have seen the water and the
10  sign, but I did not rely on that for my analysis.  I
11  only focused on the fact that the pallet, in and of
12  itself, and the characteristics of the pallet and the
13  size of the pallet and the contrast of the pallet versus
14  the carpet, made that pallet conspicuous in her field of
15  view, and so she should have seen it.
16       So, to answer your question then, if the water
17  and sign weren't there, my opinion does not change
18  because my analysis basically did not change.
19  **Q   But Doctor, would you agree with me that a**
20  **dangerous condition exists within itself whether a**
21  **person can perceive it or not?**
22       MR. MCCOY:  Form.
23       THE WITNESS:  No.
24  BY MR. JORDI:
25  **Q   Okay.  Doctor, then elaborate on what makes a**

47

1  **condition dangerous.**
2       A   Well, if we're trying to define something
3  that's dangerous or potentially hazardous, again, we
4  have to look at the entire situation.  We have to look
5  at, you know, placement.  We have to look at things like
6  expectancy.  So, there's more to it than just the fact
7  that someone could encounter, like in this case,
8  physically, someone can obviously trip on the pallet and
9  fall; can't say that that's not possible.  But just
10  because somebody can actually physically do that
11  interaction doesn't necessarily make something
12  dangerous.
13       We have to take it a step further and, as I
14  mentioned, we have to look at things as, well, you know,
15  where is it placed within the environment.  Is that
16  something that is similar to other things and that
17  people are going to expect?  Like, for instance, in this
18  case, the CVS store has end caps and products at the end
19  of their aisles, in my understanding, based on the
20  photographs, versus water.
21       So, the fact that Ms. Guzman was familiar with
22  the store and this isn't something that is going to be
23  specific just to CVS anyways, is that there are those
24  mental constructs that we build and the understanding
25  that when aisles end, there are -- there's likely going

48

1  to be more product as that end cap.  Whether she
2  specifically saw that pallet or not, she would be
3  familiar with the layout of the store and then, you
4  know, expectancy is -- is part of that.
5       So, you know, there's a difference between
6  whether something in and of itself is dangerous just
7  because it can create an occurrence, versus all the
8  characteristics of it.  You know, is it conspicuous or
9  is it not?  And those are a lot of the things that I
10  brought up in the report, is that if something -- if you
11  -- you have to balance those things.
12       You have to balance the characteristics of the
13  object and the environment and the interaction.  And
14  that's what human factors does, is we look at the
15  interaction of the person, what they're doing, and the
16  in -- and the object to be able to do a full analysis
17  and determine whether something is dangerous or
18  potentially hazardous.
19  **Q   Okay.  So, just so that I make sure that I**
20  **understand you, Doctor, so then, when you're analyzing**
21  **whether or not something is dangerous, you're not**
22  **looking solely at the subject object.  Is that fair?**
23       A   Correct.
24  **Q   You're also looking at the other person's**
25  **ability or -- or the people around its ability to**

49

1  **perceive that object?**
2       A   That is part of it.
3  **Q   Okay.  Well, Doctor, let's say there's a wild**
4  **lion loose in CVS somewhere, regardless of my ability or**
5  **your ability to perceive that wild lion, you would agree**
6  **that that animal would be dangerous.  Correct?**
7       MR. MCCOY:  Form.
8       THE WITNESS:  I would agree, but I'd be doing
9  an analysis that would assume that -- certain
10  things, that a lion, in and of itself, is not
11  dangerous to a person unless we investigate the
12  entire situation.  And I'll give you a quick
13  example.
14       If we're at the zoo and a lion is in a cage
15  and there's no reason to believe that the cage
16  isn't defective, it's not a dangerous condition for
17  me to stand outside the cage and watch the lion.
18  So, for your example, if someone said there is a
19  lion that is loose and fully conscious in the CVS,
20  it could potentially be dangerous, but there's
21  still an analysis going on of understanding the
22  environment, understanding the lion, the
23  capabilities of the lion.  It's a more obvious
24  answer, but it is still the same analysis that
25  would be gone through, it just wouldn't take very



Levitan, Angela, PH.D   05-27-2022

50

1    long.
2    BY MR. JORDI:
3        Q    Doctor, would you agree that this pallet, the
4    subject pallet in this case would have been less
5    dangerous if it had been fully stocked?
6        MR. MCCOY:  Form.
7        THE WITNESS:  Not necessarily.
8    BY MR. JORDI:
9        Q    Okay.  Can you explain?
10       A    Well, the initial answer is that, again, every
11   situation has to be looked at.  But to elaborate on that
12   a little bit, what does fully stocked mean?  So, that
13   would be information that I would need.  There are no
14   regulations, codes or standards in the retail
15   environment that I know of that establish what "fully
16   stocked" means.  So, I would need that type of
17   information.
18       Then we'd also need to have the information
19   of, what is it fully stocked with?  What are the
20   characteristics of that?  So, for example, to take us
21   back to this incident, we have a location of this pallet
22   which was holding cases of water with, when we look at
23   the travel direction of Ms. Guzman, and the backdrop of
24   the refrigerated cases that have things like bottles of
25   water or soda in them, that would have to be analyzed

51

1    separately.  So, I'm not saying it is or isn't, but I
2    think that it is -- it would not clearly be just because
3    there would be something at a higher level.  It would
4    have to be analyzed.
5        I think that the pallet, in its almost empty
6    condition is highly conspicuous because of the color,
7    the size of it, and the backdrop against the gray
8    carpet.  So, they may be conspicuous for different
9    reasons but not clearly that just because there's water
10   on the pallet does not necessarily make it more
11   conspicuous.
12       Q    Doctor, would you agree with me that the more
13   merchandise that is placed on a pallet, the more safe it
14   would be?
15       A    No.
16       Q    Doctor, can leaving empty pallets on a sales
17   floor result in any OSHA violations?
18       A    Again, I would have to have, you know,
19   specific information and I'd have to refresh and do an
20   actual analysis for the pertinent regulations which
21   would only really apply to employees anyways because
22   OSHA is protecting employees from employers.  And it's
23   not my understanding that Ms. Guzman was an employee of
24   CVS.
25       Q    Do you know -- I know that you're, you know,

52

1    you specialize in work safety.  Have you come across
2    this at all during, you know, your professional career
3    as to whether or not leaving an empty pallet on a sales
4    floor can result in any OSHA violations?
5        A    I don't believe I've ever investigated empty
6    pallets from workplace safety because, again, workplace
7    safety is going to look at the employees.  So, I haven't
8    seen anything about that.  I've looked at, you know,
9    cases that have to do with retail establishments and
10   issues in them, and we don't usually look at OSHA for
11   those reasons.
12       Q    Doctor, let's pop back into Figure 2 here.  We
13   see the pallet and we see that there are -- there's like
14   a black liner around this pallet.  These -- the corners
15   of this black liner, that's made of plastic.  Correct?
16       A    That is my understanding.  Yes.
17       Q    And then how about this, the sides of the
18   black liner?  What's that made out of?
19       A    I don't know specifically.
20       Q    So you don't know whether this is part in
21   plastic or whether it's a soft fabric?
22       A    I believe it's some type of fabric.
23       Q    It appears just from the way -- I mean, you're
24   the pro here, I guess I should ask you.  Based on the
25   way that the liner is kind of falling on this pallet,

53

1    would it indicate that it's kind of a malleable fabric?
2        A    Yes, that would be my -- my understanding
3    based on all the photographs that I looked at that were
4    taken during the inspection.
5        Q    So if this is a movable fabric, I can
6    technically just kind of place my foot under the fabric
7    and put my foot into one of these holes on the sides of
8    the pallet.  Correct?
9        MR. MCCOY:  Form.
10       THE WITNESS:  In the condition -- in the
11   condition that it's in, in Figure 2?  Is that what
12   you're asking?  Could you clarify?
13   BY MR. JORDI:
14       Q    Sure.  Yeah.  Let's talk about in the
15   condition it's in, in Figure 2.
16       A    The condition it's in, in Figure 2, yes, there
17   appear to be sections where the foot could go in between
18   the top and the bottom of the pallet.
19       Q    And let's assume now that we were going to
20   walk into Figure 2 and put that corner end in its place
21   and put the liner back all around the pallet.  I would
22   still have the capability to be able to put my foot
23   under that fabric, that malleable fabric and into that
24   hole.  Is that fair?
25       A    I don't believe you should be able to do that.



54

1  If -- my understanding is, based on the measurements and
2  the inspection, it will cover the hole.  That is the
3  intention of pallet covers, is to cover the side and
4  that it is taller than the pallet itself so it covers
5  the entire hole.
6      Q   Did you use any -- did you or Dr. Tresierras
7  use any methodology in order to confirm that?
8      A   It wasn't necessary for my analysis.
9      Q   Well, part of your analysis was whether -- one
10  of your opinions is that this condition is not a
11  dangerous condition.  Right?
12      A   Correct.
13      Q   You don't think it's relevant to check whether
14  or not someone could slide their foot in this thing in
15  determining whether or not it's dangerous?
16      MR. MCCOY:  Form.
17      THE WITNESS:  I did not.
18  BY MR. JORDI:
19      Q   Doctor, in your opinion, what could have been
20  done to make the pallet, as we see it in Figure 2,
21  safer?
22      A   Well, there are always things you can do to
23  make a display safer.  Whether it's the pallet, in and
24  of itself, I don't think any changes needed to be made
25  to that, particularly given its size and given the fact

55

1  that it was blue; I am going to make an assumption that
2  that was done on purpose to make it more conspicuous
3  when it wasn't loaded.  So, there's not really anything
4  you can specifically do to the pallet.
5      Using the pallet cover is intended to make it
6  safer, so when people are actually standing at it to
7  take water off of it that their feet don't go in
8  between, which was not the case with Ms. Guzman, which
9  is one of the reasons why it wasn't relevant to me to
10  figure out about the cover, because she was not
11  interacting with it in an intentional manner.  So, it's
12  not that her foot got caught because she was standing
13  too close to it.  She testified she was walking when she
14  contacted it.
15      Q   Okay.  But was there -- was there anything
16  that could have been done to the pallet as we see it in
17  Figure 2 to make it safer?  And if so, what are those
18  things?
19      A   Again, I don't think that there's really
20  anything else, given the description of this incident,
21  that there isn't anything else that really could have
22  been done to the pallet itself to make it more
23  conspicuous because it's pretty conspicuous, in my
24  opinion.
25      Q   Okay.  So, it's fair to say, in your opinion,

56

1  that there's nothing that really could have been done to
2  this pallet to make it safer?
3      MCCOY:  Form.
4      THE WITNESS:  To the pallet itself, no,
5      nothing, nothing specifically to the pallet.
6  BY MR. JORDI:
7      Q   Doctor, do you know whether or not the pallet
8  -- black pallet cover was in the same condition as we
9  see here in Figure 2 at the time of the fall?  Or strike
10  that.  Let me ask a different -- let me ask a different
11  question.  Let me ask it another way that will hopefully
12  be a little clearer.
13      Do you know if when my client tripped on the
14  pallet, if this black liner was in the same condition as
15  we see it in this photograph, or if it was different?
16      A   I do not know because this is a picture that
17  she took afterwards.  She, Ms. Guzman, did not testify
18  as to seeing the pallet prior, so she could not testify
19  to what it looked like prior.  And again, it wasn't
20  necessary for my opinions to know whether the cover
21  moved due to the incident or if it was already not in
22  that position.
23      Q   So, just so that I'm clear about your opinion,
24  so then when you say that this wasn't a dangerous
25  condition, the condition of the pallet that you're

57

1  referring to is the condition that we see exactly in
2  Figure 2 that is with the black liner up on top of the
3  pallet?
4      MR. MCCOY:  Form.
5      THE WITNESS:  The black liner on top of the
6      pallet is the condition that it was in at the time
7      that I didn't find was dangerous.  The location of
8      the black liner -- given the testimony and what
9      happened in this incident, the location of the
10      pallet cover does not change the analysis or my
11      opinion.  If the cover of the pallet wasn't there
12      at all, I would still have the same opinion.
13      If the pallet cover was in its location that
14      it was supposed to be, I would still have the same
15      opinion.  It's still the same colors, it's still
16      the same size, it's still highly contrastable in
17      color and pattern, so my opinions don't change.  It
18      was not hinging on the location of the cover.
19  BY MR. JORDI:
20      Q   Doctor, we've discussed some of the opinions
21  that you had in this case but I know we haven't
22  discussed others.  So what I'd like to do is I'd like to
23  understand all of the opinions that you've generated in
24  connection with this case, and I'd like to do those in
25  order.



Levitan, Angela, PH.D   05-27-2022

58

1    So, can you give me your first opinion that
2  you have with respect to this case, please?
3    A   Well, by looking at page 9 of my report where
4  I summarized my opinions, the -- would you like me to
5  read it or summarize it?
6    Q   No, just can you give it to me in your own
7  words.  I know your report and I have -- I'm looking at
8  page 9 of the conclusion section but I just want to get
9  an idea, from your own words, what your opinions are
10 related to this case.
11   A   So, the first opinion is assessing the
12 characteristics of the pallet within this incident and
13 identifying that, based on those characteristics, it was
14 conspicuous, given the location and the actions of Ms.
15 Guzman at the time.  So, it was conspicuous, and given
16 what she was doing, given her testimony, that it's my
17 opinion she should have been able to perceive it,
18 observe -- observe it, perceive it, and then react to
19 it.
20    So, again, we've talked about the fact that
21 when analyzing the pallet in this environment for this
22 subject incident that it didn't create a dangerous
23 condition.  And that because it's my opinion that the
24 pallet was conspicuous and within Ms. Guzman's field of
25 view, so she could observe it, perceive it, and then

59

1  react to it, that it's my opinion that her actions, or
2  lack of, are also a causative factor of the incident.
3    Q   Doctor, can you please elaborate on the
4  methodology used to reach that conclusion?
5    MR. MCCOY:  Carlos, can you specify which
6  conclusion you're referencing?
7    MR. JORDI:  Sure.
8  BY MR. JORDI:
9    Q   So you gave me -- I'm not sure if that was one
10 opinion or if that encapsulates all your opinions,
11 Doctor.  Which one is that?  It seems like maybe that was
12 kind of the whole gamut.  Right?
13   A   Right.  I mean, I stepped through it, but, you
14 know, basically it's one or two opinions in parts.
15   Q   Got you.  Okay.  So you said it was two
16 opinions in two parts?
17   A   Well, it -- you know, it's written as three
18 opinions in the report.  So, you know, the basis of it
19 not being dangerous, so it's not dangerous is one
20 opinion.
21   Q   Okay.  So let's --
22   A   The fact that she was --
23   Q   I'm sorry, Doctor.  I don't mean to cut off,
24 but let's just do it one by one.  So let's just stick
25 with that first opinion that the pallet's not dangerous.

60

1  Can you run me through the scientific methodology you
2  used in reaching that opinion?
3    A   So that is where -- the foundation of that is
4  the opinion before it; that it's conspicuous.  So if we,
5  you know, go back to the fundamentals of how we do
6  testing and the scientific method, then, you know, we're
7  going to establish the fact that we have a hypothesis
8  that we want to put forth and have to collect
9  information and collect data and do whatever testing is
10 necessary to try to figure out whether that hypothesis
11 can be accepted or it has to be rejected.
12    So, you know, in this case, for example, to
13 see if it, if the pallet is conspicuous, you know, the
14 hypothesis would be that, for example, that the pallet
15 was conspicuous and should have been observed and
16 reacted to, or we could state it as, it wasn't
17 dangerous, and then we'd have to do the data collection.
18 And then the data collection is going to be in the basis
19 of, you know, looking at the materials that were
20 provided, looking -- you know, doing the site
21 inspection, getting the information from this site
22 inspection; whatever materials are provided that I can
23 review and I can analyze that help provide information
24 about Ms. Guzman, about the pallet and about the
25 environment, that that analysis can be done to see

61

1  whether I can accept or reject that hypothesis that this
2  was a dangerous condition.
3    So, that's really the primary hypothesis in
4  ascertaining that if she tripped on it, given that I
5  just determined it wasn't dangerous, that's where the
6  third opinion comes in that, well, she should have seen
7  it, and she didn't, then her actions or lack of would
8  have to be contributory.  So, do you want me to go into
9  more detail about the conspicuity?
10    Q   Please, yes.  How did you -- did you do any
11 tests, did you select a sample size and run folks
12 through that area?  How did you reach the conclusion
13 that it was conspicuous?
14    A   Well, there's -- so for decades there's been
15 research that's on not just in the human factors
16 community but certainly a large portion of this, if not,
17 you know, most of it is going to be human factors based
18 where we have learned a lot about people.  So, as I
19 mentioned earlier, the human factors is a scientific
20 discipline that looks at people and their interaction
21 with their environments and the tasks they're
22 performing.
23    So, we have to understand information about
24 all those things.  So, we already talked about the fact
25 that the site inspection, and the photographs taken, the



Levitan, Angela, PH.D   05-27-2022

62

1  information, the materials provided are going to give
2  most of the information about the environment, so that's
3  the store, that's the measurements of the pallet, you
4  know, that is more of the -- the quantitative
5  information from that point of view.
6       We also have an understanding of the task that
7  was being performed.  So, the tasks that are being
8  performed, generally speaking, by Ms. Guzman in this
9  case are going to be when she's walking, it's where
10 she's looking, and understanding the capabilities of
11 people.  And that's where the decades of human factors
12 research comes in where we understand -- we understand
13 gait, more importantly in this case, well, at least as
14 important, we understand how people see, where people
15 see when they're being reasonably attentive to their --
16 to their task.  We can establish a field of view.
17      So, the first thing that if we want something
18 to be conspicuous, one of the first things we have to do
19 is establish that that's in the person's field of view.
20 If it's not in their field of view, then they can't see
21 it. It doesn't matter what it looks like if it's not in
22 their field of view.  So, once we've established, based
23 on human factors research, that given the parameters of
24 everything that we've been talking about that the pallet
25 would've been in her field of view, then we have to make

63

1  sure that the characteristics of the pallet, given our
2  situation that we're analyzing, have the -- the
3  characteristics to be conspicuous.  And this is based
4  primarily on illumination, size, and contrast.
5       And that's where we pull in the information
6  about the size, different sizes of the pallet.  So, it's
7  not just that it's four feet by 40 inches, but looking
8  at the height of it, you know, there's information as
9  specific as to how far it was sticking out into the
10 aisle, the corners of the pallet cover; all of those
11 things were documented to be able to be part of
12 identifying any aspects that would make it conspicuous
13 at different times during the incident.
14      So, if it is conspicuous and in her field of
15 view, then that is -- you know, that's how we go about
16 trying to figure out whether she had the opportunity to
17 observe, perceive, and react to it, which is primarily
18 the opinion number two in my report.
19 **Q   Were there any formulas that were used?  Was
20 there any, outside of just understanding literature
21 generally as to what a person's field of view is, is
22 there anything else that you used in forming this
23 opinion?**
24     A   Yes.  The research on field of view is very
25 quantitative.  This has been established for decades.

64

1  And the reference in -- the main reference that I stated
2  in my report, which is not the only one that talks about
3  visual angles, I do have others in the report and there
4  are certainly others out there.  But the main reference
5  is the Woodson reference, which is a human factors
6  handbook that is a compilation of data that's been
7  collected through different types of studies that is
8  authoritative that is used by people who are designing
9  different things or analyzing different things in which
10 it's important for them to know certain engineering
11 aspects or human factors aspects.
12      And one of the things that they have included
13 is going to be, for instance, information about that 10
14 foot away you can see an inch, character heights, you
15 know, to determine sizes and how big something has to be
16 for somebody to identify it.  That's based on research,
17 not specific research I did but research that's been
18 done that is printed in the United States military
19 standards that has then been put into this Woodson
20 compilation handbook that I referenced, but it's
21 actually based on the -- the studies that were done
22 before.
23      And as I said, there are also other places
24 where they talk about visual angles and character
25 heights and other military standards that -- that also

65

1  talk about different sizes.  Though, the Woodson book
2  also is going to include information about the field of
3  view and it gives the percentages and the different
4  degrees of what we see and where our line of sight is,
5  and so, it can be calculated based on a person's stature
6  and then where their eye height is.
7       We can figure out, depending on whether the
8  person's looking, you know, straightforward, which
9  naturally is 15 degrees below -- below horizontal, even
10 though that's what people say when it's straightforward.
11 We have information, there is a nice chart in the book
12 that talks about if, you know, if people move their eyes
13 in a typical fashion, how does the fields of view
14 change; if you added moving the head during normal head
15 movement, how does that change.
16      So, you know, I'm using actual quantitative
17 information to calculate the area, the general area of
18 the field of view and making sure that I understand that
19 as Ms. Guzman is standing there, as she's walking, where
20 is her line of sight going to be, what is her cone of
21 vision going to be, what's her field of view going to
22 be, and is that pallet going to be in that field of
23 view.  So, it's not just general information.  It's
24 actually doing some calculations and understanding that,
25 you know, given these situations, you know, she should



66

1 have been able to see, including in her periphery, about
2 two feet in front of her and much further on but as
3 close as two feet in front using her peripheral vision.
4    Q   So then you calculated Ms. Guzman's line of
5 sight when reaching this conclusion of yours?
6    A   Right. So I have -- I have a spreadsheet
7 that's based on that Woodson reference that I -- that I
8 mentioned that's out of the United States military
9 standard to get an idea of what her field of view would
10 be depending on those components. So, I have
11 information that would be, you know, this is the
12 vertical and horizontal. You know, in this case I would
13 -- my opinion is that although the horizontal is
14 obviously important, the vertical aspect is the more
15 important because that determines how far in front of us
16 we see as opposed to left and right.
17        So, because I don't know exactly where she was
18 and I don't know exactly what her head movements were, I
19 looked at more of a parametric analysis to compare,
20 well, what if she wasn't moving her head very much or
21 what if she was only moving her eyes and not her head.
22 And so, we can look at all those different
23 characteristics, and regardless, it still would've been
24 in her field of view at multiple times during the
25 incident.

67

1    Q   When you say parametric, what does that mean?
2    A   So, it's basically I'm not making one
3 assumption. I'm using, like, ranges, I'm doing
4 different factors at different levels to be able to find
5 answers that aren't specific to one pinpointed
6 recreation that might be incorrect slightly.
7    Q   Okay. So, I'm going to share this again with
8 you because I just -- I'm just trying to wrap my head
9 around this as a lay person. So we've already
10 established, Doctor, that you don't know exactly where
11 Ms. Guzman was standing at any point in time when she
12 was in aisle 16. You just have information that she
13 went into aisle 16. Right?
14    A   Well, I mean, I know how wide aisle 16 is and
15 I know that she walked from the beginning of it to the
16 back massagers. So, although I don't know specifically
17 whether she was on the left, middle or right, I do have
18 video from all three of those orientations, but I didn't
19 need to know that to know that -- to be able to do my
20 analysis. But I do have at least those bounds that she
21 was within the aisle. There's no evidence that she hit
22 any of the products as she was walking down, so it does
23 give us some constraints.
24    Q   Does where she's located in the aisle make her
25 line of sight vary?

68

1    A   It does a little bit, but we're not just
2 looking at the line of sight. The line of sight is from
3 the eye to the object that you're looking at, at the
4 time. What we're -- what I was really interested in is
5 the whole field of view, because the line of sight is
6 just that one central object you're -- that point you're
7 looking at, at that one moment.
8        We then have the cone of vision which is also
9 important which is where we're seeing, and that is going
10 to be like our central optimal visual acuity which
11 wouldn't necessarily be needed just to be able to
12 identify this pallet but we do have that. And then we
13 have the full field of view, again which incorporates
14 the cone of vision but also the periphery.
15    Q   Okay. Doctor, so you reached -- you have a
16 conclusion that the pallet was conspicuous. You then,
17 from there the next opinion is that the pallet is not a
18 dangerous condition. Right?
19    A   Correct.
20    Q   Okay. And explain to me that basically is
21 born of the fact that it's conspicuous, so it's not
22 dangerous.
23        MR. MCCOY:   Form.
24        THE WITNESS:   Well, given this -- given this
25 situation, it's my opinion that Ms. Guzman should

69

1 have seen it because it was conspicuous, and all
2 the other parameters there would've -- she would've
3 had the ability to see it, which is the
4 observation, but also to perceive it, which in this
5 case the perception is just that she is conscious
6 of it. She doesn't really have to know what it is
7 to know that there's something there and then have
8 time to make adjustments. So, for her, it was not
9 a dangerous condition.
10 BY MR. JORDI:
11    Q   And is there any methodology that we haven't
12 already discussed that allowed you to reach this second
13 opinion that it's not dangerous?
14    A   I think that that's, you know, part of the
15 things we've already discussed that there are, you know,
16 the references within my report that talk about -- I
17 mean, we talked about them as the basis for conspicuity,
18 but -- but that really is laying out the -- the
19 approach. And there are a couple of references in my
20 report that talk about that, that establish looking at
21 size and looking at contrast and looking at
22 illumination, you know, to be able to tell if something
23 is -- you know, if you're able to see something.
24        The basis for, you know, taking that the next
25 step further is really looking at it in the entirety of



Levitan, Angela, PH.D  05-27-2022

70

1  what we were talking about.  And, you know, we already
2  talked about the expectancy.  We already talked about,
3  you know, being able to see something and reasonably
4  cautious people scanning their environment.
5        But methodologically, it's really the
6  overarching -- the overarching method is the scientific
7  method that I talked about.  And then this is really the
8  methodology of how do we take the data that's collected
9  to assess it. And using the references that talk about
10  determining conspicuity is the assessment part to be
11  able to tell whether I should be accepting or rejecting
12  that null hypothesis.
13    **Q   So, correct me if I'm wrong, it seems like the**
14  **heavy lifting with respect to scientific methodology is**
15  **in determining whether or not it's conspicuous.  You do**
16  **that by determining what's, in this case, Ms. Guzman's**
17  **line of sight, what is the cone of her vision, what is**
18  **the periphery of her vision, and then once you determine**
19  **that, then everything else kind of falls -- all your**
20  **other opinions fall into place?**
21      MR. MCCOY:  Form.
22      THE WITNESS:  If I'm understanding you
23  correctly, as far as the opinions in -- as it's
24  laid out in the report, that, yes, number two,
25  which talks about conspicuity is basically the

71

1  foundation of that's the analysis which then leads
2  to three, which says, so, therefore given this,
3  that it's conspicuous and that we have like, that
4  it's dangerous.  So, yes, it -- in essence, number
5  two is the main analysis done, and then three and
6  four just follow from that.
7  BY MR. JORDI:
8    **Q   Okay.  So, from opinion number two to opinion**
9  **number three, is there anything that you did in terms of**
10  **scientific methodology to reach -- to bridge opinion two**
11  **to opinion three?  How did you get to opinion three from**
12  **there?  Was it just looking at the photographs, looking**
13  **at the discovery in the case?**
14      MR. MCCOY:  Form.
15      THE WITNESS:  Well, I mean, yes.  It's doing
16  an analysis of the materials that was provided, but
17  it's taking into account, you know, things from her
18  testimony, for example, that she's talking about,
19  you know, relative to her familiarity with the
20  shopping at the CVS, you know, having been to that
21  location in the store before.
22      You know, that whole idea of the mental
23  construct, taking into account some expectancy
24  issues; so, there is a little bit more that goes
25  into it in totality of the analysis to take it from

72

1  two to three.  But there isn't like a specific
2  addition to the methodology.
3  BY MR. JORDI:
4    **Q   So it's fair to say that there is nothing**
5  **scientific in order to allow you to get to opinion**
6  **number three?**
7      MR. MCCOY:  Form.
8      THE WITNESS:  I wouldn't agree with that.
9  BY MR. JORDI:
10    **Q   Okay.  Okay.  Explain to me how I'm wrong.**
11    A   Well, so this is based on the research and
12  understanding research and how people, you know, scan
13  their environments, how they use vision when they walk
14  and trying to ascertain where they're going.  So,
15  there's -- there's, you know, research articles that
16  talk about gait and how gait and vision work together.
17        So, now we're taking it specifically to this
18  level of something not just being conspicuous but
19  putting it into the situation that we're in.  Because,
20  obviously, somebody standing and looking at a pallet or
21  walking towards a pallet is different than somebody
22  potentially, you know, sitting on the floor next to it.
23  So, we have to actually put it into the context.
24        So, by putting it into that context, there is
25  more science behind it that allows me to go to two to

73

1  three because of the understanding of the research
2  that's been done that talks about how people, for
3  example, scan prior to taking a step, to understanding
4  how people actually interact with their environment.  If
5  I didn't have an understanding of that, based on
6  research that's been done in the bio-mechanical and
7  human factors community, then I couldn't necessarily
8  have a basis to go from two to three.
9        Like if we walked with our eyes closed and
10  didn't -- and didn't care about vision, then conspicuity
11  wouldn't matter.  But we know that vision is very
12  important.  Some of the references in my report allude
13  to that.  A lot of work by Dr. Patla, you know, talking
14  about people and how vision is important.
15        One of the papers in my report is basically a
16  really nice summary of a lot of the work that had been
17  done about establishing how vision is important for
18  people to navigate.  Other work that, you know, has been
19  done that looks at, you know, people whether they're
20  walking on rough terrains and how do you ascertain where
21  to put your feet.
22        You know, how do vision and gait interact with
23  each other.  So, that's important.  So, no, I wouldn't
24  agree that -- you can't go two to three without
25  understanding a little bit more about the science



Levitan, Angela, PH.D   05-27-2022

74

1  between how vision and gait and motor control interact.
2      Q    Doctor, you mentioned that expectancy was
3  important with respect to opinion number three in your
4  report.  Could you elaborate what you meant by that?
5      A    Well, I'm not sure if I specifically said for
6  number three, but expectancy is one of the things that
7  we look at to determine whether conspicuity is enough.
8  So, that's where we go to these mental constructs.
9  That's where we talk about the fact that -- like in this
10  instance, Ms. Guzman is very familiar with shopping in
11  CVSs, although I don't know for certain, she probably
12  shops at other stores too.  So, we have -- we, as
13  individuals, have general ideas of things that we
14  understand that we apply even if we don't know that
15  we're doing it.
16      So, like, for instance, when Ms. Guzman went
17  to the CVS, she may not have actually seen a pallet.
18  She may not have registered that she was looking at the
19  -- she may or -- she didn't testify to it but she may or
20  may not have recalled that there was stacks of water
21  there specifically.  But she certainly would have a
22  mental construct about how the store is laid out
23  generally, an understanding of the fact that there are -
24  - there are often and almost all the time products at
25  the end of this aisle, for example.

75

1      Like it wouldn't be unexpected that there
2  would be an end cap display; that would be an example of
3  what I'm talking about of expectancy in this case.  But,
4  generally speaking, expectancy of something is important
5  to analyze.  You know, for example, a crack in a sidewalk
6  in New York City is not going to be unexpected.
7      So that's why I was talking about earlier we
8  have to understand an environment before we talk about
9  whether something's dangerous.  Because a pallet at an
10  end cap, for example, may or may not be different than a
11  pallet in the middle of the floor that's empty, which
12  I'm not saying is dangerous, I'm just saying it's a
13  different situation and the expectancy of it is
14  something that you would have to include in your
15  analysis.
16      Q    So, Doctor, what if the subject pallet, the
17  one that we see in Figure 2 in your report, what if it
18  had never been there before the date of the fall, would
19  that change my client's expectancy as to it being there?
20      A    If it had never been there and what was there
21  in its place?
22      Q    Nothing, just the end of an aisle.
23      A    It doesn't change my opinions about the fact
24  that it's conspicuous.  I think that your hypothetical
25  doesn't really go with the information about my

76

1  knowledge of that CVS and my mental construct about
2  stores and the fact that end caps are expected.  So, if
3  this was a, you know, if this potentially was something
4  that was odd or out of character, that doesn't mean that
5  Ms. Guzman's mental construct about the stores would be
6  any different.
7      Q    But you mentioned that an individual develops
8  an expectancy by looking at something even through the
9  periphery of their vision.  They can see something even
10  though they're registering that they're not even seeing
11  it.  Right?
12      MR. MCCOY:  Form.
13  BY MR. JORDI:
14      Q    Is that my understanding of what you said?
15  And I'm sorry, I'm just trying to understand what it is
16  you're telling me, Doc.  I'm not trying to -- if I'm
17  mixing your words, let me know.  I'm not trying to
18  scramble you here.
19      A    Right.  I think you're mixing two different
20  things.  You know, one, your -- what I'll say is your
21  second point is that, yes, I was talking about that
22  sometimes we take in information that we don't
23  consciously understand that we're taking it in.  When
24  I'm talking about mental constructs, it's more of a
25  general idea.

77

1      So, it's not necessarily that she has to
2  remember specifically that pallet or specifically that
3  end cap, but if she has, for example, a mental construct
4  that the shelving is never going to be empty at the end,
5  you know, we see that picture, they're always going to
6  want to take that space to put product, and they always
7  do.  So, if, for example, she has that mental construct
8  and she knows I'm walking in the aisle and the aisle is
9  not going to be over without an end cap, that's not
10  specific to that pallet.  That's not specific to cases
11  of water on that pallet in that spot.  That's a general
12  mental construct.
13      So, for example, we have most people, at least
14  those of us who live in the Northeast, have a mental
15  construct that ice is slippery.  Does that mean every
16  ice has to be slippery or you'll fall on it, no; but
17  from experience, we develop mental constructs that we
18  can use that information.  That long term memory, those
19  ideas that we formulated help us move throughout our
20  day.
21      So, that's where the mental construct comes
22  in.  The second part is a little bit more of, it's not -
23  - it's not my opinion that she had to have ever seen
24  that specific pallet, or it's not my opinion that she,
25  you know, she necessarily remembered specifically that



78

1  maybe the last time it was there it was full of water.
2  Like that -- that specificity isn't part of mental
3  construct and wasn't necessary for my analysis or my
4  opinions.
5      **Q   So, correct me if I'm wrong then, what you're**
6  **telling me is that, generally, as shoppers, someone who**
7  **shops at CVS should always expect there to be some kind**
8  **of end cap display at the end of an aisle?**
9      A   Well, I do think that for a lot of people that
10  would be part of your mental construct, so, yes.
11      **Q   And that would be true even if you have gone**
12  **in this particular aisle and not seen an end cap in that**
13  **area?**
14      A   Can you repeat that and clarify?
15      **Q   Sure, sure, sure.  So, you said that there's a**
16  **general mental construct in, let's call them all CVS**
17  **shoppers, right, people that -- folks that shop at CVS**
18  **frequently, they all have a mental construct from seeing**
19  **end cap displays that there is going to be an**
20  **expectation that there's an end cap display at the end**
21  **of the aisle. Is that fair?**
22      A   It's fair that it's -- that generally
23  speaking, yes, shoppers should -- are going to be aware
24  that there may be and that there usually is some type of
25  end cap or product.  I mean, it's one of the reasons why

79

1  people don't usually walk right next to things.  You
2  know, we're -- there are general things that we do as,
3  you know, walking through aisles and hopefully, you
4  know, reasonably cautious people, people that are being
5  attentive are going to be ascertaining where they're
6  going, making sure there aren't other people that
7  they're going to bump into or that there aren't objects
8  that could become obstacles for them.
9      You know, that is something that -- that's
10  something basic that we learn just to not trip and fall
11  all the time as we go through life.  But that, although
12  it sounds simple, that's also a mental construct that,
13  you know, research has shown that people -- we leave
14  gaps, we leave buffers, you know, when they walk by
15  something.  It's just human nature that's brought on by
16  experience that creates mental constructs, and then that
17  leads to our motor control.
18      MR. MCCOY:  Carlos, do you have any idea how
19  much longer you're going to be?
20      MR. JORDI:  It's like 10, 15 minutes more. I'm
21  just trying to wrap my head around this, Mike,
22  that's all.
23      MR. MCCOY:  If you're going to take any longer
24  I was going to ask for a restroom break, but I
25  think that's fine.

80

1      MR. JORDI:  Oh, if you need a break, we can
2  get a break.
3      MR. MCCOY:  We're good, yeah.
4      MR. JORDI:  Okay.
5      MR. MCCOY:  Unless, Dr. Levitan, you would
6  like a break.
7      MR. JORDI:  Of course, Doctor, if you need a
8  break, please.
9      THE WITNESS:  I can wait 10 minutes.
10      MR. JORDI:  Okay.
11  BY MR. JORDI:
12      **Q   So, Doctor, the mental construct, then,**
13  **correct me if I'm wrong, is based on a person's**
14  **experience on shopping at the store?**
15      A   Not specifically to shopping at the store.  I
16  guess that's maybe the -- what I'm not agreeing with you
17  on is mental constructs are more general, and some of
18  them are specific.  But even just the general mental
19  construct of how do you walk through life being
20  reasonably cautious, and that's where the research that
21  I was talking about comes in where people have their
22  field of view, people scan, and how vision is a feed
23  forward control to have people hopefully safely
24  determine what their next action is going to be.
25      So there's a lot of different research on --

81

1  you know, once eye trackers became available in the 80s,
2  I believe, there's been more research on where people
3  look when they're doing different tasks.  You know, and
4  this is going to include how we scan.  And you're going
5  to -- and a reasonably conscious person is going to be
6  scanning, they're going to be scanning forward, they're
7  going to be scanning side to side; it depends on the
8  environment.  So, that is, in and of itself, a mental
9  construct, is that people walking through their
10  environment know that they need to scan and they need
11  not to just stare forward, for example, so it gets as
12  basic as that.
13      It's not necessary for my opinions for me to
14  know that Ms. Guzman specifically at that moment knew
15  whether there was a pallet, or knew, which she didn't
16  testify to, that the last time she was there, there
17  wasn't a pallet and she believed that there wouldn't be
18  a pallet again so she didn't look.  I would argue she
19  should have looked anyways, but she didn't testify to
20  that.  And even if she did, I would be highly surprised
21  that she would remember that kind of detail.
22      But this is more of a general mental construct
23  about when someone initiates walking they should be
24  ascertaining where they're going first.  And that
25  includes scanning, and that includes understanding field



Levitan, Angela, PH.D   05-27-2022

82

1  of view -- well, getting information within your field
2  of you and then perceiving it and making assessments
3  before you proceed.
4      Q   Doctor, in your opinion, if my client had been
5  to the CVS before and been in the same area and not seen
6  a pallet on the floor, and let me elaborate what I mean,
7  the pallet was not there in this situation, let's say
8  it's not there, that's why she didn't see it, would that
9  have changed that mental construct of hers to now one
10  where you're saying, okay, the mental construct is of,
11  I'm going to be cautious as I turn the corner, but now
12  she's been there before and she's seen that there is no
13  pallet, would that change the mental construct?
14      MR. MCCOY:  Carlos, just to clarify, this is a
15  hypothetical.  Right?
16      MR. JORDI:  Yeah.
17      MR. MCCOY:  That it wasn't there?
18      MR. JORDI:  Yeah.
19      THE WITNESS:  I'm sorry.  Can you finish your
20  question?
21  BY MR. JORDI:
22      Q   That's basically it.  I could re-ask it in a
23  different way.  Let's talk about this hypothetical that
24  I have for you, Doctor.
25      In your opinion you've discussed, at length,

83

1  the idea of the mental construct, and I think I get it
2  now.  So my opinion is -- the question is going to be,
3  can that mental construct change?  And let me highlight
4  with, before you answer the question, with a
5  hypothetical.  Let's say my client had been to this CVS
6  before, she had been in this area and there was no
7  pallet in that area.  Would that have changed her mental
8  construct and, in turn, her expectancy?
9      A   You know, obviously trying to analyze a
10  hypothetical, like, in moments, you know, you'd have to
11  analyze the whole situation.  It wouldn't change, in my
12  opinion, it shouldn't change her general mental
13  construct about the fact that she needs to scan and be
14  aware of her surroundings before she continues to walk.
15  So, no, it wouldn't change that.  Even if she did
16  testify to remembering that the last time she was there,
17  there was nothing, it still doesn't mean she shouldn't
18  have looked.
19      And at that point, the pallet is conspicuous,
20  and my opinion is she should have seen it.  My opinion
21  is also she should have seen it as she's approaching the
22  back massagers anyways.  And so, if in the time before,
23  hypothetically, that there was nothing there, that in
24  this case when she's approaching the back massagers she
25  would've been able to see that there was something

84

1  there. And if she didn't know what it was, that if she
2  was being reasonably cautious, she should have
3  investigated further.
4      Q   Doctor, you mentioned that gait was important
5  in determining opinion three.  Do you know anything
6  about my client's gait with respect to the date of the
7  subject fall?
8      A   I believe that I testified to that
9  understanding the importance of vision and gait is
10  something that we have to understand because we have to
11  understand the role of vision in -- with motor control,
12  for example, gait or - - because in this case, she said
13  she was walking, but not specific characteristics of
14  gait necessarily for this opinion.
15      Q   So, Doctor, your opinion would be the same if
16  my client had trouble walking and if she was an Olympic
17  athlete.  Your opinion wouldn't change?
18      A   I hate to give any specifics, but within the
19  realm of the variability that I would expect based on
20  the understandings that I have of the testimony of Ms.
21  Guzman that -- that normal variation would not change my
22  opinion, especially normal variation in her gait.  If
23  she is, for example, a slower walker, a slightly faster
24  walker, that's not going to change my opinions.
25      Q   What if she had recently -- strike that.  Let

85

1  me just ask this way.  Doctor, what if she had recently
2  started walking again?  What if she had suffered a fall
3  a year or two before the subject fall at CVS, and during
4  that fall, she wasn't able to walk and she recently
5  started walking and then she walked into CVS on the day
6  of the subject fall?
7      So, I guess my question is, with a person who
8  is recuperating from a traumatic event, would you agree
9  that that would be a person whose gait wouldn't be that
10  of a regular person?
11      A   I hesitate to think that that would change my
12  opinion at all anyways, but if that were the case, which
13  there doesn't seem to be anything in the testimony that
14  describes that, I would have to do a full analysis.  I
15  would have to understand how that manifested itself.
16  But generally speaking, again, my analysis isn't -- it's
17  not a kinematic analysis that I'm breaking down where
18  her foot was at some time or that it hinges on gait
19  speed or if she was limping; none of those things would
20  matter to change my analysis.
21      The reason why I talked about the interaction
22  between vision and gate is more about the role of vision
23  to talk about the fact that we see before we act, and
24  there's no reason that her gait kinematically was
25  different, that that should change that interplay.  You

Levitan, Angela, PH.D   05-27-2022

86

1  know, there was nothing that she testified to, she said
2  she was looking straight ahead.  You know, she didn't
3  give any indications that she was walking in any
4  different way or looking in a different way due to any
5  previous issues.
6       So, for me, in this case, there's no evidence
7  of that.  So if there was some new evidence that came
8  into play, although I don't think it would change my
9  opinion, I would obviously have to analyze it to make
10  sure.
11      Q    And you also mentioned a person's motor
12  skills.  Is that fair?  Did you say that?
13      A    Motor control?
14      Q    Motor control.  Is that important in reaching
15  your conclusion, what a person's motor control would be?
16      A    Again, I was talking about it as the
17  interaction between vision and motor control, so when we
18  -- we analyze this feed forward loop in a very
19  simplistic format. People see something, they look
20  ahead, they look out at their environment where they're
21  going, they take in that information, they process it,
22  they -- I mean, it's human information processing
23  theory, is you process it in the moment.  You also
24  process it in your long term memory and your mental
25  constructs, and then you feed that information to your

87

1  brain to say, okay, what are we going to do now, which
2  tells your body how to control your movement.
3       That's all the motor control is that I was
4  talking about.  So, it may be, you know, take a step
5  forward, it may be take a step forward to the right,
6  like, that's all I meant by motor control, is just that
7  feed forward loop into telling your body how are you
8  going to move.
9       Q    In reaching your opinion, you figured that Ms.
10  Guzman had average motor control in her body because you
11  didn't have any evidence to suggest otherwise.  Is that
12  fair?
13      MR. MCCOY:  Form.
14      THE WITNESS:  It's fair that there's no
15  evidence that she was with -- outside the normal
16  variation of a person, you know, her gender and
17  age.  But beyond that, I'm not necessarily saying
18  that if something new came about that it would
19  necessarily change my opinions.
20  BY MR. JORDI:
21      Q    Okay, doctor.  Doctor, we talked about how you
22  had some medical records pertaining to Ms. Guzman.  When
23  were those medical records from?  Were they from after
24  the fall at CVS or were they from before the fall at
25  CVS?

88

1      A    I don't recall specifically if I had anything
2  beyond -- at this moment, I apologize, I would have to
3  look -- beyond the medical records that I alluded to in
4  my report which were the day after, and that is
5  mentioned in my report where I stated the anthropometry
6  as stated in those medical records.
7      Q    Got you.  So as you sit here today, what you
8  remember is the medical records that you referred to in
9  your report, they're from medical -- they're from a
10  provider from the following day after the fall?
11      A    Yes.  I would have to look and confirm that
12  there wasn't anything else.
13      Q    Got you.
14      A    But at this moment, I don't specifically
15  recall anything else.
16      Q    You don't recall ever receiving any medical
17  records with respect to anything that occurred before
18  the CVS fall?
19      A    At this moment, I do not.  It doesn't mean I
20  didn't, but at this moment, I do not; although she did
21  testify to certain things.
22      Q    Doctor, you don't have any opinions related to
23  the force generated during this fall.  Right?
24      A    I did not -- was not asked to look into
25  anything like that as part of this analysis.

89

1      Q    And you don't have any opinions with respect
2  to whether or not the force generated in this fall could
3  have or could not have caused any injury or permanent
4  injury?
5      A    I was not asked to look at anything as part of
6  my analysis regarding that.
7      Q    We're almost done, Doctor.  I know we need a
8  break but if you can give me another five minutes, I
9  have just a little bit more here and then we'll be done.
10      MR. JORDI:  Unless you guys want a break.  Do
11  you guys want a break?
12      THE WITNESS:  I'm still okay for a couple more
13  minutes.
14      MR. JORDI:  Mike?  Good, Mike?
15      MR. MCCOY:  I'm okay for a couple more
16  minutes.  I'm not going to have too many questions.
17      MR. JORDI:  Cool.
18  BY MR. JORDI:
19      Q    Doctor, you mentioned that you -- with respect
20  to the medical records that you have received, when did
21  you receive those?  Was that at the beginning of you --
22  or near the beginning of you being retained for this
23  case?
24      A    I don't recall any gaps in the reception of
25  material, so I assume it was all either at the same time



Levitan, Angela, PH.D   05-27-2022

90

1 or very close in proximity.
2    Q   Okay.  So it's fair to say, then, that
3 everything you received during this case, you received
4 it more or less near the time that you were retained.
5 Is that fair?
6    A   Yes.  I mean, certainly prior to writing the
7 report.
8    Q   Okay.  And when were you retained on this
9 case?
10    A   I don't recall.  I'm going to estimate that it
11 was in 2022.
12    Q   Would it be fair to say it was before April
13 7th of 2022 when your report was written?
14    A   And it was definitely before the inspection on
15 April 5th, yes.
16    Q   Okay.  Do you know how long before the
17 inspection, more or less; a month, two months, three
18 months?
19    A   I do not.  Sorry.  I work on way too many
20 cases to keep that kind of information in my brain.
21    Q   Same.  I hear you.  Doctor, do you do any work
22 outside of testifying as an expert in legal cases?
23    A   For ARCCA we do other things.  We do research;
24 we do development; we consult.
25    Q   Doctor, I read an article of yours entitled A

91

1        Slippery Slope:  How Counsel and Experts Can
2 Work Together to Detect Slip and Fall Claims Fraud.
3 That's dated April 15th, 2017.  Correct me if I'm wrong,
4 but the basic gist of the article is assisting companies
5 when they get sued for slip and falls and trip and
6 falls, and how they can kind of navigate through that
7 process.  Is that a fair estimation of that article?
8    A   So, I honestly don't recall the specifics of
9 it right now.
10    Q   Okay.  But does it sound like a general
11 estimation of the information found in that article?
12    MR. MCCOY:  Form.
13    THE WITNESS:  Usually those types of articles
14 are information about -- you know, information that
15 might be necessary or useful for an expert to be
16 able to assist, you know, the types of information
17 that we need; things like that.
18 BY MR. JORDI:
19    Q   Okay.  And that was directed at folks that
20 have been sued for slip-and-falls and trip-and-falls.
21 Right?
22    A   It sounds like it was, yes.
23    Q   Have you written anything directed at folks
24 who are suing someone for a slip-and-fall and/or a trip-
25 and- fall?

92

1    A   I don't recall if there were any that were
2 specifically oriented towards people who were suing
3 other people, but I certainly believe that some of the
4 articles were just more general information and not
5 necessarily defense oriented but just informational.
6 And certainly the scientific publications are purely
7 scientific informational and not biased towards
8 litigation.
9    Q   Doctor, I just asked you recently if you do
10 any work outside of expert legal work, you said you do
11 some consulting and you do some other work.  What
12 percentage would you say is expert work as opposed to
13 all the other stuff you do?
14    A   So, I definitely don't keep track of that, but
15 I will say that, you know, it depends.  If I'm working
16 on a research project, then the percentage of time on
17 that would obviously be higher.  I'm not always working
18 on a research project, for example.  So I would say the
19 majority is certainly litigation support, but it does --
20 it does fluctuate depending on what -- what people ask
21 us to do.
22        The consulting is based on if somebody asks us
23 to consult, and there's not actually a litigation next
24 to it, you know.  We'll provide whatever consulting is
25 necessary, so that's as the work comes in.  So that's

93

1 also going to fluctuate.  But for me, at least at this
2 point, it's -- the bulk of it is litigation support.
3    Q   Would that, the bulk being over 50 percent,
4 would that be -- do you know if it's 60 as opposed to 80
5 as opposed to 90?
6    A   I don't keep track of it numerically, that's
7 certainly not something that's worth me spending my time
8 on.  Definitely well over half, though.  And again, it
9 does fluctuate, but that is my primary job, is
10 litigation support.
11    Q   Doctor, I've received your fee schedule from
12 Mr. McCoy, and it looks like you charge 325 an hour for
13 testimony as well as for analysis.  Is that right?
14    A   Well, ARCCA charges, I do not.  The fee
15 schedule should be 325 for everything but testimony, and
16 testimony should have been 375.
17    Q   I'm sorry.  You're absolutely right.  Analysis
18 rate is 325 and testimony rate is 375.  Does that sound
19 right?
20    A   Yes, that's what ARCCA charges right now for
21 my time.
22    Q   Okay.  So, for any time you're raising your
23 right hand and giving deposition testimony, trial
24 testimony, whatever it might be, it's 375, and then
25 everything else you do is 325?

94

1    A   Generally speaking, yes.  If they make
2  arrangements otherwise, that's not part of my job.
3    Q   Got you.  How many hours have you spent on
4  this case?
5    A   I don't know, but I did come prepared that I
6  can say that ARCCA has invoiced, if I may answer it this
7  way -
8             -
9    Q   Sure.
10   A   -- a little bit under $6,000 for this case.
11   Q   Okay.
12   A   And that includes the site inspection.
13   Q   Understood, okay.  So that'll include
14  everything that's been done on the case so far, before
15  this deposition.  Right?
16   A   Correct.  That would include the review, the
17  inspection, the report.
18   Q   Now, I'm going to ask you a question and I
19  don't want to know a single thing that you talked about
20  with your attorney, I just want to know one thing.  Did
21  you happen to speak with Mr. McCoy and/or Mr. Liro
22  before today related to your deposition testimony for
23  today?
24   A   Yes.
25   Q   Okay.  That invoice that you mentioned, does

95

1  that include your time for that meeting?
2    A   No, because that would be too recent.
3    Q   All right.  How long did you speak with Mr.
4  Mccoy and/or Jacob Liro?  Was it an hour, two hours?
5    A   Combined, less than an hour.
6    Q   Okay.  All right.  So then we can expect,
7  then, with respect to any pre-deposition conference, it
8  would've been probably, at most, 325?
9        MR. MCCOY:  Form.
10       THE WITNESS:  Yes.
11  BY MR. JORDI.
12   Q   Okay.  All right.  Doctor, how much do you
13  make per year from your expert work?
14       MR. MCCOY:  Form.  Hold on.  Carlos, you can't
15  ask that.  You can ask percentage; you can't ask
16  about the income.
17       MR. JORDI:  Okay.
18       MR. MCCOY:  She's not going to answer any
19  questions on income.
20       MR. JORDI:  Got you.
21       MR. MCCOY:  She can answer for this case but
22  not for herself.
23       MR. JORDI:  I got you.  Mike, make your
24  objection -- just make your objection and instruct
25  the witness that she's not to respond to the

96

1  question.  Go ahead.
2        MR. MCCOY:  Oh, yeah.  That's my objection and
3  she's not going to answer for her own income.  Don't
4  answer the question.
5        MR. JORDI:  Okay.  Got it.
6  BY MR. JORDI:
7    Q   Ms. -- I'm sorry, Doctor.  You know what, I'm
8  about done, Doctor.  Why don't we let Mr. McCoy go
9  ahead, I'm going to review my notes and make sure I
10  didn't miss anything, but Mr. McCoy, go ahead.
11       MR. MCCOY:  Perfect.
12             CROSS EXAMINATION
13  BY MR. MCCOY:
14   Q   Doctor, I don't have too many questions.  I
15  just want some clarification on a few things.
16  Plaintiff's counsel asked you if it'd be important to
17  interview the employees after the incident.  Do you
18  remember those questions?
19   A   Yes.
20   Q   Do you know if any employees of CVS witnessed
21  this incident at all?
22   A   I do not.
23   Q   And would you agree with me that the most
24  important thing for you to look at is the Plaintiff's
25  recollection of the incident?

97

1    A   As far as testimony, yes, but I would also
2  just like to clarify that the information gained at the
3  inspection was also very important.
4    Q   Of course.  I just meant for any conferences
5  or depositions, the most important thing for you to look
6  at would be the Plaintiff's recollection of the
7  incident. Correct?
8    A   Yes.
9    Q   And you were also asked questions by
10  Plaintiff's counsel whether Ms. Guzman was walking on
11  the left or right side of aisle 16.  Correct?
12   A   Yes.
13   Q   And for your analysis, it doesn't matter which
14  side she was walking in the aisle.  Correct?
15   A   Correct.
16   Q   You also received a lot of questions about the
17  gait of the Plaintiff.  Do you remember that?
18   A   Yes.
19   Q   The Plaintiff's gait would have no effect on
20  your opinions in this case.  Correct?
21   A   Generally speaking, correct.
22   Q   Okay.
23   A   Specifics about the gait aren't relevant.
24   Q   Okay.  And aspects of the gait, I believe you
25  mentioned if someone's running or if they're walking or



Levitan, Angela, PH.D   05-27-2022

98

1  if they were rushing to get out of the store, things
2  like that would be relevant.  Correct?
3      A   I'm sorry.  Can you say that one more time?
4      Q   Of course.  I think you mentioned earlier that
5  with the gait, the things that would be relevant is if
6  she was walking or if she was running or if they were
7  potentially rushing to get out of the store.  Correct?
8      A   Right.  Characterization that she was walking
9  was enough.
10     Q   Okay.  But you don't need any certain
11  specifics of how she walked.  Correct?
12     A   No, I didn't.
13     Q   And would you expect if someone has an issue
14  walking that they would be more cognizant of where they
15  were walking?
16     A   Yes.
17     Q   You also mentioned that the pallet was
18  conspicuous.  What are the characteristics of the pallet
19  that make it so conspicuous?
20     A   Well, generally, we're looking at illumination
21  of the area, we're looking at size, and we're looking at
22  contrast.  So, you know, in this case we knew the
23  pallet, we knew a lot of dimensions of the pallet,
24  length and width being four feet by 40 inches, also
25  looking at, like, the height of it, because depending on

99

1  when -- when and where you are will depend on what
2  dimensions affect it.
3      The other aspects that are really important --
4  evidence that the lighting would've been a problem, was
5  the fact that the pallet was primarily blue, so it had
6  blue aspects, black aspects and the backdrop.  So, it's
7  contrast in color with the relatively uniform gray
8  carpeting and also the fact that there's different, you
9  know, textures and patterns between carpeting and -- and
10  the pallet, you know, the fact that the pallet has
11  slats, so it has gaps.  So, it has a more irregular
12  pattern versus the -- the carpeting.  So, those are the
13  kinds of characteristics that we're looking at.
14     Q   Okay.  That's all the questions I have.
15     MR. JORDI:  I have nothing further.  Thank
16  you, Doctor.
17     THE WITNESS:  Thank you, both.  Thank you,
18  Court Reporter.  I hope everybody has a great
19  holiday weekend.
20     MR. JORDI:  Likewise.
21     MR. MCCOY:  Thank you.
22     THE COURT REPORTER:  You too.
23     MR. MCCOY:  Thank you very much.
24     THE COURT REPORTER:  All right.  Just before
25  we go off the record, read or waive?

100

1      MR. MCCOY:  Doctor, do you want to read?
2      THE WITNESS:  Read, please.
3      MR. MCCOY:  Okay.  Yeah.
4      THE COURT REPORTER:  Okay.  Thank you.  Off
5  the record.
6      (Deposition concluded at 12:55 p.m.)
7      (Reading and signing of the deposition by the
8      witness has been reserved.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

101

1          CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5      I, NATALIE PUELLES, Court Reporter and Notary
6  Public for the State of Florida, do hereby certify that
7  I was authorized to and did digitally report and
8  transcribe the foregoing proceedings, and that the
9  transcript is a true and complete record of my notes.
10     I further certify that I am not a relative,
11  employee, attorney or counsel of any of the parties, nor
12  am I a relative or employee of any of the parties'
13  attorneys or counsel connected with the action, nor am I
14  financially interested in the action.
15
       Witness my hand this 3rd day of June 2022.
16
17
18
19  _____
       NATALIE PUELLES, CER, COURT REPORTER
20  NOTARY PUBLIC, STATE OF FLORIDA
21
22
23
24
25



Levitan, Angela, PH.D  05-27-2022

102

1          CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4
5      I, NATALIE PUELLES, the undersigned authority,
6  certify that ANGELA LEVITAN, PH.D., appeared before me
7  remotely pursuant to Florida Supreme Court Order AOSC20-
8  23 and was duly sworn on the 27th day of May 2022.
9
        Witness my hand this 3rd day of June 2022.
10
11
12
13  _____
   NATALIE PUELLES, CER, COURT REPORTER
14  NOTARY PUBLIC, STATE OF FLORIDA
   Notary Commission No:  HH 026285
15  Notary Commission Exp:  08/26/2024
16
17
18
19
20
21
22
23
24
25

104

1                    ERRATA SHEET
2  I wish to make the following changes, for the following
   reasons:
3
   PAGE NO.  LINE NO.
4  _____ _____ _____ CHANGE_____
5                   REASON_____
6  _____ _____ _____ CHANGE_____
7                   REASON_____
8  _____ _____ _____ CHANGE_____
9                   REASON_____
10  _____ _____ _____ CHANGE_____
11                   REASON_____
12  _____ _____ _____ CHANGE_____
13                   REASON_____
14  _____ _____ _____ CHANGE_____
15                   REASON_____
16  _____ _____ _____ CHANGE_____
17                   REASON_____
18  _____ _____ _____ CHANGE_____
19                   REASON_____
20  _____ _____ _____ CHANGE_____
21                   REASON_____
22  _____ _____ _____ CHANGE_____
23                   REASON_____
24
25     SIGNATURE              DATE

103

1  DATE:    June 3, 2022
   TO:    Angela Levitan, Ph.D.
2  C/O
       Michael L. Mccoy, Esquire
3      Wicker Smith 2800 Ponce de Leon Blvd Suite 800
       Coral Gables, Florida 33134
4  IN RE:   Evelyn E. Guzman vs. Holiday CVS, LLC
   CASE NO:  1:21-cv-23021-KMW
5
   Dear Ms. Levitan,
6
   Please take notice that on May 27, 2022, you gave your
7  deposition in the above-referenced matter.  At that
   time, you did not waive signature.  It is now necessary
8  that you sign your deposition.  You may do so by
   contacting your own attorney or the attorney who took
9  your deposition and make an appointment to do so at
   their office.  You may also contact our office at the
10  below number, Monday - Friday, 9:00 AM - 5:00 PM, for
   further information and assistance.
11  If you do not read and sign your deposition within
   thirty (30) days, the original, which has already been
12  forwarded to the ordering attorney, may be filed with
   the Clerk of the Court.
13  If you wish to waive your signature, sign your name in
   the blank at the bottom of this letter and promptly
14  return it to us.
15  Very truly yours,
16   Natalie Puelles, CER, Court Reporter
   Universal Court Reporting
17  (954)712-2600
18  I do hereby waive my signature.
19
20
21  _____
   Angela Levitan
22  Cc:  via transcript:
           Carlos A. Jordi, Esquire
23          Michael L. Mccoy, Esquire
24
25



877.291.3376
www.UCRinc.com

**$**

**$6,000** 94:10

**0**

**026285** 102:14

**08/26/2024**
  102:15

**1**

**1** 4:3 8:6,7

**1:21-cv-23021-
  KMW** 1:2 103:4

**10** 13:21 35:4
  36:2,8,16,19,
  23 37:2,5
  64:13 79:20
  80:9

**10:38** 1:17

**100** 13:18

**11** 10:17 13:5

**12** 10:17

**12:55** 1:17
  100:6

**13** 10:17

**14** 10:17

**15** 10:18 65:9
  79:20

**15th** 91:3

**16** 18:21
  21:3,4,10
  22:8,17
  23:8,21 24:1
  33:25 35:3,12
  37:17
  67:12,13,14
  97:11

**2**

**2** 4:4 21:17
  23:15,17
  37:20,22 39:2
  44:17,21
  45:14 52:12
  53:11,15,16,2
  0 54:20 55:17
  56:9 57:2
  75:17

**20** 13:17 40:9

**2017** 91:3

**2022** 1:17 5:2
  8:19 15:13
  30:24
  90:11,13
  101:15
  102:8,9
  103:1,6

**23** 4:4 102:8

**27** 1:17 5:2
  103:6

**27th** 102:8

**2800** 2:9 103:3

**29th** 8:19

**3**

**3** 15:19 21:2,3
  35:6,10 103:1

**30** 35:24
  103:11

**305-448-3939**
  2:10

**305-661-6000**
  2:5

**325**
  93:12,15,18,2

  5 95:8

**33134** 2:9
  103:3

**33156** 2:4

**375**
  93:16,18,24

**3rd** 101:15
  102:9

**4**

**4** 21:16 22:11

**40** 63:7 98:24

**5**

**5** 3:3 21:1
  22:11 37:16

**5:00** 103:10

**50** 13:21 93:3

**5th** 15:13
  30:24 90:15

**6**

**6** 23:12,13,20
  24:24

**60** 93:4

**7**

**7th** 90:13

**8**

**8** 4:3

**80** 93:4

**800** 103:3

**80s** 81:1

**9**

**9** 58:3,8

**9:00** 103:10

**90** 93:5

**9130** 2:4

**954)712-2600**
  103:17

**96** 3:5

**A**

**A.M** 1:17

**AAA** 11:15

**ability** 37:10
  48:25 49:4,5
  69:3

**able** 6:22
  13:14 21:21
  22:2 25:2,21
  27:9 31:9
  35:11,15
  36:12,17,19,2
  1 37:3,6
  43:15 46:4
  48:16
  53:22,25
  58:17 63:11
  66:1 67:4,19
  68:11
  69:22,23
  70:3,11 83:25
  85:4 91:16

**about** 5:17
  13:17
  14:18,19
  15:25 16:4
  19:10,16,18
  25:19,20
  26:13,24 27:2
  29:8,16,23
  30:12
  31:10,14 32:4
  34:23



35:21,22
36:16 41:3
52:8,17 53:14
55:10 56:23
58:20 60:24
61:9,18,23,24
62:2,24
63:6,15
64:2,13,24
65:1,2,12
66:1
69:16,17,20
70:1,2,7,9,25
71:18 72:16
73:2,10,14,17
,25 74:9,22
75:3,7,8,23,2
5
76:1,5,21,24
80:21 81:23
82:23 83:13
84:6
85:21,22,23
86:16
87:4,18,21
91:14 94:19
95:16 96:8
97:16,23
**above-**
**referenced**
103:7
**absence** 45:10
**absolutely**
16:13 93:17
**accept** 61:1
**accepted** 60:11
**accepting**
70:11
**access** 40:3
**according** 44:6

**account** 17:4
71:17,23
**accounted** 34:3
**accuracy** 9:8
**accurate** 24:20
34:6
**across** 52:1
**act** 85:23
**action** 80:24
101:13,14
**actions** 58:14
59:1 61:7
**actual** 51:20
65:16
**actually**
9:8,18 21:20
29:18
37:20,24
39:19 43:15
47:10 55:6
64:21 65:24
72:23 73:4
74:17 92:23
**acuity** 68:10
**added** 65:14
**addition** 72:2
**additional**
13:20
39:13,20
41:19
**adjustments**
69:8
**advertise**
20:11
**advertising**
20:8

**affect** 99:2
**after** 5:5 7:16
14:19 27:3
31:20 32:8,19
87:23 88:4,10
96:17
**afterwards**
56:17
**again** 20:12
22:23 23:9
25:2 26:22
28:20 29:16
30:1 35:7
43:3,12 44:17
46:8 47:3
50:10 51:18
52:6 55:19
56:19 58:20
67:7 68:13
81:18 85:2,16
86:16 93:8
**against** 5:14
37:17 51:7
**age** 87:17
**ago** 5:22
**agree**
25:7,9,18
28:12,18
42:6,24 43:9
46:19 49:5,8
50:3 51:12
72:8 73:24
85:8 96:23
**agreeing** 80:16
**ahead** 15:6
28:3,4
38:13,14
86:2,20
96:1,9,10

**aisle** 18:20
21:3,4,6,10,1
2 22:8,17
23:8,21
24:1,8,10,16
27:3 33:24
35:3,12,24
36:10,11
37:9,17,25
38:3,16,19
47:20 63:10
67:12,13,14,2
1,24 74:25
75:22 77:8
78:8,12,21
97:11,14
**aisles** 27:3
47:19,25 79:3
**all** 1:18 5:19
6:25 7:20
9:10,17,24
10:7,16
13:3,10,23
14:4 21:15
22:15 27:5
33:1 43:4
48:7 52:2
53:3,21
57:12,23
59:10 61:24
63:10 66:22
67:18 69:1
70:19 74:24
78:16,18
79:11,22
85:12 87:3,6
89:25 92:13
95:3,6,12
96:21
99:14,24
**allegedly**
40:11



allow 72:5

allowed 69:12

allows 72:25

allude 73:12

alluded 88:3

almost 20:2
  42:21 46:5
  51:5 74:24
  89:7

along 6:3 9:13

already 5:24
  34:13 56:21
  61:24 67:9
  69:12,15
  70:1,2 103:11

also 7:19
  12:7,9 16:7
  17:20,22
  18:10 23:5
  34:18
  36:21,24 37:7
  38:16 48:24
  50:18 59:2
  62:6 64:23,25
  65:2 68:8,14
  69:4 79:12
  83:21
  86:11,23 93:1
  97:1,3,9,16
  98:17,24 99:8
  103:9

although 34:2
  66:13 67:16
  74:11 79:11
  86:8 88:20

always 32:24
  54:22 77:5,6
  78:7 92:17

am 18:3 20:15

34:22 55:1
101:10,12,13
103:10

among 17:3,9

analysis
  25:2,22 30:4
  34:4 35:22,23
  42:5
  46:4,10,18
  48:16
  49:9,21,24
  51:20 54:8,9
  57:10 60:25
  66:19 67:20
  71:1,5,16,25
  75:15 78:3
  85:14,16,17,2
  0 88:25 89:6
  93:13,17
  97:13

analyze
  42:13,22
  43:15 60:23
  75:5 83:9,11
  86:9,18

analyzed 50:25
  51:4

analyzing
  48:20 58:21
  63:2 64:9

and/or 91:24
  94:21 95:4

Angela 1:15
  3:2 5:1,4
  102:6
  103:1,21

angle 23:21

angles 64:3,24

animal 49:6

another
  13:17,18
  21:15 23:20
  39:23 56:11
  89:8

answer 6:15
  10:3 29:2
  34:10 41:11
  43:12 46:16
  49:24 50:10
  83:4 94:6
  95:18,21
  96:3,4

answering 44:4

answers
  14:23,25 33:2
  67:5

anthropometry
  88:5

any 6:22 7:1
  9:4,7 13:7
  14:7,11
  15:20,25
  16:1,4
  18:1,3,7,10,1
  1 19:2,15,24
  20:3,7,14
  21:8 24:9
  25:25 26:10
  28:10 29:5,9
  30:10 31:14
  34:7 36:14
  37:9 38:2
  39:13,22
  40:2,10,11,24
  41:3,13,16,19
  45:20 51:17
  52:4
  54:6,7,24
  61:10
  63:12,19,20

67:11,22
69:11 76:6
79:18,23
84:18 86:3,4
87:11
88:16,22
89:1,3,24
90:21 92:1,10
93:22 95:7,18
96:20 97:4
98:10
101:11,12

anyone 19:25
  27:21 30:12
  41:6

anything 6:5
  9:14,23 15:22
  19:1,15
  29:5,9
  30:12,14
  31:15
  39:2,9,19,20
  42:21 52:8
  55:3,15,20,21
  63:22 71:9
  84:5 85:13
  88:1,12,15,17
  ,25 89:5
  91:23 96:10

anyways 47:23
  51:21 81:19
  83:22 85:12

AOSC20 102:7

AOSC20-23 1:19

apologize
  15:12 16:13
  18:15 28:4
  44:11 88:2

apparent 39:16

appear 53:17



APPEARANCES
  2:1

appeared 1:18
  26:17 102:6

appears 52:23

apply 51:21
  74:14

appointment
  103:9

approach 37:2
  45:16,19,24
  69:19

approaching
  36:8 83:21,24

appropriate
  42:1

approximate
  5:21

Approximately
  10:10 38:4

April 15:13
  30:2,21,24
  90:12,15 91:3

ARCCA 15:12
  16:24 17:1,4
  20:1,7 90:23
  93:14,20 94:6

area 21:19
  25:21 26:1,16
  27:6,10 35:10
  36:1 40:25
  41:6,7,14
  61:12 65:17
  78:13 82:5
  83:6,7 98:21

areas 25:14

aren't 9:2
  67:5 79:6,7

97:23

argue 81:18

around 20:24
  34:6,8
  41:1,15 48:25
  52:14 53:21
  67:9 79:21

arrangements
  94:2

article 90:25
  91:4,7,11

articles 72:15
  91:13 92:4

ascertain
  29:18 72:14
  73:20

ascertaining
  61:4 79:5
  81:24

ask 10:4 11:2
  14:3,13 16:11
  26:14 29:3
  32:5,6 33:15
  37:14 40:22
  41:10,11
  52:24
  56:10,11
  79:24 85:1
  92:20 94:18
  95:15

asked 11:10
  33:23 88:24
  89:5 92:9
  96:16 97:9

asking 9:15
  32:3,4,11,13
  43:23 44:4,12
  53:12

asks 92:22

aspect 46:3
  66:14

aspects 17:3
  36:25 63:12
  64:11 97:24
  99:3,6

assess 70:9

assessing
  58:11

assessment
  70:10

assessments
  82:2

assist 91:16

assistance
  103:10

assisting 91:4

assume 6:15
  20:9 49:9
  53:19 89:25

assuming 44:13

assumption
  26:4 55:1
  67:3

Astin
  7:6,10,16

A-S-T-I-N 7:8

Aston 7:7

athlete 84:17

attentive
  62:15 79:5

attorney 94:20
  101:11
  103:8,12

attorneys
  101:13

authoritative
  64:8

authority
  102:5

authorized
  101:7

available
  15:14 17:12
  81:1

average 87:10

aware 18:3
  34:18,21
  78:23 83:14

away 45:18
  46:8 64:14

_____
        B
_____
back 21:16
  22:19 23:6,10
  24:8,10,18
  25:25 27:9
  30:2 33:24
  34:14 35:25
  45:16,17,25
  50:21 52:12
  53:21 60:5
  67:16
  83:22,24

backdrop 50:23
  51:7 99:6

balance
  48:11,12

based 21:21
  26:18 27:8,17
  30:4 34:25
  35:20
  38:11,23 43:5
  44:5 45:13
  47:19 52:24



53:3 54:1
58:13 61:17
62:22 63:3
64:16,21 65:5
66:7 72:11
73:5 80:13
84:19 92:22

**basic** 79:10
81:12 91:4

**basically** 17:8
19:6 38:21
46:4,18 59:14
67:2 68:20
70:25 73:15
82:22

**basis** 59:18
60:18
69:17,24 73:8

**became** 81:1

**because** 6:16
15:7 26:10
29:1 37:25
39:15 44:4
46:18 47:10
48:7
51:2,6,9,21
52:6
55:10,12,23
56:16 58:23
66:15,17 67:8
68:5 69:1
72:19 73:1
75:9 84:10,12
87:10 95:2
98:25

**become** 79:8

**before** 5:15
7:6,13,17
13:8,11 19:15
25:15 34:8

37:14 40:14
60:4 64:22
71:21 75:8,18
82:3,5,12
83:4,6,14,22
85:3,23 87:24
88:17
90:12,14,16
94:14,22
99:24 102:6

**beginning** 5:25
30:2 67:15
89:21,22

**behalf** 1:16
2:2,7 17:14

**behind** 72:25

**belief** 37:18
40:23 45:2

**believe** 9:7
12:2,9
24:12,15 30:7
33:2 40:2
41:13 45:20
49:15 52:5,22
53:25 81:2
84:8 92:3
97:24

**believed** 81:17

**below** 65:9
103:10

**besides**
19:12,13,14

**best** 17:24

**better** 29:1

**between** 7:18
13:20 17:25
44:3 48:5
53:17 55:8
74:1 85:22

86:17 99:9

**beyond** 22:3
30:15
41:4,16,20
87:17 88:2,3

**biased** 92:7

**big** 36:7 64:15

**bigger** 37:4

**bio-mechanical**
73:6

**bit** 20:24
37:20 50:12
68:1 71:24
73:25 77:22
89:9 94:10

**black**
52:14,15,18
56:8,14
57:2,5,8 99:6

**blank** 103:13

**blue** 55:1
99:5,6

**Blvd** 103:3

**body** 87:2,7,10

**book** 65:1,11

**born** 68:21

**both** 25:7 32:5
99:17

**bottles** 44:20
50:24

**bottom** 53:18
103:13

**BOULEVARD**
2:4,9

**bounds** 67:20

**brain** 87:1

90:20

**break** 79:24
80:1,2,6,8
89:8,10,11

**breaking** 85:17

**bridge** 71:10

**bring** 35:6
37:13

**brought** 48:10
79:15

**BROWARD** 101:3
102:3

**buffers** 79:14

**build** 47:24

**building** 42:1

**bulk** 93:2,3

**bump** 79:7

**business** 31:19
32:18

---

C

**C/O** 103:2

**cage**
49:14,15,17

**calculate**
65:17

**calculated**
65:5 66:4

**calculations**
65:24

**call** 78:16

**called** 5:5

**came** 86:7
87:18

**can** 6:9,12



8:11,12 9:13
10:2 14:3,7,9
23:22 24:13
25:6,7,9
31:23,25
32:10 36:3,25
37:11,23 38:2
39:18
42:8,18,21,25
43:10 45:9
46:21 47:8,10
48:7 50:9
51:16 52:4
53:5 54:22
55:4 58:1,6
59:3,5
60:1,11,22,23
,25 61:1
62:16 64:14
65:5,7 66:22
76:9 77:18
78:14 80:1,9
82:19 83:3
89:8 91:1,6
94:6
95:6,15,21
98:3

**cannot** 29:13

**can't** 6:4
10:22 11:3
21:24 28:21
30:2 47:9
62:20 73:24
95:14,15

**cap** 48:1
75:2,10
77:3,9
78:8,12,19,20
,25

**capabilities**
49:23 62:10

**capability**
53:22

**capacity**
32:13,14,15,1
8

**caps** 47:18
76:2

**care** 73:10

**career** 10:13
52:2

**Carlos** 2:3 3:3
5:12 14:10
32:10 59:5
79:18 82:14
95:14 103:22

**carpet** 46:14
51:8

**carpeting**
99:8,9,12

**Carrero** 12:8

**carried** 7:9

**case** 1:2 9:19
10:6
11:15,16,21,2
3,25 12:1
13:25 14:5
15:21 16:1
17:6,11
18:8,12
19:8,11 28:15
29:6,10 30:13
31:15 33:7
42:3 43:18
44:7,8,13,23
45:2,5,14,19,
20 46:2
47:7,18 50:4
55:8 57:21,24
58:2,10 60:12

62:9,13 66:12
69:5 70:16
71:13 75:3
83:24 84:12
85:12 86:6
89:23 90:3,9
94:4,10,14
95:21 97:20
98:22 103:4

**cases** 8:10
9:1,25
10:7,10,18
11:8
13:10,11,15
39:5,17
50:22,24 52:9
77:10
90:20,22

**caught** 55:12

**causative** 59:2

**caused** 89:3

**cautious** 70:4
79:4 80:20
82:11 84:2

**Cc** 103:22

**center** 21:11
27:3 35:3

**central**
68:6,10

**CER** 1:24
101:19 102:13
103:16

**cert** 20:19

**certain** 25:19
26:25 29:13
42:12 49:9
64:10 74:11
88:21 98:10

**certainly** 14:7

45:19 61:16
64:4 74:21
90:6
92:3,6,19
93:7

**certainty** 38:2

**CERTIFICATE**
101:1 102:1

**certifications**
20:18

**certified**
20:15,22

**certify**
101:6,10
102:6

**change**
46:17,18
57:10,17
65:14,15
75:19,23
82:13
83:3,11,12,15
84:17,21,24
85:11,20,25
86:8 87:19
104:4,6,8,10,
12,14,16,18,2
0,22

**changed** 26:16
82:9 83:7

**changes** 54:24
104:2

**character**
64:14,24 76:4

**characteristic
s** 35:21
43:4,6
46:5,12
48:8,12 50:20



58:12,13
63:1,3 66:23
84:13 98:18
99:13

**Characterizati**
**on** 98:8

**characters**
19:17 36:3

**charge** 93:12

**charges**
93:14,20

**chart** 65:11

**check** 54:13

**checked** 9:8

**citation** 36:22

**cited** 15:15

**City** 75:6

**CJORDI@RUBENST**
**EINLAW.COM**
2:5

**claim** 42:17

**Claims** 91:2

**clarification**
14:10 22:24
96:15

**clarify** 10:2
14:1 31:23
32:10 37:11
45:9 53:12
78:14 82:14
97:2

**clear** 29:2
32:3 56:23

**clearer** 56:12

**clearly** 51:2,9

**Clerk** 103:12

**client** 15:9
21:9,18 22:20
23:7 24:7
33:24 34:7
35:18 41:1,15
56:13 82:4
83:5 84:16

**client's** 27:8
75:19 84:6

**close** 40:5
42:7 55:13
66:3 90:1

**closed** 73:9

**code** 42:1

**codes** 50:14

**cognizant**
98:14

**collect** 60:8,9

**collected** 18:4
64:7 70:8

**collection**
60:17,18

**color** 51:6
57:17 99:7

**colors** 57:15

**Combined** 95:5

**come** 18:23
26:20 28:15
38:5,7,8 52:1
94:5

**comes** 9:20
61:6 62:12
77:21 80:21
92:25

**Commission**
102:14,15

**common**
42:15,18

**communicate**
29:15

**communicated**
28:21

**communication**
29:18

**community**
61:16 73:7

**companies** 91:4

**compare** 66:19

**compilation**
64:6,20

**complaint**
14:22

**complete** 101:9

**completely**
44:21

**comply** 41:25

**components**
66:10

**conclude** 27:9

**concluded**
100:6

**conclusion**
28:15 38:8
58:8 59:4,6
61:12 66:5
68:16 86:15

**condition**
38:21 39:2
40:5,11
42:8,12,13
43:1,10,20,22
,25 44:10,25
45:6,8 46:20

47:1 49:16
51:6
53:10,11,15,1
6 54:10,11
56:8,14,25
57:1,6 58:23
61:2 68:18
69:9

**conduct** 17:10
31:19 32:7,17

**conducted** 6:2
15:13

**cone** 65:20
68:8,14 70:17

**conference**
95:7

**conferences**
97:4

**confirm** 19:2
21:2 24:6
25:24 54:7
88:11

**confirmation**
28:8

**confirmed**
27:21 28:23
38:18,23

**confusing** 6:12

**confusion**
32:12

**connected**
101:13

**connection**
57:24

**conscious**
49:19 69:5
81:5

**consciously**



76:23

**consistency**
30:6

**consistent**
27:6,15

**conspicuity**
61:9 69:17
70:10,25
73:10 74:7

**conspicuous**
46:7,14 48:8
51:6,8,11
55:2,23
58:14,15,24
60:4,13,15
61:13 62:18
63:3,12,14
68:16,21 69:1
70:15 71:3
72:18 75:24
83:19
98:18,19

**constraints**
67:23

**construct** 34:7
71:23 74:22
76:1,5
77:3,7,12,15,
21
78:3,10,16,18
79:12
80:12,19
81:9,22
82:9,10,13
83:1,3,8,13

**constructs**
47:24 74:8
76:24 77:17
79:16 80:17
86:25

**consult** 90:24
92:23

**consulting**
92:11,22,24

**contact** 21:20
22:1 42:7
103:9

**contacted**
55:14

**contacting**
103:8

**container**
44:20

**context**
72:23,24

**continues**
83:14

**Continuing**
22:5

**Contracting**
11:22

**contradicted**
26:25

**contrast** 46:13
63:4 69:21
98:22 99:7

**contrastable**
57:16

**contributory**
61:8

**control** 74:1
79:17 80:23
84:11
86:13,14,15,1
7 87:2,3,6,10

**conversation**
18:7,11

**conversations**
18:3 19:24
31:17

**Cool** 89:17

**coordinated**
40:20

**Coral** 2:9
103:3

**corner** 53:20
82:11

**corners** 52:14
63:10

**correct** 6:20
7:18 9:22
15:17 18:8,9
19:21 21:7
22:13
24:11,13
27:24 29:6
34:21 38:20
48:23 49:6
52:15 53:8
54:12 68:19
70:13 78:5
80:13 91:3
94:16
97:7,11,14,15
,20,21
98:2,7,11

**correctly**
70:23

**could** 7:7,12
10:4 13:16,23
14:1 16:19
24:23 25:11
37:6 38:17
46:9 47:7
49:20
53:12,17
54:14,19

55:16,21
56:1,18 58:25
60:16 74:4
79:8 82:22
89:2,3

**couldn't** 10:25
22:9 73:7

**counsel** 2:1
91:1 96:16
97:10
101:11,13

**counsel's**
14:17

**counting** 10:18

**COUNTY** 101:3
102:3

**couple** 5:18
69:19
89:12,15

**course** 6:9
7:24 14:5
15:20 16:5
30:18 31:13
32:21 36:8,24
80:7 97:4
98:4

**courses** 20:18

**Court**
1:1,19,24 5:8
99:18,22,24
100:4
101:5,19
102:7,13
103:12,16

**cover** 54:2,3
55:5,10
56:8,20
57:10,11,13,1
8 63:10



covers 54:3,4

co-workers
  16:18

CPE 20:19,21

crack 75:5

create 48:7
  58:22

creates 79:16

CROSS 3:4
  96:12

Cungachi 11:25

currently
  20:14

customers
  40:25 41:17
  42:7

cut 59:23

CVS 1:8 5:14
  16:10,14
  18:1,7,12
  19:2,5 22:17
  25:9
  26:5,9,13
  27:21 28:13
  29:5,9,21
  30:12 31:14
  34:20
  40:14,19,21
  47:18,23
  49:4,19 51:24
  71:20 74:17
  76:1
  78:7,16,17
  82:5 83:5
  85:3,5
  87:24,25
  88:18 96:20
  103:4

CVSs 74:11

─────────────
        D
─────────────
DADELAND 2:4

dangerous
  42:8,13,18
  43:1,10,16,19
  ,22,25
  44:10,25
  45:6,8 46:20
  47:1,3,12
  48:6,17,21
  49:6,11,16,20
  50:5 54:11,15
  56:24 57:7
  58:22
  59:19,25
  60:17 61:2,5
  68:18,22
  69:9,13 71:4
  75:9,12

data 18:4
  60:9,17,18
  64:6 70:8

date 75:18
  84:6 103:1
  104:25

dated 91:3

dates 7:11 8:2

day 22:20
  23:5,7,24
  26:1,2
  27:11,23,24
  38:22 39:3,23
  40:6,14,19
  77:20 85:5
  88:4,10
  101:15
  102:8,9

days 103:11

de 2:9 103:3

Dear 103:5

decades 61:14
  62:11 63:25

decide 33:3

defective
  49:16

defendant 1:9
  2:7
  11:9,16,22
  12:1,5,15,17,
  19,23,25

defendants
  11:24 12:5,7
  13:5

Defendant's
  14:24 18:24

defense
  12:9,11 14:17
  19:8 92:5

define 47:2

definitely
  26:12 31:7
  90:14 92:14
  93:8

degrees 65:4,9

depend 43:13
  99:1

depending
  29:25 46:1
  65:7 66:10
  92:20 98:25

depends 33:8
  81:7 92:15

DePinho 12:3

depo 7:24

deposed

5:14,20

deposition
  1:15 4:3 5:1
  6:1,9 8:17,18
  15:1,3 16:6
  22:10 24:7
  30:6 93:23
  94:15,22
  100:6,7
  103:7,8,9,11

depositions
  97:5

describe 22:2

describes
  85:14

description
  4:2 55:20

designing 64:8

detail 61:9
  81:21

details 22:10
  25:4,8,14

detect
  35:11,15 91:2

detected 35:19

detection
  35:22

determine
  38:15 39:9
  42:11 43:16
  48:17 64:15
  70:18 74:7
  80:24

determined
  61:5

determines
  66:15



determining
54:15
70:10,15,16
84:5

develop 77:17

development
90:24

develops 76:7

devices 22:16
23:22,25

didn't 15:11
17:10 24:9
25:13,18
40:2,10,19
41:5 44:9
57:7 58:22
61:7 67:18
73:5,10 74:19
81:15,18,19
82:8 84:1
86:2 87:11
88:20 96:10
98:12

DiDomencio
7:13,17,18

DiDomenico 7:5

difference
44:3,12,13
45:4,10 48:5

different 6:13
10:4 11:2
25:12 33:7
35:23 36:24
40:11 42:14
45:24 51:8
56:10,15
63:6,13
64:7,9 65:1,3
66:22 67:4
72:21

75:10,13
76:6,19 80:25
81:3 82:23
85:25 86:4
99:8

differently
41:11

difficulty 6:3

digitally
101:7

dimensions
38:16 98:23
99:2

DIRECT 3:3
5:10

directed
91:19,23

direction
17:15 30:5
50:23

directly 19:4

dis 26:16

discipline
61:20

discovery 19:7
71:13

discuss 5:23

discussed
57:20,22
69:12,15
82:25

display 23:11
26:16 27:18
30:7 34:3,14
35:4 54:23
75:2 78:8,20

displays 29:19

78:19

disposal 40:6

distance 35:4
36:17 37:7

distances
36:25

DISTRICT 1:1

Doc 76:16

doctor
7:1,20,22
8:11,13 13:23
16:13,14,16
18:16,18
20:1,14,23
21:2,19
23:4,20 25:24
26:13
28:4,5,12
31:18 32:15
33:1,22
34:5,18,23
35:8 39:11
40:13,24
41:21 42:18
43:8 44:18
45:7 46:19,25
48:20 49:3
50:3 51:12,16
52:12 54:19
56:7 57:20
59:3,11,23
67:10 68:15
74:2 75:16
80:7,12
82:4,24
84:4,15 85:1
87:21 88:22
89:7,19
90:21,25 92:9
93:11 95:12
96:7,8,14

99:16 100:1

documentation
28:19

documented
63:11

documents
13:24
14:4,18,20,22
15:8,15,20

doesn't 29:17
32:22 36:20
47:11 62:21
69:6 75:23,25
76:4 83:17
85:13 88:19
97:13

done 13:8
20:17 38:14
40:17 54:20
55:2,16,22
56:1 60:25
64:18,21 71:5
73:2,6,17,19
89:7,9 94:14
96:8

don't 6:10
8:16,23
9:4,15 10:15
11:7 15:22
17:12,24
18:16
19:14,15,24
20:9 22:2
24:12 28:6,18
30:14,19,25
31:16 32:1
33:1,14 34:1
39:13,20,22
40:2,16
41:11,16,18
44:2,11 45:20



52:5,10,19,20
53:25
54:13,24
55:7,19 57:17
59:23
66:17,18
67:10,16
74:11,14
76:22 79:1
86:8
88:1,14,16,22
89:1,24 90:10
91:8 92:1,14
93:6 94:5,19
96:3,8,14
98:10

down 5:9 24:16
27:2 30:14
35:3,25 67:22
85:17

dozen 5:18

Dr 16:12,18
18:15 19:10
24:6 25:24
27:15,20 28:7
29:1,8,21
30:11,17
38:9,20
40:4,14,18
54:6 73:13
80:5

due 56:21 86:4

duly 5:6 102:8

duration 31:2

during 6:9
15:20
16:2,5,7
17:16,20
22:10,12
25:15 28:8

30:18 31:13
34:20 38:9,22
39:10 52:2
53:4 63:13
65:14 66:24
85:3 88:23
90:3

---

E

each 42:13,22
73:23

earlier 26:14
29:14 61:19
75:7 98:4

effect 37:10
97:19

either 89:25

El 11:21

elaborate 23:2
46:25 50:11
59:3 74:4
82:6

else 15:22
19:22,25 39:9
55:20,21
63:22 70:19
88:12,15
93:25

employee 19:3
29:16,22
32:12 51:23
101:11,12

employees
18:2,7,12
19:5 25:25
26:5,11,15
28:10,13,18
29:5,9
31:14,17,20
32:7,18 33:15

40:21
51:21,22 52:7
96:17,20

employers
51:22

empty 46:6
51:5,16
52:3,5 75:11
77:4

encapsulates
59:10

encounter 47:7

end 14:17
18:19 21:5
24:1,16,21,22
35:12
37:9,11,17
47:18,25 48:1
53:20 74:25
75:2,10,22
76:2 77:3,4,9
78:8,12,19,20
,25

engineering
64:10

enough 25:20
36:7 74:7
98:9

entered 8:7
23:17

entire 31:2
34:3 47:4
49:12 54:5

entirety 69:25

entitled 90:25

environment
47:15 48:13
49:22 50:15
58:21 60:25

62:2 70:4
73:4 75:8
81:8,10 86:20

environments
61:21 72:13

ergonomist
20:15,22

ERRATA 104:1

especially
28:18 84:22

Esquire 2:3,8
3:3,5
103:2,22,23

essence 71:4

establish
50:15 60:7
62:16,19
69:20

established
62:22 63:25
67:10

establishing
73:17

establishments
52:9

estimate 13:16
90:10

estimation
91:7,11

Evelyn 1:5
5:13 15:1
103:4

event 85:8

every 30:3
33:7 43:13,14
47:20 50:10
77:15



everybody
99:18

everything
38:24 62:24
70:19 90:3
93:15,25
94:14

evidence 24:2
41:13,16,19
67:21 86:6,7
87:11,15 99:4

exact 13:14
25:13

exactly
21:22,25
22:7,19 36:4
57:1 66:17,18
67:10

EXAMINATION
3:1,3,4 5:10
96:12

example 37:1
49:13,18
50:20
60:12,14
71:18 73:3
74:25
75:2,5,10
77:3,7,13
81:11
84:12,23
92:18

exhibit 4:2
8:6,7 16:6
23:15,17

exhibits 4:1
15:3

exists 46:20

Exp 102:15

expect 46:6
47:17 78:7
84:19 95:6
98:13

expectancy
47:6 48:4
70:2 71:23
74:2,6
75:3,4,13,19
76:8 83:8

expectation
78:20

expected 76:2

experience
77:17 79:16
80:14

expert 10:13
13:11
32:13,14,15,1
9 33:19 90:22
91:15
92:10,12
95:13

Experts 91:1

explain 50:9
68:20 72:10

extended 38:19

extent 27:1

eye 65:6 68:3
81:1

eyes 65:12
66:21 73:9

─────────
F
─────────

fabric
52:21,22
53:1,5,6,23

FaceTime

31:1,6,13

FaceTimed
17:19

FaceTiming
30:17 31:17

fact 22:3 27:6
37:8 42:12
46:11 47:6,21
54:25 58:20
59:22 60:7
61:24 68:21
74:9,23 75:23
76:2 83:13
85:23
99:5,8,10

factor 59:2

factors 35:20
48:14
61:15,17,19
62:11,23
64:5,11 67:4
73:7

fair 6:17 7:17
10:18 11:19
13:5 18:6,12
25:7,9,13
27:20 29:4
33:1 36:18
37:16,17
40:4,18,21
41:6 48:22
53:24 55:25
72:4 78:21,22
86:12
87:12,14
90:2,5,12
91:7

fall 22:21
23:6,24 25:15
26:1 27:24

32:20 38:22
39:3,10 40:6
47:9 56:9
70:20 75:18
77:16 79:10
84:7
85:2,3,4,6
87:24
88:10,18,23
89:2 91:2,25

fallen 24:8

falling 52:25

falls 70:19
91:5,6

familiar 47:21
48:3 74:10

familiarity
71:19

far 14:20
15:23 20:18
22:7 24:1,4
26:22 38:15
63:9 66:15
70:23 94:14
97:1

fashion 65:13

faster 84:23

fee 93:11,14

feed 80:22
86:18,25 87:7

feeling 29:1

feet 35:5,24
36:2,8,16,19,
23 37:2,3,5
55:7 63:7
66:2,3 73:21
98:24

fell 23:7



27:7,11
41:1,15

**few** 17:22
96:15

**field** 35:2
45:22 46:14
58:24
62:16,19,20,2
2,25
63:14,21,24
65:2,18,21,22
66:9,24
68:5,13 80:22
81:25 82:1

**fields** 65:13

**figure** 8:1
21:2,3,15,17
22:11
23:12,13,20
24:24 35:6,9
37:15,20,22,2
3 39:2
44:17,21
45:14 52:12
53:11,15,16,2
0 54:20
55:10,17 56:9
57:2 60:10
63:16 65:7
75:17

**figured** 87:9

**file** 14:9

**filed** 103:12

**final** 34:24

**financially**
101:14

**find** 33:14
57:7 67:4

**fine** 8:4 79:25

**finish** 82:19

**first** 5:5
11:15 45:24
58:1,11 59:25
62:17,18
81:24

**five** 10:17
30:25 89:8

**fix** 6:7

**fixture** 18:19

**floor** 34:19
39:24 42:25
43:9 51:17
52:4 72:22
75:11 82:6

Florida
1:1,19,25
2:4,9 17:13
101:2,6,20
102:2,7,14
103:3

**fluctuate**
92:20 93:1,9

**flushed** 37:17

**focused** 46:11

**folks** 12:4
19:22 61:11
78:17
91:19,23

**follow** 71:6

**following**
88:10 104:2

**follows** 5:6

**follow-up**
14:13

**foot**
21:23,24,25

53:6,7,17,22
54:14 55:12
64:14 85:18

**footage** 39:23
40:1

**footnotes**
15:16

**force** 88:23
89:2

**foregoing**
101:8

**forget** 19:18

**forgive** 33:23

**forgot** 9:19

**forgotten** 9:7

**form** 9:3 11:6
13:19 22:22
24:25 25:17
26:3 27:12,25
28:2,16
29:11,24
31:4,22
33:6,17 34:9
35:13 39:4
41:8 42:9,19
43:2,11 44:1
46:22 49:7
50:6 53:9
54:16 56:3
57:4 68:23
70:21 71:14
72:7 76:12
87:13 91:12
95:9,14

**format** 86:19

**forming** 63:22

**formulas** 63:19

**formulated**

77:19

**forth** 60:8

**forward** 80:23
81:6,11 86:18
87:5,7

**forwarded**
103:12

**found** 91:11

**foundation**
60:3 71:1

**four** 10:17
13:4,6,8,12
63:7 71:6
98:24

**Fraud** 91:2

**frequently**
78:18

**Friday** 103:10

**from** 9:16 18:5
19:5,7 24:8
35:3,15 38:18
39:23 51:22
52:6,23 58:9
60:21 62:5
67:15,18
68:2,17
71:6,8,11,17,
25 73:8 77:17
78:18 85:8
87:23,24
88:9,10 93:11
95:13

**front** 14:2
66:2,3,15

**full** 16:19
48:16 68:13
78:1 85:14

**fully** 49:19



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

50:5,12,15,19

**fundamentals**
60:5

**further** 19:15
37:6 47:13
66:2 69:25
84:3 99:15
101:10 103:10

———————
G
———————

**Gables** 2:9
103:3

**gained** 97:2

**Gaines** 11:21

**gait** 62:13
72:16 73:22
74:1
84:4,6,9,12,1
4,22
85:9,18,24
97:17,19,23,2
4 98:5

**gamut** 59:12

**gaps** 79:14
89:24 99:11

**Garcia** 12:12

**gate** 85:22

**gathered** 17:16
27:13

**gave** 8:4 59:9
103:6

**gender** 87:16

**general** 8:3
11:9 25:21
26:16 32:3
36:11 41:17
65:17,23
74:13 76:25

77:11 78:16
79:2 80:17,18
81:22 83:12
91:10 92:4

**generally**
32:6,22
33:9,14,18
42:10 43:8
62:8 63:21
74:23 75:4
78:6,22 85:16
94:1 97:21
98:20

**generated**
57:23 88:23
89:2

**get** 5:25 19:4
31:9 35:25
58:8 66:9
71:11 72:5
80:2 83:1
91:5 98:1,7

**gets** 81:11

**getting** 24:7
29:2 60:21
82:1

**gist** 91:4

**give** 7:12,25
8:13 13:14,16
16:19 24:9
33:22 38:17
40:10 49:12
58:1,6 62:1
67:23 84:18
86:3 89:8

**given** 30:11
36:6 37:5
42:20 44:8,9
45:1,12,15,22
54:25 55:20

57:8
58:14,15,16
61:4 62:23
63:1 65:25
68:24 71:2

**gives** 65:3

**giving** 93:23

**go** 11:10 15:6
19:15 20:23
21:15,16
22:11 28:3,4
37:22
38:13,14
53:17 55:7
60:5 61:8
63:15 72:25
73:8,24 74:8
75:25 79:11
96:1,8,10
99:25

**goes** 71:24

**going** 6:15
7:20 8:5,6,14
9:11,12 13:13
14:13
20:24,25
21:1,16,17
23:12 26:4,19
30:1 43:13
47:17,22,25
49:21 52:7
53:19 55:1
60:7,18 61:17
62:1,9 64:13
65:2,20,21,22
67:7 68:9
72:14 75:6
77:4,5,9
78:19,23
79:5,6,7,19,2
3,24 80:24

81:4,5,6,7,24
82:11 83:2
84:24 86:21
87:1,8 89:16
90:10 93:1
94:18 95:18
96:3,9

**gone** 49:25
78:11

**good** 5:12 8:4
80:3 89:14

**graduate** 8:2

**gray** 51:7 99:7

**great** 99:18

**greater** 35:4
36:1

**ground** 5:23

**guard** 37:24

**guess** 8:20
37:14 52:24
80:16 85:7

**guesses** 20:12

**guidelines**
42:2

**guys** 89:10,11

**Guzman** 1:5
5:13 15:1,2
24:4 35:2
40:9 41:4,12
44:6 45:1,13
47:21 50:23
51:23 55:8
56:17 58:15
60:24 62:8
65:19 67:11
68:25
74:10,16
81:14 84:21



87:10,22
97:10 103:4

**Guzman's** 58:24
66:4 70:16
76:5

---
H
---
**had** 8:17 13:7
18:4,6,11
22:5 24:8
26:16,18
27:18 28:7,19
29:21 30:7
31:10 34:19
35:24 37:2
38:24
40:1,3,6,11
43:18 44:6
45:5 50:5
57:21 63:16
69:3 71:3
73:16
75:18,20
77:23 82:4
83:5,6
84:16,25
85:1,2
87:10,22 88:1
99:5

**half** 93:8

**hand** 5:9 93:23
101:15 102:9

**handbook**
64:6,20

**happen** 32:22
94:21

**happened** 57:9

**happy** 6:7 7:24
11:10

**has** 32:8,19

47:18 50:11
60:11 63:25
64:15,19
73:18
77:1,3,7,16
79:13 94:6
98:13
99:10,11,18
100:8 103:11

**hate** 84:18

**have** 5:14
6:1,3 7:1,4
8:10,15 9:6
10:16,17
13:7,11,24
14:4,8,12
15:7 16:9,15
18:11
19:10,19,23
20:1,18,20
21:8 22:3
24:2,23 25:20
29:22
33:22,23
34:2,6,15,23
35:15,19,22
36:6,12,17,19
,21 37:3,6,9
39:17
40:2,22,24
41:3,16,18
42:13,21
43:3,4,15,19,
24 45:3,18,20
46:2,9,15
47:4,5,13,14
48:11,12
50:4,18,21,24
,25
51:4,18,19
52:1,9 53:22
54:19

55:16,21 56:1
57:12,14
58:2,7,17
60:7,8,15,17
61:6,8,18,23
62:6,18,25
63:2 64:3,12
65:11
66:1,6,10
67:12,17,20
68:8,12,13,15
69:1,6,7
72:23 73:5,8
74:12,13,17,1
8,20,21
75:8,14
77:13,14,23
78:11,18
79:18
80:21,23
81:19 82:9,24
83:7,10,18,20
,21
84:2,10,20
85:14,15 86:9
87:11
88:2,11,22
89:1,3,9,16,2
0 91:20,23
93:16 94:3
96:14 97:19
99:14,15

**haven't** 9:8
16:11,14 52:7
57:21 69:11

**having** 5:5 6:5
27:1 31:16
34:13 40:3
71:20

**hazardous** 47:3
48:18

**he** 16:25

17:2,4,7,13,1
8,20,21,22
18:3,4
29:8,13,14,22
30:3,5,12,15,
16 31:6,10
38:23
39:2,5,9,14,1
8,22 40:3,6

**head** 13:13
65:14
66:18,20,21
67:8 79:21

**hear** 6:4,10
15:11 31:14
90:21

**heavy** 70:14

**height** 63:8
65:6 98:25

**heights**
64:14,25

**help** 6:7 32:20
37:13 40:17
44:16 60:23
77:19

**helps** 8:2

**her**
21:13,21,23,2
4,25 22:10
24:4,7
25:3,20 26:22
27:2,14 32:13
34:15,20 35:2
36:7 37:10
41:20 44:9
45:16,19,21,2
2,24 46:4,14
55:12 58:16
59:1 61:7
62:25 63:14



65:20,21
66:1,2,3,9,18
,20,21,24
67:24 69:8
70:17,18
71:17,19
83:7,8,12,14
84:22
85:18,24
87:10,16 96:3

**here** 8:11
15:7,18,24
20:23,24,25
22:12
23:13,20,22
24:24 26:13
34:24 35:9
37:14 44:17
52:12,24 56:9
76:18 88:7
89:9

**hereby** 101:6
103:18

**Heredia** 12:16

**hers** 82:9

**herself** 95:22

**hesitate** 85:11

**Hey** 9:18

**HH** 102:14

**higher** 51:3
92:17

**highlight** 83:3

**highly** 51:6
57:16 81:20

**him** 30:14
31:1,9,13,14,
16

**hinges** 85:18

**hinging** 57:18

**hired** 10:11
32:20

**his** 16:19 17:1
31:2 40:6

**hit** 21:23
67:21

**hold** 20:3,14
41:10 95:14

**holding** 50:22

**holds** 17:7

**hole** 53:24
54:2,5

**holes** 53:7

**holiday** 1:8
99:19 103:4

**honestly** 91:8

**Hoornstra**
11:15

**hope** 99:18

**hopefully**
56:11 79:3
80:23

**horizontal**
65:9 66:12,13

**hour** 93:12
95:4,5

**hours** 17:25
94:3 95:4

**human** 35:20
48:14
61:15,17,19
62:11,23
64:5,11 73:7
79:15 86:22

**hypothesis**

60:7,10,14
61:1,3 70:12

**hypothetical**
44:18 75:24
82:15,23
83:5,10

**hypothetically**
83:23

---
I
---

**ice** 77:15,16

**I'd** 11:10
15:10 49:8
51:19
57:22,24

**idea** 58:9 66:9
71:22 76:25
79:18 83:1

**ideas** 74:13
77:19

**identification**
36:11

**identified**
36:3

**identify** 13:23
14:4 64:16
68:12

**identifying**
58:13 63:12

**I'll** 6:7 7:24
35:7 49:12
76:20

**illumination**
63:4 69:22
98:20

**illustrate**
36:10

**I'm** 6:6,15

7:20 8:5,13
9:5,11,12,15
12:20 13:13
14:1,13 15:11
17:3,5 18:15
20:9,12,24
21:16 23:12
24:6 25:11
26:4,8 29:1
32:2 34:25
37:11
38:13,20
40:20 43:23
44:2,4,12
51:1 56:23
58:7 59:9,23
65:16
67:2,3,7,8
70:13,22
72:10 74:5
75:3,12
76:15,16,17,2
4 77:8 78:5
79:20
80:13,16
82:11,19
85:17 87:17
89:12,15,16
90:10 91:3
92:15,17
93:17 94:18
96:7,9 98:3

**imagine** 14:8
39:18

**importance**
84:9

**important**
28:13 31:18
32:7,17,23
33:2,5,15
62:14 64:10
66:14,15 68:9



73:12,14,17,2
3 74:3 75:4
84:4 86:14
96:16,24
97:3,5 99:3

**importantly**
62:13

**impractical**
31:5

**inch** 36:3,23
37:4 64:14

**inches** 38:4,19
63:7 98:24

**incident** 22:10
43:6,21
45:1,23 50:21
55:20 56:21
57:9 58:12,22
59:2 63:13
66:25
96:17,21,25
97:7

**include** 65:2
75:14 81:4
94:13,16 95:1

**included**
15:4,24 36:9
64:12

**includes** 81:25
94:12

**including**
14:11 15:14
35:1 66:1

**income**
95:16,19 96:3

**incorporates**
68:13

**incorrect** 67:6

**INDEX** 3:1 4:1

**indicate** 30:12
36:23 53:1

**indication**
40:10

**indications**
86:3

**individual**
76:7

**individuals**
74:13

**information**
17:16 19:5,6
21:9,13 22:3
25:20 26:18
27:2,5,13,16
29:15,25
33:8,9,11
34:2,11 35:22
36:24 39:14
40:24 41:3,17
50:13,17,18
51:19
60:9,21,23
61:23
62:1,2,5
63:5,8 64:13
65:2,11,17,23
66:11 67:12
75:25 76:22
77:18 82:1
86:21,22,25
90:20
91:11,14,16
92:4 97:2
103:10

**informational**
92:5,7

**initial** 14:25
50:10

**initiates**
81:23

**injury** 89:3,4

**inspection**
15:12
16:3,8,17
17:10,14,17,2
0,23 22:13
26:2
27:14,17,23
28:9,22 29:13
30:5,18,20
31:3 38:9,22
40:13,15,20
53:4 54:2
60:21,22
61:25
90:14,17
94:12,17 97:3

**instance** 24:23
47:17 64:13
74:10,16

**instances**
36:20

**instruct** 95:24

**Insurance**
11:16

**intended** 55:5

**intention** 54:3

**intentional**
55:11

**interact**
73:4,22 74:1

**interacting**
55:11

**interaction**
47:11
48:13,15

61:20 85:21
86:17

**interested**
68:4 101:14

**interplay**
85:25

**interrogatorie
s** 14:24,25
18:25

**interview**
96:17

**interviews**
31:19 32:7,17
33:10

**into** 8:8 17:4
23:18 24:16
37:25
38:3,15,19
42:3 52:12
53:7,20,23
61:8 63:9
64:19 67:13
70:20
71:17,23,25
72:19,23,24
79:7 85:5
86:8 87:7
88:24

**investigate**
41:23 49:11

**investigated**
52:5 84:3

**invoice** 94:25

**invoiced** 94:6

**involved** 8:11
9:1 20:10,13

**involving** 29:5

**irregular**



99:11

**isn't** 34:11
47:22 49:16
51:1 55:21
72:1 78:2
85:16

**issue** 98:13

**issues** 52:10
71:24 86:5

**it'd** 96:16

**items** 17:4
28:14

**its** 45:15
48:25 51:5
53:20 54:25
57:13 75:21

**it's** 6:11,16
8:23,24
9:11,12 11:3
18:6,16 25:12
26:9,15 28:22
29:4
36:4,5,11
37:16 40:4,18
41:6 42:15,25
43:4,13,21
44:5,13
45:1,3,12
49:16,23
51:22
52:21,22
53:1,11,15,16
54:13,15,23
55:11,23,25
57:15,16
58:16,23
59:1,14,17,19
60:4
62:9,20,21
63:6,7

64:10,20
65:10,23 67:2
68:21,25
69:13
70:5,15,23
71:3,4,15,17
72:4 75:12,24
76:24
77:1,22,23,24
78:22,25
79:15,20
81:13 82:8
85:16 86:22
87:14 90:2
93:2,4,24
99:6

**itself** 42:22
45:4 46:12,20
48:6 49:10
54:4,24 55:22
56:4 81:8
85:15

**I've** 9:22
20:17 23:15
25:3 42:14
52:5,8 93:11

─────────

**J**

**Jacob** 95:4

**job** 93:9 94:2

**Jordi** 2:3 3:3
5:11,13 8:9
9:9 11:13
13:22
14:13,16 15:5
23:2,3,19
25:5,23 26:7
27:19
28:2,11,24
29:20 30:9
31:12,24

32:14,16
33:13,21
34:17 35:17
39:7 41:9
42:16,23
43:7,17 44:15
46:24 50:2,8
53:13 54:18
56:6 57:19
59:7,8 69:10
71:7 72:3,9
76:13 79:20
80:1,4,7,10,1
1 82:16,18,21
87:20
89:10,14,17,1
8 91:18
95:11,17,20,2
3 96:5,6
99:15,20
103:22

**jump** 6:25
20:24

**June** 101:15
102:9 103:1

**just** 5:25 6:25
7:12 8:3,13
9:5,11,12,13
11:2 14:10,18
19:16 20:24
21:2,16 24:13
28:2,25 29:2
30:2 31:25
32:1,2,6
34:25 35:6,7
36:11,22
37:1,15 38:17
39:11 40:19
47:6,9,23
48:6,19 49:25
51:2,9 52:23
53:6 56:23

58:6,8 59:24
61:5,15
63:7,20 65:23
67:8,12
68:1,6,11
69:5 71:6,12
72:18
75:12,22
76:15
79:10,15,21
80:18 81:11
82:14 85:1
87:6 89:9
92:4,5,9
94:20 95:24
96:15 97:2,4
99:24

─────────

**K**

**keep** 8:23
10:15 11:7
23:15 90:20
92:14 93:6

**keeps** 9:6

**kind** 6:3 22:16
44:16 52:25
53:1,6 59:12
70:19 78:7
81:21 90:20
91:6

**kinds** 99:13

**kinematic**
85:17

**kinematically**
85:24

**knew** 81:14,15
98:22,23

**know** 5:24
6:6,12 7:24
9:4,14,15,16



10:13 11:11 13:14,21 19:14,15,17,19 20:7,11,17 21:8,10,19,24 22:5,7,19 23:6,24 26:17,25 27:1,2 29:2 30:1,4 33:25 34:1 36:2 37:2 39:22 40:5 42:3 47:5,14 48:4,5,8 50:15 51:18,25 52:2,8,19,20 56:7,13,16,20 57:21 58:7 59:14,17,18 60:5,6,12,13,19,20 61:17 62:4 63:8,15 64:10,15 65:8,12,16,25 66:11,12,17,18 67:10,14,15,16,19 69:6,7,14,15,22,23,24 70:1,3 71:17,19,20,22 72:12,15,22 73:11,13,18,19,22 74:11,14 75:5 76:3,17,20 77:5,25 79:2,3,4,9,13,14 81:1,3,10,14

83:9,10 84:1,5 86:1,2 87:4,16 89:7 90:16 91:14,16 92:15,24 93:4 94:5,19,20 96:7,20 98:22 99:9,10

**knowledge** 76:1

**known** 7:1

**knows** 77:8

———————

L

**lack** 59:2 61:7

**laid** 70:24 74:22

**large** 61:16

**larger** 37:5

**last** 5:19 7:9 8:17 10:20 13:12 30:23 78:1 81:16 83:16

**later** 39:16

**LAW** 2:3

**lawsuit** 5:14

**lay** 67:9

**laying** 69:18

**layout** 26:23 31:9 48:3

**lead** 41:13

**leadership** 20:3,5

**leads** 71:1 79:17

**leaf** 8:14 9:11,12

**learn** 18:23 79:10

**learned** 61:18

**least** 9:20 62:13 67:20 77:13 93:1

**leave** 79:13,14

**leaving** 51:16 52:3

**led** 26:20

**left** 21:11 42:24 43:9,19,24 44:21 66:16 67:17 97:11

**legal** 10:14 14:22 90:22 92:10

**length** 82:25 98:24

**Leon** 2:9 103:3

**less** 50:4 90:4,17 95:5

**let's** 5:23 6:25 9:10,11 11:14 14:17 15:6 20:23 21:15 22:11 32:6 37:15,22 44:17,18,19 49:3 52:12 53:14,19 59:21,24 78:16 82:7,23 83:5

**letter** 103:13

**level** 51:3 72:18

**levels** 67:4

**Levitan** 1:15 3:2 5:1,4,12 7:17 14:19 16:9,12 19:10 24:6 28:4 29:1 80:5 102:6 103:1,5,21

**Leviton** 18:15

**licenses** 20:14

**licensing** 20:19

**life** 79:11 80:19

**lifting** 70:14

**lighting** 99:4

**likely** 47:25

**Likewise** 99:20

**limited** 15:14

**limping** 85:19

**line** 45:21 65:4,20 66:4 67:25 68:2,5 70:17 104:3

**lined** 38:10

**liner** 52:14,15,18,25 53:21 56:14 57:2,5,8

**lion** 49:4,5,10,14,17,19,22,23

**Liro** 19:14,18



94:21 95:4

**Liss** 12:22

**list** 4:3
8:10,15,22
9:2,18,19,22,
25 10:12
11:11 15:16

**listed** 15:23

**literature**
15:14 63:20

**litigation**
17:2,5,8
32:21
92:8,19,23
93:2,10

**little** 8:20
29:1 37:20
50:12 56:12
68:1 71:24
73:25 77:22
89:9 94:10

**live** 77:14

**LLC** 1:8 103:4

**loaded** 55:3

**located** 17:13
22:7 23:7,25
24:10,24 26:1
27:10,22,23
36:1 45:3
67:24

**location** 16:10
22:17 23:10
26:24 27:16
28:14,20 30:8
34:4,14 41:25
43:14
45:13,15
50:21
57:7,9,13,18

58:14 71:21

**locations**
35:23 41:19

**long** 17:23
18:16 20:1
30:17 35:24
50:1 77:18
86:24 90:16
95:3

**longer**
79:19,23

**look** 21:1,17
22:11 37:15
42:3 43:3,4
44:17
47:4,5,14
48:14 50:22
52:7,10 66:22
74:7 81:3,18
86:19,20
88:3,11,24
89:5 96:24
97:5

**looked** 9:22
45:23 46:4
50:11 52:8
53:3 56:19
66:19 81:19
83:18

**looking** 5:21
7:22 21:3
22:12 23:13
26:22 33:24
39:8 45:17,25
48:22,24
58:3,7
60:19,20
62:10 63:7
65:8 68:2,3,7
69:20,21,25
71:12 72:20

74:18 76:8
86:2,4
98:20,21,25
99:13

**looks** 10:16
37:15 61:20
62:21 73:19
93:12

**loop** 86:18
87:7

**loose** 49:4,19

**lot** 12:3 22:9
25:3,7,19
48:9 61:18
73:13,16 78:9
80:25 97:16
98:23

---

M

**ma'am** 5:15
19:13

**made** 17:18,19
21:20,25 22:8
38:9 39:18
45:3 46:14
52:15,18
54:24

**maiden** 7:5,13

**main** 40:8
64:1,4 71:5

**majority** 92:19

**make** 10:1 26:4
39:11 45:10
46:7 47:11
48:19 51:10
54:20,23
55:1,2,5,17,2
2 56:2 62:25
63:12 67:24

69:8 86:9
94:1
95:13,23,24
96:9 98:19
103:9 104:2

**makes** 46:25

**making** 20:12
65:18 67:2
79:6 82:2

**malleable**
53:1,23

**management**
20:6

**manager** 9:6

**manifested**
85:15

**manner** 55:11

**many** 5:17
13:11 25:13
89:16 90:19
94:3 96:14

**March** 8:18

**marketing**
20:13

**married** 7:6

**massager** 22:19
23:6,10
24:8,10 27:10

**massagers**
23:25 24:18
25:25 27:22
33:24 34:14
35:4,25
45:16,17 46:1
67:16
83:22,24

**massaging**



22:16

**matched** 24:3

**material** 89:25

**materials**
15:4,23 26:18
30:10 33:11
34:25
60:19,22 62:1
71:16

**matter** 62:21
73:11 85:20
97:13 103:7

**matters** 10:14

**may** 1:17 5:2,8
14:6,12 16:11
18:11 33:22
45:18 46:2
51:8
74:17,18,19,2
0 75:10 78:24
87:4,5 94:6
102:8
103:6,8,9,12

**maybe** 5:18
6:5,10,11
13:17 59:11
78:1 80:16

**mccoy** 2:8 3:5
9:3 11:6
13:19
14:10,15
19:12,13,18
22:22,24
24:25 25:17
26:3 27:12,25
28:2,9,16
29:11,24
31:4,22 32:10
33:6,17 34:9
35:13 39:4

40:17,22 41:8
42:9,19
43:2,11 44:1
46:22 49:7
50:6 53:9
54:16 56:3
57:4 59:5
68:23 70:21
71:14 72:7
76:12
79:18,23
80:3,5
82:14,17
87:13 89:15
91:12 93:12
94:21
95:9,14,18,21
96:2,8,10,11,
13 99:21,23
100:1,3

**Mccoy** 95:4
103:2,23

**me**
6:4,5,6,10,12
7:7,12,24
8:4,6 9:14
10:3 11:2
13:16 14:2,3
16:11,19,20
18:4,16 21:25
23:2 24:13
25:10,12,21
27:17
28:12,22
29:3,15
30:3,15
31:9,10 32:5
33:12,22,23
36:14 37:13
38:2,17,20
40:3 41:10,11
44:12,16

46:19 49:17
51:12 55:9
56:10,11
58:1,4,6 59:9
60:1 61:8
68:20 70:13
72:10,25
76:16,17
78:5,6 80:13
81:13 82:6
83:3 85:1
86:6 89:8
91:3 93:1,7
96:23 102:6

**mean** 18:16
29:17 33:3
36:20
39:13,14 45:9
50:12 52:23
59:13,23
67:1,14 69:17
71:15 76:4
77:15 78:25
82:6 83:17
86:22 88:19
90:6

**means** 6:2
50:16

**meant** 26:5
74:4 87:6
97:4

**measurement**
38:6,12

**measurements**
17:21 31:7
38:16 54:1
62:3

**medical** 15:2,8
87:22,23
88:3,6,8,9,16

89:20

**meeting** 95:1

**memory** 77:18
86:24

**mental** 34:7
47:24 71:22
74:8,22
76:1,5,24
77:3,7,12,14,
17,21
78:2,10,16,18
79:12,16
80:12,17,18
81:8,22
82:9,10,13
83:1,3,7,12
86:24

**mention** 18:18

**mentioned**
15:10 18:4
25:3 28:7
30:20 34:5
47:14 61:19
66:8 74:2
76:7 84:4
86:11 88:5
89:19 94:25
97:25 98:4,17

**mentioning** 9:5

**merchandise**
51:13

**merchandising**
42:7

**method** 60:6
70:6,7

**methodological
ly** 70:5

**methodology**
54:7 59:4



60:1 69:11
70:8,14 71:10
72:2

**MIAMI** 2:4

**Michael** 2:8
3:5 103:2,23

**middle** 67:17
75:11

**might** 5:24
6:3,7 9:1
32:11 33:3
37:13 44:16
67:6 91:15
93:24

**Mike** 79:21
89:14 95:23

**military**
64:18,25 66:8

**mind** 9:20

**mine** 17:2

**minute** 7:23
30:25

**minutes** 40:10
79:20 80:9
89:8,13,16

**Mischaracteriz**
**ation** 27:25

**miss** 96:10

**missing**
9:5,16,23
25:3,7

**mixing**
76:17,19

**MMCCOY@WICKERS**
**MITH.COM** 2:10

**moment** 8:13
28:20 38:18

39:21 68:7
81:14 86:23
88:2,14,19,20

**moments** 83:10

**Monday** 103:10

**month** 5:21
8:20 30:23
90:17

**months**
90:17,18

**Moore** 13:1

**more** 8:20 47:6
48:1 49:23
51:10,12,13
55:2,22 61:9
62:4,13
66:14,19
71:24 72:25
73:25 76:24
77:22 79:20
80:17 81:2,22
85:22
89:9,12,15
90:4,17 92:4
98:3,14 99:11

**morning** 5:12
6:4,20,23
9:10 18:16

**most** 61:17
62:2 77:13
95:8 96:23
97:5

**motor** 74:1
79:17 84:11
86:11,13,14,1
5,17
87:3,6,10

**movable** 53:5

**move** 65:12

77:19 87:8

**moved** 27:18
56:21

**movement** 65:15
87:2

**movements**
66:18

**moving** 65:14
66:20,21

**much** 37:6 38:3
66:2,20 79:19
95:12 99:23

**multiple** 66:24

**must** 34:6

**Musto** 12:18

**my** 5:12
6:10,11
7:5,21
8:11,23,24
9:5 10:1,18
11:11 13:13
14:1,6 15:4,9
16:18
17:14,24
21:9,18 22:20
23:4,7,22
24:6 25:2,22
26:15,19 27:8
30:4,5
33:2,24
34:3,7
35:7,14,18,21
38:18 39:6,25
41:1,15 42:4
43:4,12,21
44:5,8,17,18
45:2,12,15
46:3,10,17,18
47:19 49:4
51:23 52:16

53:2,6,7,22
54:1,8 55:23
56:13,20
57:10,17
58:3,4,16,23
59:1 63:18
64:2 66:13
67:8,19 68:25
69:16,19
73:12,15
75:19,23,25
76:1,14
77:23,24 78:3
79:21 81:13
82:4
83:2,5,11,20
84:6,16,21,24
85:7,11,16,20
86:8 87:19
88:4,5 89:6
90:20
93:7,9,21
94:2 96:2,9
101:9,15
102:9 103:18

---

N

**name** 5:12,13
7:2,4,5,9,13
16:20 103:13

**Natalie** 1:24
101:5,19
102:5,13
103:16

**naturally** 65:9

**nature** 79:15

**navigate** 73:18
91:6

**navigated**
25:8,15

**navigation**



24:4 25:21

**near** 21:11
24:22 27:4
89:22 90:4

**necessarily**
28:17 29:17
34:11 47:11
50:7 51:10
68:11 73:7
77:1,25 84:14
87:17,19 92:5

**necessary**
32:24 38:17
54:8 56:20
60:10 78:3
81:13 91:15
92:25 103:7

**need**
7:22,23,25
33:9
50:13,16,18
67:19 80:1,7
81:10 89:7
91:17 98:10

**needed** 39:14
46:6 54:24
68:11

**needs** 83:13

**neither** 27:20

**never** 9:22
18:6 29:4
34:19
75:18,20 77:4

**new** 75:6 86:7
87:18

**next**
12:6,8,10,12,
14,16,18,20,2
4 13:1 68:17

69:24 72:22
79:1 80:24
92:23

**nice** 65:11
73:16

**nine** 20:2

**no** 1:2 6:24
8:1 9:6
10:9,25 11:17
14:3 20:6
21:13
22:2,9,23
24:2 25:1
26:12 27:16
30:7 32:2,14
37:18 40:22
41:7 44:24
45:3 46:23
49:15 50:13
51:15 56:4
58:6 67:21
73:23 77:16
82:12 83:6,15
85:24 86:6
87:14 95:2
97:19 98:12
102:14 103:4
104:3

**none** 85:19

**nor** 27:20
101:11,13

**normal** 65:14
84:21,22
87:15

**Northeast**
77:14

**not** 13:13
15:14,23
16:15 17:18
18:3 19:2,4

20:9,13
21:13,21,22
23:9
26:5,10,14,16
27:1
28:9,17,22
29:2,7,14
32:2,25
33:3,10,18
34:4 35:14
36:4,9,12
40:25 42:3
43:5,13,14,16
,22 44:13
45:5,10,18
46:3,6,10,17,
18,21 47:9
48:2,9,21
49:10,16 50:7
51:1,2,9,10,2
3 52:3
54:10,14,15,1
7
55:3,8,10,12
56:7,16,17,18
,21 57:10,18
59:9,19,25
61:15,16
62:20,21 63:7
64:2,17 65:23
66:21 67:2
68:1,17,21
69:8,13 70:15
72:18
74:5,17,18,20
75:6,10,12
76:10,16,17
77:1,9,10,22,
23,24 78:12
79:10
80:15,16
81:11,13
82:5,7,8

84:13,21,24
85:17 87:17
88:19,20,24
89:2,3,5,16
90:19
92:4,7,17,23
93:7,14 94:2
95:18,22,25
96:3,22
101:10
103:7,11

**Notary** 1:25
101:5,20
102:14,15

**notes** 30:10
96:9 101:9

**nothing** 9:20
26:24 44:22
56:1,5 72:4
75:22
83:17,23 86:1
99:15

**notice** 40:14
103:6

**noticed** 9:23
46:2

**now** 14:2
21:15,16,17
23:12 32:6
53:19 72:17
82:9,11 83:2
87:1 91:9
93:20 94:18
103:7

**null** 70:12

**number** 13:14
17:18,20,21
20:17 27:3
35:6 37:16
63:18 70:24



71:4,8,9 72:6
74:3,6 103:10

**numerically**
93:6

**numerous** 42:14

_____ O _____

**oath** 6:19
102:1

**object**
48:13,16,22
49:1 68:3,6

**objection** 42:9
95:24 96:2

**objections**
28:3

**objects** 79:7

**observation**
69:4

**observations**
17:18,19
39:18

**observe**
58:18,25
63:17

**observed** 60:15

**obstacle** 34:6

**obstacles** 79:8

**obvious** 49:23

**obviously**
19:20 37:4
39:14 47:8
66:14 72:20
83:9 86:9
92:17

**occasion** 34:16

**occurred** 30:20

88:17

**occurrence**
48:7

**odd** 76:4

**off** 13:13
22:20 23:8
55:7 59:23
99:25 100:4

**offered** 17:14

**office** 103:9

**Official** 20:5

**often** 42:11
74:24

**oh** 12:3 26:8
32:14 80:1
96:2

**okay**
5:17,19,23
6:8,14 7:20
8:13,18,25
9:17,24 10:10
11:2,14,18,21
,25 12:6,8
13:3,7,16
14:15,20
15:6,18,25
16:9,16 18:6
19:6
20:3,7,16,21,
23 21:5,8
24:13,19
28:25 32:5,23
34:23 43:23
44:20,22
46:25 48:19
49:3 50:9
55:15,25
59:15,21 67:7
68:15,20 71:8
72:10 80:4,10

82:10 87:1,21
89:12,15
90:2,8,16
91:10,19
93:22
94:11,13,25
95:6,12,17
96:5 97:22,24
98:10 99:14
100:3,4

**Olympic** 84:16

**on** 1:16 2:2,7
5:9 9:19,25
10:12 12:4
13:25 14:5
15:13,19
17:14
21:10,18,21,2
5 22:16,20
23:7,24
24:1,6,18,24
26:1,2,18
27:8,10,17,23
,24 29:25
30:4 31:1
33:11
34:8,16,19,25
35:20 37:9,10
38:11,22,23
39:6,24 40:12
41:1,10 42:24
43:5,9
44:5,7,8,22
45:13,15
46:1,3,10,11,
25 47:8,19
49:21 50:11
51:10,13,16
52:3,24,25
53:3,7 54:1
55:2 56:13
57:2,5,18

58:13 59:3
61:4,15 62:23
63:4,24
64:16,21
65:5,7
66:2,7,10
67:17
72:11,22
73:5,20
77:11,16
79:15
80:13,14,17,2
5 81:2,7 82:6
84:19 85:5,18
90:8,14,19
92:16,18,20,2
2 93:8
94:3,14
95:14,19
96:15
97:10,19
98:25 99:1
102:8 103:6

**once** 7:6 62:22
70:18 81:1

**one** 8:13 10:17
11:24
12:4,5,6,7,8,
10,12,14,16,1
8,20,24 13:1
16:18 20:19
34:24 36:3,23
38:17 40:19
41:7,23
44:7,13 53:7
54:9 55:9
59:9,11,14,19
,24 62:18
64:2,12
67:2,5 68:6,7
73:15 74:6
75:17 76:20



78:25 82:9
94:20 98:3

ones 11:12

only 9:12
   17:19 19:16
   20:12,19 40:6
   44:6,7 46:11
   51:21 64:2
   66:21

opinion 27:8
   31:18 33:4
   35:8,14 36:16
   37:8 43:5,21
   44:23 45:8,12
   46:17 54:19
   55:24,25
   56:23
   57:11,12,15
   58:1,11,17,23
   59:1,10,20,25
   60:2,4 61:6
   63:18,23
   66:13
   68:17,25
   69:13
   71:8,10,11
   72:5 74:3
   77:23,24
   82:4,25
   83:2,12,20
   84:5,14,15,17
   ,22 85:12
   86:9 87:9

opinions 34:24
   44:8 54:10
   56:20
   57:17,20,23
   58:4,9
   59:10,14,16,1
   8 70:20,23
   75:23 78:4
   81:13 84:24

87:19 88:22
89:1 97:20

opportunity
   36:6 63:16

opposed 66:16
   92:12 93:4,5

optimal 68:10

order 1:19
   54:7 57:25
   72:5 102:7

ordering
   103:12

orientations
   67:18

oriented
   92:2,5

original
   103:11

OSHA 51:17,22
   52:4,10

other 7:1
   13:15 14:22
   15:7,20
   17:3,9 35:12
   36:20 37:9,11
   38:16 41:20
   47:16 48:24
   64:23,25 69:2
   70:20
   73:18,23
   74:12 79:6
   90:23
   92:3,11,13
   99:3

others 57:22
   64:3,4

otherwise
   87:11 94:2

our 63:1 65:4
   68:10 73:9
   77:19 79:17
   103:9

out 5:25 8:1
   9:14 33:15
   35:1 37:20
   52:18 55:10
   60:10 63:9,16
   64:4 65:7
   66:8 69:18
   70:24 74:22
   76:4 86:20
   98:1,7

outside 15:18
   19:19,22
   20:16 22:7
   39:1,8 41:12
   49:17 63:20
   87:15 90:22
   92:10

over 35:24
   37:2 77:9
   93:3,8

overarching
   70:6

own 58:6,9
   96:3 103:8

owner 32:8,11

owners 31:19
   32:18

_____
   P
_____
p.m 1:17 100:6

page 3:2 4:2
   15:19 21:1,16
   22:11 23:13
   58:3,8 104:3

pages 9:12,13

Palantine 12:6

pallet 18:19
   21:5,18,19,23
   ,25
   34:8,12,19
   35:2,11,19,21
   36:1,18
   37:4,8,10,16,
   19,21,24,25
   38:10,11,18,2
   1,25
   39:10,15,19,2
   3
   41:1,2,14,25
   42:6,24
   43:8,13,18,24
   44:6,21,23
   45:4
   46:5,11,12,13
   ,14 47:8 48:2
   50:3,4,21
   51:5,10,13
   52:3,13,14,25
   53:8,18,21
   54:3,4,20,23
   55:4,5,16,22
   56:2,4,5,7,8,
   14,18,25
   57:3,6,10,11,
   13
   58:12,21,24
   60:13,14,24
   62:3,24
   63:1,6,10
   65:22
   68:12,16,17
   72:20,21
   74:17
   75:9,11,16
   77:2,10,11,24
   81:15,17,18
   82:6,7,13
   83:7,19



98:17,18,23
99:5,10

**pallets** 39:17
51:16 52:6

**pallet's** 59:25

**papers** 73:15

**parameters**
62:23 69:2

**parametric**
66:19 67:1

**part** 33:18
37:24 42:4
48:4 49:2
52:20 54:9
63:11 69:14
70:10 77:22
78:2,10 88:25
89:5 94:2

**particular**
22:25 78:12

**particularly**
54:25

**parties** 1:18
33:10
101:11,12

**parts** 59:14,16

**past** 13:6,8

**Patla** 73:13

**pattern** 57:17
99:12

**patterns** 99:9

**PENTHOUSE** 2:4

**people**
41:14,20
47:17 48:25
55:6 61:18,20
62:11,14 64:8

65:10,12 70:4
72:12
73:2,4,14,18,
19 77:13
78:9,17
79:1,4,6,13
80:21,22,23
81:2,9 86:19
92:2,3,20

**per** 95:13

**perceive**
36:13,17
37:10 46:21
49:1,5
58:17,18,25
63:17 69:4

**perceiving**
82:2

**percent** 93:3

**percentage**
10:10,23
11:4,8
92:12,16
95:15

**percentages**
65:3

**perception**
69:5

**Perfect** 96:11

**perform** 17:14

**performed**
62:7,8

**performing**
61:22

**peripheral**
66:3

**periphery** 66:1
68:14 70:18

76:9

**permanent**
18:19 89:3

**person**
10:8,11,24
11:4 34:6
35:16 46:21
48:15 49:11
67:9 81:5
85:7,9,10
87:16

**person's** 48:24
62:19 63:21
65:5,8 80:13
86:11,15

**perspective**
36:10

**pertaining**
15:2,9 87:22

**pertinent**
51:20

**Ph.D** 1:15 3:2
5:1,4 102:6
103:1

**photo** 37:14

**photograph**
16:7 21:17
22:12,15
23:1,14 35:16
36:9 38:11,23
39:1,8 40:7
44:5,19 45:13
56:15

**photographs**
14:11,19
16:4,5,7
17:21,22
30:15 47:20
53:3 61:25

71:12

**physically**
16:9 47:8,10

**picked** 23:7

**picture** 40:9
56:16 77:5

**pieces** 27:5

**pinpointed**
67:5

**place** 27:22
53:6,20 70:20
75:21

**placed** 47:15
51:13

**placement** 47:5

**places** 64:23

**plaintiff**
1:6,16 2:2
11:8,12,18,19
12:13,21
13:2,4,15
97:17

**Plaintiff's**
8:6,7
14:23,25
18:25
23:15,17
96:16,24
97:6,10,19

**plastic**
52:15,21

**play** 86:8

**please** 6:6,12
7:7,24 9:14
13:23 14:4
16:12,19,20
25:11 28:2,3
31:23 58:2



59:3 61:10
80:8 100:2
103:6

**plenty** 36:5

**PM** 103:10

**point** 9:21
14:7 28:6
35:9,18 62:5
67:11 68:6
76:21 83:19
93:2

**Ponce** 2:9
103:3

**pop** 52:12

**portion** 61:16

**pose** 42:25
43:10,22
44:10,24
45:5,7

**posed** 43:19,25

**position** 56:22

**positioned**
38:25 39:10

**positions**
20:3,5

**possession**
13:24 14:2

**possibility**
8:25 46:2

**possible** 9:17
46:9 47:9

**possibly** 45:16

**potentially**
19:13 42:12
47:3 48:18
49:20 72:22
76:3 98:7

**pre-deposition**
95:7

**prefer** 37:21

**prepared** 94:5

**pretty** 9:11
55:23

**previous**
34:16,20 86:5

**primarily**
63:4,17 99:5

**primary** 61:3
93:9

**printed** 64:18

**prior** 28:1
31:11 39:19
56:18,19 73:3
90:6

**pro** 52:24

**probably** 13:20
40:18 74:11
95:8

**problem** 6:7
99:4

**proceed** 82:3

**proceedings**
101:8

**process**
86:21,23,24
91:7

**processing**
86:22

**product** 48:1
77:6 78:25

**products** 47:18
67:22 74:24

**professional**

20:15,22 33:4
44:23 45:8
52:2

**project** 9:5
92:16,18

**promise** 18:17

**promptly**
103:13

**pronouncing**
12:20

**proof** 34:7

**property**
32:8,11

**protecting**
51:22

**protruding**
37:25 38:3,15

**provide** 21:22
23:9 36:22
37:1 60:23
92:24

**provided** 8:5
14:21 15:23
24:3 27:17
30:15 33:8,12
40:1 60:20,22
62:1 71:16

**provider** 88:10

**provides** 17:2

**proximity** 90:1

**Public** 1:25
101:6,20
102:14

**publications**
92:6

**publicly** 15:14

**Puelles** 1:24

101:5,19
102:5,13
103:16

**pull** 15:6
23:12 63:5

**purely** 92:6

**purpose** 55:2

**pursuant** 1:19
102:7

**put** 5:8 34:15
53:7,20,21,22
60:8 64:19
72:23 73:21
77:6

**putting**
72:19,24

---

Q

**quantitative**
62:4 63:25
65:16

**question**
6:10,11,13,16
10:1,25 11:10
14:14,16,17
23:4 26:19
31:25
32:1,2,3
33:2,23
34:10,23
37:14
39:11,12
44:3,4,12
46:16 56:11
82:20 83:2,4
85:7 94:18
96:1,4

**questions** 29:3
33:16 89:16
95:19



96:14,18
97:9,16 99:14

**quick** 34:23
49:12

**quickly** 8:14

_____

R

**raising** 93:22

**random** 40:19

**ranges** 67:3

**rate** 93:18

**RE** 103:4

**reach** 33:15
59:4 61:12
69:12 71:10

**reached** 68:15

**reaching** 60:2
66:5 86:14
87:9

**react** 58:18
59:1 63:17

**reacted** 60:16

**read** 9:13 58:5
90:25 99:25
100:1,2
103:11

**reading** 34:25
100:7

**really** 51:21
55:3,19,21
56:1 61:3
68:4
69:6,18,25
70:5,7 73:16
75:25 99:3

**realm** 84:19

**re-ask** 31:25

82:22

**reason** 6:22
9:6 30:7 40:2
45:20 49:15
85:21,24
104:5,7,9,11,
13,15,17,19,2
1,23

**reasonably**
62:15 70:3
79:4 80:20
81:5 84:2

**reasons** 51:9
52:11 55:9
78:25 104:2

**recall** 10:22
11:1,3 15:22
17:12,24
19:24 21:22
22:9 25:3,13
28:6,21
30:14,19,25
31:16
39:13,20
40:16
88:1,15,16
89:24 90:10
91:8 92:1

**recalled** 74:20

**receive** 40:14
89:21

**received** 20:18
89:20 90:3
93:11 97:16

**receiving**
88:16

**recent** 95:2

**recently** 8:15
84:25 85:1,4

92:9

**reception**
89:24

**recollection**
17:25 96:25
97:6

**record** 5:9 8:8
23:14,18
99:25 100:5
101:9

**recorded** 31:21

**records** 15:2,8
87:22,23
88:3,6,8,17
89:20

**recreated**
38:21

**recreating**
39:2

**recreation**
67:6

**recuperating**
85:8

**refer** 16:11

**reference**
14:6,8,9
36:22
37:12,21
64:1,4,5 66:7

**referenced**
64:20

**references**
15:16
69:16,19 70:9
73:12

**referencing**
22:25 59:6

**referred** 88:8

**referring** 57:1

**reflected** 9:2

**refresh** 51:19

**refrigerated**
24:17 27:4
50:24

**refrigerators**
21:6

**regarding**
14:14 34:2
89:6

**regardless**
49:4 66:23

**registered**
74:18

**registering**
76:10

**regular** 85:10

**regularly**
32:25

**regulations**
50:14 51:20

**reject** 61:1

**rejected** 60:11

**rejecting**
70:11

**related** 13:25
29:9 30:13
31:15 58:10
88:22 94:22

**relation** 18:7

**relative** 37:12
71:19
101:10,12

**relatively**



99:7

**relevant** 28:14
54:13 55:9
97:23 98:2,5

**rely** 33:11
46:3,10

**remember** 25:19
30:3 77:2
81:21 88:8
96:18 97:17

**remembered**
77:25

**remembering**
83:16

**remotely** 1:18
2:6,11 102:7

**remove**
44:18,20

**removed** 39:5

**repeat** 25:11
78:14

**rephrase** 6:12

**report** 4:4
14:6,8
15:4,15,19
18:18 20:25
21:1 23:15
34:5 35:1
36:10 38:18
45:15 48:10
58:3,7 59:18
63:18 64:2,3
69:16,20
70:24
73:12,15 74:4
75:17
88:4,5,9
90:7,13 94:17
101:7

**reported** 1:24
32:9,20

**Reporter** 1:24
5:8
99:18,22,24
100:4
101:1,5,19
102:13 103:16

**Reporting**
103:16

**represent** 5:13
10:8 11:16,22
12:1

**represented**
11:18,19,24

**research** 17:3
35:20 36:23
61:15
62:12,23
63:24
64:16,17
72:11,12,15
73:1,6 79:13
80:20,25 81:2
90:23
92:16,18

**reserved** 100:8

**respect** 9:24
13:10 15:25
16:1 18:12
23:4,5
24:9,20
25:8,14 27:21
28:13 29:5,9
43:18 58:2
70:14 74:3
84:6 88:17
89:1,19 95:7

**respond** 95:25

**responses**

18:24

**restroom** 79:24

**result** 51:17
52:4

**retail** 42:7
50:14 52:9

**retained** 10:14
13:11 32:19
89:22 90:4,8

**return** 103:14

**review** 9:18
15:20 16:1,4
60:23 94:16
96:9

**reviewed** 15:9
16:2,6 26:18
34:25 39:22

**reviewing**
15:22

**right** 5:19
6:25 7:14,20
9:10,17,24
10:16,20
11:19 13:3,10
14:2
15:9,10,16
16:14 19:8,20
21:6,12,15
22:1,4,6,8,15
,17
24:6,16,18
25:6,16 26:8
27:4 30:23
33:1 35:1
40:7 41:22
54:11
59:12,13
66:6,16
67:13,17
68:18

76:11,19
78:17 79:1
82:15 87:5
88:23 91:9,21
93:13,17,19,2
0,23 94:15
95:3,6,12
97:11 98:8
99:24

**role** 17:1,7
84:11 85:22

**rough** 7:12
73:20

**R-R-A-S** 16:23

**RUBENSTEIN** 2:3

**rude** 18:17

**rules** 5:23

**run** 60:1 61:11

**running** 97:25
98:6

**rushing** 98:1,7

---

S

**Saccenti** 12:14

**safe** 51:13

**safely** 80:23

**safer** 54:21,23
55:6,17 56:2

**safety** 41:21
42:4 52:1,6,7

**said** 7:13 22:3
24:14 26:14
45:25 49:18
59:15 64:23
74:5 76:14
78:15 84:12
86:1 92:10



sales 51:16
  52:3

same 23:21
  24:1 26:1
  27:10,22
  38:24
  39:15,17
  43:12,14
  49:24 56:8,14
  57:12,14,15,1
  6 82:5 84:15
  89:25 90:21

sample 61:11

Sanchez 12:24

saw 48:2

say 9:18 18:6
  21:23 23:14
  25:12,13 26:5
  27:20 28:23
  29:4,13
  37:15,16
  40:4,18
  41:5,6
  44:18,19 47:9
  49:3 55:25
  56:24 65:10
  67:1 72:4
  76:20 82:7
  83:5 86:12
  87:1 90:2,12
  92:12,15,18
  94:6 98:3

saying 35:23
  51:1 75:12
  82:10 87:17

says 34:24
  71:2

scan 72:12
  73:3 80:22
  81:4,10 83:13

scanning 70:4
  81:6,7,25

schedule
  93:11,15

school 8:2

science 72:25
  73:25

scientific
  60:1,6 61:19
  70:6,14 71:10
  72:5 92:6,7

scope 33:19

scramble 76:18

screen 7:21
  8:11 23:22
  35:7 44:17

second 11:21
  33:22 69:12
  76:21 77:22

section 24:17
  27:5 58:8

sections 45:24
  53:17

see 6:4 7:21
  8:11,17 15:18
  22:15
  23:20,21,22
  24:23 35:9
  36:5,7,15,20,
  21 37:3,6,23
  39:1 44:19
  46:4,7 52:13
  54:20 55:16
  56:9,15 57:1
  60:13,25
  62:14,15,20
  64:14 65:4
  66:1,16
  69:3,23 70:3

75:17 76:9
  77:5 82:8
  83:25 85:23
  86:19

seeing 6:5
  56:18 68:9
  76:10 78:18

seem 85:13

seems 59:11
  70:13

seen 8:15,16
  14:4 34:19
  36:7,25 42:14
  45:18 46:9,15
  52:8 61:6
  69:1 74:17
  77:23 78:12
  82:5,12
  83:20,21

select 61:11

sense 10:1
  39:11

separately
  51:1

set 40:5,13,16

share 8:5 35:7
  44:17 67:7

she 9:7 14:11
  21:9,10,20,21
  ,23
  22:2,3,5,6,7,
  8,9 23:7,9
  24:7,8,9,15,2
  1
  25:1,8,13,14,
  18,20 26:23
  27:3,7,11
  33:25
  34:1,8,11,13,

18,19
  35:3,10,14,24
  36:4,6,12,17,
  19,21
  37:2,3,5
  40:9,11 41:5
  45:17,18
  46:2,6,8,9,15
  48:1,2
  55:10,12,13
  56:17,18
  58:16,17,25
  59:22
  61:4,6,7
  63:16 65:25
  66:17,20,21
  67:11,12,15,1
  7,20,21,22
  69:2,5,6 71:3
  74:11,17,18,1
  9,21
  77:1,3,7,8,23
  ,24,25
  81:15,16,17,1
  8,19,20,21
  82:8
  83:6,13,14,15
  ,16,17,20,21,
  24
  84:1,2,12,13,
  16,23,25
  85:1,2,4,5,19
  86:1,2,3
  87:15 88:20
  95:21 97:14
  98:6,8,11

SHEET 104:1

shelves
  22:17,20

shelving 23:8
  37:19 38:1
  45:22 77:4



**she's** 25:7
  27:4 36:7
  45:17,25 46:1
  62:9,10 65:19
  67:24 71:18
  82:12
  83:21,24
  95:18,25 96:3
**shop** 78:17
**shoppers**
  78:6,17,23
**shopping** 71:20
  74:10
  80:14,15
**shops** 74:12
  78:7
**short** 9:12
**should** 7:22
  21:4 23:14
  35:11,15
  36:6,12,17,19
  37:3,15 46:15
  52:24 53:25
  58:17 60:15
  61:6 65:25
  68:25 70:11
  78:7,23
  81:19,23
  83:20,21 84:2
  85:25
  93:15,16
**shouldn't**
  83:12,17
**show** 6:6 7:21
  20:25 40:19
**showed** 40:15
**shown** 79:13
**side** 9:25
  21:11,12

  45:22 54:3
  81:7 97:11,14
**sides** 52:17
  53:7
**sidewalk** 75:5
**sight** 45:21
  65:4,20 66:5
  67:25 68:2,5
  70:17
**sign** 44:19,24
  45:2,5,10,15,
  19,21
  46:3,7,10,17
  103:8,11,13
**signature**
  103:7,13,18
  104:25
**signing** 100:7
**similar**
  17:2,5,7
  26:17 30:8
  38:24 47:16
**similarly**
  38:25
**simple** 79:12
**simplistic**
  86:19
**Since** 29:12
**single** 94:19
**sit** 88:7
**site** 15:12
  16:3,7,17
  17:10,16,23
  22:12 26:2
  27:23 28:8
  31:2 38:22
  40:20
  60:20,21

  61:25 94:12
**sitting** 72:22
**situation**
  42:20,22 43:5
  44:9 47:4
  49:12 50:11
  63:2 68:25
  72:19 75:13
  82:7 83:11
**situations**
  43:15 65:25
**size** 36:6,25
  46:13 51:7
  54:25 57:16
  61:11 63:4,6
  69:21 98:21
**sizes** 35:22
  63:6 64:15
  65:1
**skills** 86:12
**slats** 99:11
**slide** 54:14
**slightly** 67:6
  84:23
**slip** 91:2,5
**slip-and-fall**
  31:20 91:24
**slip-and-falls**
  91:20
**slippery**
  77:15,16 91:1
**Slope** 91:1
**slower** 84:23
**Smith** 2:8
  103:3
**smooth** 6:1

**soda** 50:25
**soft** 52:21
**Sol** 11:21
**solely** 48:22
**some** 5:23 6:3
  9:1
  15:1,2,7,8
  22:16 40:21
  52:22 57:20
  65:24 67:23
  71:23 73:12
  78:7,24 80:17
  85:18 86:7
  87:22 92:3,11
  96:15
**somebody** 47:10
  64:16
  72:20,21
  92:22
**someone** 32:4
  47:7,8 49:18
  54:14 78:6
  81:23 91:24
  98:13
**someone's**
  97:25
**something** 7:22
  8:5 9:16
  29:22 32:23
  37:3 43:16
  47:2,11,16,22
  48:6,10,17,21
  51:3 62:17
  64:15
  69:7,22,23
  70:3 72:18
  75:4,14
  76:3,8,9
  79:9,10,15
  83:25 84:10



86:19 87:18
93:7
**something's**
75:9
**sometimes**
76:22
**somewhere** 49:4
**sorry** 9:15
14:1 15:11
18:15 25:11
26:8 37:11
38:13 44:2
59:23 76:15
82:19 90:19
93:17 96:7
98:3
**so-so** 12:22
**sound** 91:10
93:18
**sounds** 79:12
91:22
**SOUTHERN** 1:1
**space** 77:6
**span** 34:3
**speak** 18:1
28:13,17 29:8
31:14 94:21
95:3
**speaking**
33:10,14
42:10,11 43:8
62:8 75:4
78:23 85:16
94:1 97:21
**specialize**
41:21 52:1
**specific** 19:24
23:5 25:1,14

29:15,16 30:3
34:4,12 39:20
41:16,18,19
42:4 43:6
47:23 51:19
63:9 64:17
67:5 72:1
77:10,24
80:18 84:13
**specifically**
14:23 17:24
24:9,21 26:14
28:7,9,21
29:15 31:16
32:4 34:1,12
43:23 48:2
52:19 55:4
56:5 67:16
72:17 74:5,21
77:2,25 80:15
81:14 88:1,14
92:2
**specificity**
78:2
**specifics**
21:22 23:9
25:19 40:16
84:18 91:8
97:23 98:11
**specified**
21:13
**specify** 24:21
59:5
**specifying**
36:4,5
**speed** 85:19
**spell** 7:7
16:19,20
**spending** 93:7

**spent** 94:3
**spoke** 29:4
30:12
**spoken**
19:10,19,20,2
3 29:21
**spot** 39:15,18
77:11
**spreadsheet**
66:6
**stacks** 74:20
**stand** 49:17
**standard** 66:9
**standards**
42:1,4 50:14
64:19,25
**standing** 33:25
34:2 35:16
46:1 55:6,12
65:19 67:11
72:20
**stare** 81:11
**started** 85:2,5
**starts** 45:18
**state** 1:25
60:16
101:2,6,20
102:2,14
**stated** 24:7
64:1 88:5,6
**States** 1:1
64:18 66:8
**stature** 65:5
**step** 47:13
69:25 73:3
87:4,5

**step-by-step**
29:3
**stepped** 59:13
**stepping** 34:6
**stick** 59:24
**sticking** 63:9
**sticks** 9:14
**still** 8:1 25:2
27:10 29:19
39:17
49:21,24
53:22
57:12,14,15,1
6 66:23 83:17
89:12
**stocked**
50:5,12,16,19
**stop** 6:6 7:25
**store** 22:25
23:5 24:5
25:15 26:23
31:9 34:20
35:3,10 41:18
47:18,22 48:3
62:3 71:21
74:22
80:14,15
98:1,7
**stores** 42:8,15
74:12 76:2,5
**straight** 86:2
**straightforwar**
**d** 65:8,10
**strike** 36:14
41:10 56:9
84:25
**struck**



21:23,24

stuck 37:20

studies
64:7,21

study 8:16

stuff 5:24
92:13

subject 16:10
21:18 27:24
37:21 38:11
41:25 48:22
50:4 58:22
75:16 84:7
85:3,6

sued
10:8,11,24
11:5 91:5,20

suffered 85:2

sufficient
31:8

suggest 87:11

suing 91:24
92:2

Suite 103:3

summarize 58:5

summarized
58:4

summary 73:16

summons 14:21

Superior 11:25

supplements
24:24

support
17:3,5,8
92:19 93:2,10

supported

28:19

supposed 35:18
57:14

Supreme 1:19
102:7

sure 10:4 12:3
17:3 31:25
37:13 38:10
39:11 40:20
44:16 48:19
53:14 59:7,9
63:1 65:18
74:5 78:15
79:6 86:10
94:9 96:9

surprise 40:23

surprised
81:20

surroundings
83:14

surveillance
39:22 40:1

sworn 5:6
102:8

_____
          T
take 17:23
31:6 47:13
49:25 50:20
55:7 70:8
71:25 76:22
77:6 79:23
86:21 87:4,5
103:6

taken 1:16
14:12 16:2,7
22:12 36:9
38:12 45:13
53:4 61:25

takes 17:4

taking 27:1
35:16 69:24
71:17,23
72:17 73:3
76:23

talk 19:16
26:10 31:10
53:14 64:24
65:1 69:16,20
70:9 72:16
74:9 75:8
82:23 85:23

talked 19:16
28:10 31:11
35:21 58:20
61:24 69:17
70:2,7 85:21
87:21 94:19

talking 13:17
26:12 29:16
62:24 70:1
71:18 73:13
75:3,7
76:21,24
80:21 86:16
87:4

talks 64:2
65:12 70:25
73:2

taller 54:4

task 62:6,16

tasks 61:21
62:7 81:3

taught 33:19

technical 6:3

technically
53:6



tell 6:19 7:23
21:25 38:2
69:22 70:11

telling 76:16
78:6 87:7

tells 87:2

ten 10:17

term 24:21
77:18 86:24

terms 71:9

terrains 73:20

testified 5:6
10:23 13:3,4
22:6 24:15
29:14 34:19
55:13 84:8
86:1

testify 34:13
40:9 41:5
56:17,18
74:19
81:16,19
83:16 88:21

testifying
90:22

testimony
10:22 11:3,12
13:7 21:14,21
24:3,9
26:22,25
27:9,14 28:1
30:6 35:1,8
41:4,12,20
44:9 57:8
58:16 71:18
84:20 85:13
93:13,15,16,1
8,23,24 94:22
97:1



testing 60:6,9

tests 61:11

textures 99:9

than 8:20 35:4
36:2
37:4,5,19
38:1 40:11
47:6 54:4
72:21 75:10
95:5

Thank 5:8
99:15,17,21,2
3 100:4

that
6:1,2,5,12,15
,17,23
7:4,9,17
8:2,5,10,14,1
7,18,24,25
9:1,4,5,7,10,
19,20
10:3,15,18,22
,25
11:3,4,8,9,10
,14,15,16,19,
22 12:1,9
13:5,7,24
14:4,9,12,14,
21
15:3,4,7,9,10
,23
16:2,6,11,16,
20
17:4,12,19,21
18:3,4,6,10,1
1,12,18,23
19:2,4,6,7,19
20:10,16,18,2
0,21
21:4,10,13,18
22:3,5,6,20

23:7
24:2,7,12,14,
15,19,20,21,2
2
25:7,9,10,11,
13,14,18
26:5,15,16,19
,20,24,25
27:2,6,9,11,1
3,15,17,20
28:12,14,19,2
3,25
29:4,13,14,17
,18,22
30:3,4,5,7,11
,12,14,16,20,
21,23
32:11,21,22
33:2,3,9,11,1
8,19
34:3,5,7,11,1
8,19,21,24
35:9,10,11,14
,16,21,23,24
36:1,2,5,6,10
,12,14,16,18,
20
37:1,3,8,9,10
,16,17,18,19,
21,23
38:1,7,8,10,1
7,18,24,25
39:1,6,14,17,
18,23,25
40:3,8,9,10,1
4,18,21,23
41:1,3,5,6,7,
10,11,13,15,1
7,18,23
42:6,17,18,24
,25
43:5,9,13,19,
21

44:3,6,8,19,2
1,22,24
45:2,7,12,14,
18,20
46:2,3,6,9,10
,11,14,19
47:7,9,10,15,
16,21,22,23,2
4,25
48:1,2,4,9,10
,19,22
49:1,2,5,6,9,
10,15,19,24
50:3,10,11,12
,13,15,16,20,
24,25
51:2,5,9,12,1
3,23,25
52:8,9,13,16,
18,25
53:1,2,3,11,1
9,20,23,24,25
54:2,4,7,10,2
5
55:1,2,7,12,1
6,19,21
56:1,10,11,16
,22,23,24,25
57:1,2,6,7,13
,21,23
58:1,13,16,20
,22,23
59:1,4,9,10,1
1,22,25
60:2,3,4,7,8,
10,14,19,22,2
3,25
61:1,4,6,12,1
3,20,25
62:4,5,6,7,17
,19,23,24
63:1,2,7,12,1
5,19,22

64:1,2,6,7,8,
12,13,18,19,2
0,21,25
65:12,15,18,2
2,24
66:7,11,13,15
67:1,5,6,10,1
2,15,19,20,21
68:3,6,7,9,12
,16,17,20,21,
25
69:5,7,11,12,
13,14,15,16,1
8,20,24
70:7,9,12,16,
19,24
71:3,6,9,16,1
8,20,22,24
72:4,8,15,19,
24,25
73:2,5,11,13,
16,18,19,24
74:2,4,6,9,13
,14,18,20,23
75:1,2,14,17,
19,24
76:1,2,4,7,10
,14,21,22,23
77:1,2,4,5,6,
7,10,11,15,17
,18,19,23,24,
25
78:2,6,9,11,1
2,14,15,17,19
,20,21,22,24
79:2,4,6,7,8,
9,10,11,12,13
,16 80:20
81:8,9,10,12,
14,16,17,20,2
1,24,25
82:8,9,12,13,
17,23



83:3,7,13,15,
16,19,23,25
84:1,4,8,10,1
9,20,21,25
85:4,9,11,12,
13,14,15,17,1
8,23,24,25
86:1,3,7,12,1
4,21,25
87:3,6,9,11,1
4,15,17,18
88:3,4,8,11,1
7,25
89:6,19,20,21
90:2,4,5,10,2
0
91:6,7,11,14,
17,19
92:1,3,14,15,
17
93:3,4,9,13,1
8
94:5,6,12,16,
19,25
95:1,2,15,25
96:23 97:2,17
98:2,3,4,5,8,
14,17,19
99:3,4,5,8,10
,13
101:6,8,10
102:6
103:6,7,8

**that'll** 94:13

**that's** 8:4
11:5 15:22
20:22 24:12
31:21
32:20,23
47:3,9 48:14
52:15
61:3,5,15

62:2,3,11,19
63:5,15
64:6,16,17
65:10 66:7,8
69:14 70:8
71:1
73:2,6,23
74:8,9
75:7,11
77:9,10,11,21
79:9,12,15,22
,25 80:16,20
82:8,22 84:24
87:3,6 91:3
92:25
93:6,7,20
94:2,14 96:2
99:14

**their** 47:19
54:14 55:7
61:20,21
62:15,16,20,2
2 65:6,12
70:4 72:13
73:4 76:9
80:21,24 81:9
86:20 103:9

**them** 18:5
19:19 32:21
33:15 42:14
50:25 52:10
64:10 69:17
78:16 79:8
80:18

**then** 7:16
14:18
15:11,12,13
30:6 32:24
38:11
45:17,25
46:16,25
48:3,20 50:18

52:17 56:24
58:18,25
60:6,17,18
61:7 62:20,25
63:15 64:19
65:6 66:4
68:8,12,16
69:7
70:7,18,19
71:1,5
73:7,10 78:5
79:16 80:12
82:2 85:5
86:25 89:9
90:2 92:16
93:24 95:6,7

**theory** 86:23

**therapeutic**
22:16
23:21,25

**there** 6:22
7:18,21
8:21,25 9:19
12:3,22 13:14
14:9,21 18:19
20:4 24:3
26:23 27:16
28:8,23 29:17
32:19 34:7,11
36:5,14
39:15,25
40:25
41:5,7,13,14,
17 45:14
46:1,17
47:23,25
49:18 50:13
51:3 52:13
53:16 54:22
55:15,21
57:11
63:19,20,22

64:3,4,23
65:11,19
68:17
69:2,7,11,15,
19 71:9,12,24
72:1,4,24
74:20,21,23,2
4
75:1,18,19,20
78:1,7,19,24
79:2,6,7
81:15,16,17
82:7,8,12,17
83:6,16,17,23
,25 84:1
85:13 86:1,7
88:12 92:1

**therefore** 71:2

**there's**
9:19,20
15:7,8,12,13
24:2 31:20
35:11 36:24
47:6,25 48:5
49:3,15,20
51:9 52:13
55:3,19 56:1
61:14 63:8
67:21 69:7
72:15
78:15,20
80:25 81:2
85:24 86:6
87:14 92:23
99:8

**Thereupon** 5:3
8:7 23:17

**Therrien** 12:20

**these** 10:7
23:25 24:23
52:14 53:7



65:25 74:8

**they** 20:9,11
24:2 26:2
27:23 28:23
30:11 39:16
40:14 42:18
51:8 62:20
64:12,24
72:13 76:9
77:6 78:18
79:14
81:10,23
86:19,20,21,2
2 87:23,24
91:5,6 94:1
98:1,6,14

**they're**
42:11,17,18
48:15 61:21
62:15 72:14
73:19 76:10
77:5 79:5,7
81:3,6,24
86:20 88:9
97:25

**thing** 30:3
40:6,8 54:14
62:17
94:19,20
96:24 97:5

**things** 17:9
25:19 41:23
47:5,14,16
48:9,11 49:10
50:24 54:22
55:18 61:24
62:18 63:11
64:9,12 69:15
71:17 74:6,13
76:20 79:1,2
85:19 88:21
90:23 91:17

96:15 98:1,5

**think** 6:11
24:19 25:6
32:11 33:7
37:23 42:20
51:2,5
54:13,24
55:19 69:14
75:24 76:19
78:9 79:25
83:1 85:11
86:8 98:4

**third** 11:25
61:6

**thirty** 103:11

**this** 5:24
6:1,4,20,23
8:6,10,14,15,
22
9:2,10,16,20,
22,25 10:12
11:11 12:4
13:25
14:3,5,16,17
15:15,19,21
16:1 17:6,11
18:8,12
19:8,10
21:6,17
22:15,25
23:5,12
24:1,6 26:24
27:6,15
28:6,15,19,20
29:6,10,18
30:1,13,21
31:15 33:23
34:8,20
35:8,9,10,24
36:1,8,11,12
37:1 38:10
39:1,8,21

42:3
43:5,6,18,21,
24
44:6,18,20,23
45:1
47:7,17,22
50:3,4,21
52:2,14,15,17
,20,25 53:5
54:10,14
55:20
56:2,14,15,16
,24
57:9,21,24
58:2,10,12,21
60:12,21
61:1,16
62:8,13
63:3,22,25
64:19
66:5,11,12
67:7,9
68:12,24
69:4,12
70:7,16 71:2
72:11,17
74:9,25 75:3
76:3 78:12
79:21 81:4,22
82:7,14,23
83:5,6,24
84:12,14 85:1
86:6,18
88:2,14,19,20
,23,25
89:2,22
90:3,8 93:1
94:4,6,10,15
95:21 96:21
97:20 98:22
101:15 102:9
103:13

**those** 13:10

15:3 19:22
23:21 27:5,22
47:23 48:9,11
52:11 55:17
57:24 58:13
61:24 63:10
66:10,22
67:18,20
77:14,18
85:19 87:23
88:6 89:21
91:13 96:18
99:12

**though** 8:16
13:15 65:1,10
76:10 93:8

**thought** 38:14

**three** 10:17,20
17:25 19:22
38:4,19 45:23
59:17 67:18
71:2,5,9,11
72:1,6
73:1,8,24
74:3,6 84:5
90:17

**through** 6:2
8:14 9:11,13
11:11 27:14
49:25 59:13
60:1 61:12
64:7 76:8
79:3,11 80:19
81:9 91:6

**throughout**
7:23 10:13
14:5 24:4
31:2 32:21
77:19

**time** 5:19 7:25
10:23 11:4



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

14:7 17:13
28:22 31:6,8
35:18
41:1,15,18
56:9 57:6
58:15 67:11
68:4 69:8
71:3 74:24
78:1 79:11
81:16
83:16,22
85:18 89:25
90:4 92:16
93:7,21,22
95:1 98:3
103:7

**timeline** 8:4

**times** 5:17
13:4,5 42:14
63:13 66:24

**Timothy**
16:18,21

**T-I-M-O-T-H-Y**
16:21

**today** 14:7
88:7 94:22,23

**together** 72:16
91:2

**told** 29:23
30:3 39:16

**took** 6:19
17:20,21,22
30:16 40:9
56:17 103:8

**top** 13:13
53:18 57:2,5

**totality** 71:25

**towards** 21:6
24:16,17

72:21 92:2,7

**track** 10:15
11:7 23:16
92:14 93:6

**trackers** 81:1

**training** 20:17

**transcribe**
101:8

**transcript**
15:1 101:9
103:22

**traumatic** 85:8

**travel** 50:23

**T-R-E-S-I-E**
16:22

**Tresierras**
16:18,21,24
18:1,11
19:1,20 25:24
27:15,21 28:7
29:8,21
30:11,18
38:9,20
40:4,15,19
54:6

**trial** 4:3
93:23

**trip** 47:8
79:10 91:5,24

**trip-and** 32:19

**trip-and-fall**
31:20 32:8

**trip-and-falls**
91:20

**tripped**
21:18,20 34:8
40:12 56:13

61:4

**trouble** 6:5
84:16

**true** 19:2
24:12 78:11
101:9

**truly** 103:15

**truth** 6:20

**try** 28:25
36:10 60:10

**trying** 6:6 8:1
31:6 39:9
40:5 47:2
63:16 67:8
72:14
76:15,16,17
79:21 83:9

**turn** 22:8
82:11 83:8

**turned** 24:15
27:3 46:8

**turning** 22:4,6

**two** 9:12,13
10:17 17:25
39:16
59:14,15,16
63:18 66:2,3
70:24
71:5,8,10
72:1,25
73:8,24 76:19
85:3 90:17
95:4

**type** 50:16
52:22 78:24

**types** 42:15
64:7 91:13,16

**typical** 65:13

_____
U
_____

**unaware** 18:10

**under** 53:6,23
94:10

**undersigned**
102:5

**understand**
6:10,19 24:19
28:25 32:1,2
33:3 35:8
39:12 42:17
44:2,11 48:20
57:23 61:23
62:12,14
65:18 74:14
75:8 76:15,23
84:10,11
85:15

**understanding**
8:23,24
26:15,20,21
37:18 39:6,25
44:5 45:2
47:19,24
49:21,22
51:23 52:16
53:2 54:1
62:6,10 63:20
65:24 70:22
72:12
73:1,3,5,25
74:23 76:14
81:25 84:9

**understandings**
84:20

**understood**
6:16 20:23
94:13

**unexpected**



75:1,6

**unfortunately**
22:9 28:20
30:1

**uniform** 99:7

**unit** 38:1

**United** 1:1
64:18 66:8

**Universal**
103:16

**unless** 49:11
80:5 89:10

**unobstructed**
37:5

**unstocked**
42:25
43:9,19,24
44:22,24

**up** 7:21 15:7
23:8,12 35:6
37:13 38:10
40:13,15,17,1
9 48:10 57:2

**up-to-date**
8:22 9:6

**us** 50:20 66:15
67:23
77:14,19
92:21,22
103:14

**use** 39:9
54:6,7 72:13
77:18

**used**
42:6,11,14
59:4 60:2
63:19,22 64:8

**useful** 91:15

**using** 55:5
65:16 66:3
67:3 70:9

**usually** 52:10
78:24 79:1
91:13

──────────

V

**vague** 6:11

**variability**
84:19

**variation**
84:21,22
87:16

**vary** 67:25

**verified** 14:23

**versus**
11:9,15,21,25
12:3 44:4
46:13 48:7
99:12

**vertical**
36:3,25
66:12,14

**via** 2:6,11
103:22

**vicinity** 34:15

**video** 15:25
16:1,2 67:18

**videos**
14:11,19
17:22 30:15
31:7

**view** 35:9 37:5
45:22 46:15
58:25
62:5,16,19,20

,22,25
63:15,21,24
65:3,13,18,21
,23 66:9,24
68:5,13 80:22
82:1

**violations**
51:17 52:4

**vision** 65:21
66:3 68:8,14
70:17,18
72:13,16
73:10,11,14,1
7,22 74:1
76:9 80:22
84:9,11 85:22
86:17

**visit** 40:23

**visits** 34:20

**visual** 35:2
64:3,24 68:10

**vs** 103:4

──────────

W

**wait** 80:9

**waive** 99:25
103:7,13,18

**walk** 35:25
45:18 46:8
53:20 72:13
79:1,14 80:19
83:14 85:4

**walked** 21:10
24:16 26:23
34:8,12 35:3
67:15 73:9
85:5 98:11

**walker**
84:23,24

**walking**
21:9,11 25:9
27:2,4 40:25
41:6,7,14
55:13 62:9
65:19 67:22
72:21 73:20
77:8 79:3
81:9,23
84:13,16
85:2,5 86:3
97:10,14,25
98:6,8,14,15

**Walmart** 25:25
26:6,10

**want** 14:22
19:14,15,16
20:25 21:2
28:25 29:2
35:6,7 39:11
58:8 60:8
61:8 62:17
77:6 89:10,11
94:19,20
96:15 100:1

**wanted** 8:3

**wasn't** 10:25
17:12 22:2
25:1 28:23
29:12,17 30:8
31:7 54:8
55:3,9
56:19,24
57:11 60:16
61:5 66:20
78:3 81:17
82:17 85:4
88:12

**watch** 49:17

**water** 39:5,17
44:7,8,14,20,



24
45:3,5,10,14,
19,21
46:2,7,9,16
50:22,25 51:9
55:7 74:20
77:11 78:1

**Waters** 12:10

**way** 5:25
6:4,13 10:5
11:3,15 14:3
21:5 25:12
36:14
52:23,25
56:11 82:23
85:1 86:4
90:19 94:7

**ways** 32:5

**we** 6:1,2 13:17
15:18 17:19
19:15,19 21:3
22:5,15
23:20,21
24:23 25:6
27:2
31:8,10,17
35:9,22 36:2
37:2 38:24
39:1,16 42:21
43:3,14
44:18,19,20
47:3,4,5,13,1
4,24 48:14
49:11
50:21,22
52:10,12,13
53:19 54:20
55:16 56:8,15
57:1,21
60:4,5,7,8,16
61:18,23,24
62:6,12,14,16

,17,18,25
63:5,15
65:4,7,11
66:16,22
68:8,12
69:11,17
70:1,2,8
72:23 73:9,11
74:7,8,9,12,1
3,14
75:7,8,17
76:22
77:5,13,17,19
79:2,10,11,13
,14 80:1 81:4
84:10 85:23
86:17,18
87:1,21 89:7
90:23,24
91:17 95:6
96:8 98:22,23
99:25

**we'd** 50:18
60:17

**weekend** 99:19

**we'll** 14:18
89:9 92:24

**went** 16:16
67:13 74:16

**were** 5:20
7:16,17
9:1,25 10:11
11:12 13:14
14:21 15:4
17:19 23:25
24:18 26:1,2
27:5,9,22,23
28:23
30:11,17
31:1,17
38:14,17

39:16 40:25
44:22 53:3,19
60:19
63:11,19
64:21 66:18
70:1 85:12
87:23,24 88:4
90:4,8
92:1,2,4 97:9
98:1,6,15

**we're** 21:1,16
22:12 23:13
26:12 47:2
49:14 60:6
63:2 68:1,4,9
72:17,19
74:15 76:23
79:2 98:20,21
99:13

**Were** 63:19
87:23

**We're** 5:9
23:12 80:3
89:7

**weren't** 24:3
46:17

**we've** 57:20
58:20
62:22,24 67:9
69:15

**what** 7:4 8:4
9:15 10:10,23
15:18,19
17:1,5,16
20:21 21:19
26:20 28:21
31:10 33:8,9
35:18 36:25
37:12 43:23
46:25
48:14,15

50:12,15,19
53:11 54:19
55:17 56:19
57:8,22
58:9,16 62:21
63:21
65:4,10,20
66:9,18,20,21
67:1 68:4
69:6 70:1,17
74:4
75:3,16,17,20
76:14,15,20
78:5 80:16,24
82:6 84:1,25
85:1,2 86:15
87:1 88:7
92:11,20
93:20 96:7
98:18 99:1

**whatever** 6:7
24:13 60:9,22
92:24 93:24

**what's** 52:18
65:21 70:16

**when** 5:19 7:9
21:9,20 22:8
23:7 25:8
28:18,23 36:4
39:14
40:4,11,13
45:17,25
47:25 48:20
50:22
55:3,6,13
56:13,24
58:21 62:9,15
65:10 66:5
67:1,11 72:13
74:16 76:23
79:14 81:3,23
83:24 86:17



87:22 89:20
90:8,13 91:5
99:1

**where**
21:9,22,25
22:7,19 23:6
24:8,10,17,21
,23 25:8
26:23 27:6
29:19 33:25
34:1 35:15
36:1,8,12
39:23 46:1
47:15 53:17
58:3 60:3
61:5,18
62:9,11,12,14
63:5 64:24
65:4,6,19
66:17
67:10,24 68:9
72:14 73:20
74:8,9 77:21
79:5 80:20,21
81:2,24 82:10
85:17 86:20
88:5 98:14
99:1

**whether** 19:2
25:25 27:22
28:7 30:25
31:1 40:25
42:12 43:16
45:4 46:20
48:1,6,17,21
52:3,20,21
54:9,13,15,23
56:7,20 60:10
61:1 63:16
65:7 67:17
70:11,15
73:19 74:7

75:9 81:15
89:2 97:10

**which** 6:2 9:25
11:12
17:5,7,18
34:15 35:24
36:9 42:21
50:22 51:20
55:8 59:5,11
63:17
64:2,5,9 65:8
68:8,9,10,13
69:3,4 70:25
71:1,2 75:11
81:15 85:12
87:1 88:4
97:13 103:11

**while** 17:19
31:6,17 33:23
45:16

**who** 16:16
19:10,17,19,2
2 20:11 64:8
77:14 78:6
85:7 91:24
92:2 103:8

**whole** 31:2,8
59:12 68:5
71:22 83:11

**whose** 85:9

**why** 6:22
17:10,12
42:21 45:7,9
55:9 75:7
78:25 82:8
85:21 96:8

**Wicker** 2:8
103:3

**wide** 67:14

**wider** 37:19,25

**width** 98:24

**wild** 49:3,5

**will** 23:15
28:3 54:2
56:11 92:15
99:1

**wish** 103:13
104:2

**with** 7:18 8:5
9:24 11:11
13:10 15:25
16:1
18:7,11,12
19:2,24 21:20
22:5 23:4,5
24:9,13,20
25:8,10,14,25
27:6,15,21
28:12,13
29:5,9
30:6,17
31:1,13,14,17
33:10 38:2
39:17
40:13,17,21
42:1,7 43:18
44:7 45:15
46:19 47:21
48:3 50:19,22
51:12 52:9
55:8,11
57:2,24 58:2
59:25 61:21
67:7 70:14
71:19 72:8
73:4,9,22
74:3,10 75:25
80:16 83:4
84:6,11 85:7
87:15 88:17

89:1,19
94:20,21
95:3,7 96:23
98:5 99:7
101:13 103:12

**within** 10:20
15:15 23:10
35:2 40:9
46:20 47:15
58:12,24
67:21 69:16
82:1 84:18
103:11

**without** 5:21
40:3 73:24
77:9

**witness** 3:2
5:5,7 9:4
11:7 13:20
14:20 22:23
25:1,18 26:4
27:13 28:6,17
29:12,25
31:5,23
33:7,18 34:10
35:14 39:5
42:10,20
43:3,12 44:2
46:23 49:8
50:7 53:10
54:17 56:4
57:5 68:24
70:22 71:15
72:8 80:9
82:19 87:14
89:12 91:13
95:10,25
99:17 100:2,8
101:15 102:9

**witnessed**
96:20


**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

woman 5:13

won't 9:16,17

Woodson
  64:5,19 65:1
  66:7

words 58:7,9
  76:17

work 11:8
  13:25 14:5
  15:21 16:5,24
  33:19 52:1
  72:16
  73:13,16,18
  90:19,21 91:2
  92:10,11,12,2
  5 95:13

worked 11:4
  20:1

working
  92:15,17

workplace
  41:21 42:4
  52:6

worry 14:18

worth 93:7

would 5:21 7:4
  10:2 14:8
  15:24 17:5,25
  20:9,12 21:5
  24:22 25:18
  28:12 29:22
  32:24 33:4
  34:15 37:21
  39:25 40:8
  41:13 42:6,24
  43:9,19,24
  44:23,24 45:3
  46:19 48:2
  49:5,6,8,9,25

50:3,4,13,16,
25
51:2,3,12,14,
18,21
53:1,2,21
57:12,14 58:4
60:14 61:7
63:12
66:9,11,12
74:21
75:2,14,18
76:5 78:10,11
80:5
81:18,20,21
82:8,13 83:7
84:15,19,21
85:8,9,11,14,
15,19
86:8,9,15
87:18 88:2,11
90:12
92:12,17,18
93:3,4 94:16
95:2 96:23
97:1,6,19
98:2,5,13,14

wouldn't 6:22
  36:21 41:3
  45:7 49:25
  68:11 72:8
  73:11,23 75:1
  81:17
  83:11,15
  84:17 85:9

would've 8:18
  9:7 24:22
  29:23 31:5
  40:1 45:21
  62:25 66:23
  69:2 83:25
  95:8 99:4

wrap 67:8

79:21

writing 30:14
  90:6

written 19:7
  59:17 90:13
  91:23

wrong 24:14
  38:20 70:13
  72:10 78:5
  80:13 91:3

_____
        Y
yeah 10:4,7
  11:14 14:16
  23:2 25:12
  26:8 37:13,22
  45:11 53:14
  80:3 82:16,18
  96:2 100:3

year 30:21
  85:3 95:13

years 10:20
  13:6,8,12
  20:2 39:16

yellow
  44:19,24

yes 5:7,16
  6:18,21
  7:3,15
  8:12,16,20
  10:2,19,21
  11:20,24 12:2
  13:6,9 15:10
  16:13,25 17:9
  18:14,22
  19:9,13 21:4
  22:14,18
  23:23 30:22
  36:19
  38:18,23

41:24 52:16
53:2,16 61:10
63:24 70:24
71:4,15 76:21
78:10,23
88:11 90:6,15
91:22 93:20
94:1,24 95:10
96:19
97:1,8,12,18
98:16

York 75:6

you
  5:8,14,19,24
  6:4,6,9,10,11
  ,15,16,19,22
  7:1,7,9,12,13
  ,16,17,20,21,
  22,23,25
  8:2,3,4,5,10,
  11,15
  9:1,13,14,18,
  25
  10:2,7,11,13,
  16,22
  11:3,10,11,16
  ,18,22 12:1,6
  13:7,11,14,16
  ,21,23,24
  14:1,3,4,7,8,
  9,11,22
  15:6,9,16,20
  16:1,4,9,11,1
  4,19 17:10
  18:1,6,10,18,
  23
  19:1,6,10,16,
  19,23
  20:1,3,7,11,1
  4,17,25
  21:1,8,10,19,
  24 22:6,19,24



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

23:6,22,24
24:13
25:6,9,11,24
26:5,17,20,25
27:1,9,20
28:12,14
29:4,23
30:1,11,17,20,25
31:1,14,23
32:1,10,12
33:3,9,14,25
34:5,18,21
37:11,21,23
38:2,5,7,14,17 39:12,22
40:5,13,24
41:13,21
42:3,6,13,17,24 43:9,23
44:12 45:9
46:19 47:5,14
48:3,5,8,10,11,12,20
49:5,12
50:3,9
51:12,18,25
52:1,2,8,20,24 53:12,25
54:6,13,22
55:4
56:7,13,24
57:21
58:1,2,4,6
59:3,5,9,13,15,17,18
60:1,5,6,12,13,19,20
61:8,10,11,12,17 62:3
63:8,15,22
64:14
65:8,12,14,16

,25
66:4,11,12
67:1,8,10,12
68:15,16
69:12,14,15,22,23,24
70:1,3,15,18,22
71:9,11,17,19,20,22
72:5,12,15,22
73:13,18,19,20,22,24
74:2,4
75:5,14
76:3,7,14,18,20 77:5,25
78:11,14,15
79:1,3,9,13,14,18
80:1,5,7,16,19 81:1,3
82:2,3,19,24
83:4,9,10
84:4,5
85:8,25
86:2,11,12,23,25
87:4,7,9,10,16,21
88:7,8,13,16,22
89:1,8,10,11,19,20,21,22
90:3,4,8,16,21 91:14,16,23
92:9,10,11,12,13,15,24
93:4,12,25
94:3,18,19,21,25
95:3,12,14,15,20,23

96:7,16,17,20,23,24
97:5,9,16,17,24
98:3,4,10,13,17,22
99:1,8,10,16,17,21,22,23
100:1,4
103:6,7,8,9,1,13

**you'd** 11:14
40:22 83:10

**you'll** 77:16

**your** 5:9 7:13
10:13,22,25
11:3 13:24,25
14:5,8
15:16,18,19,20 16:5 18:18
20:25 21:1
23:14 27:8
28:15
31:13,18
32:2,14,15,18
33:4 34:5,24
35:1,8 36:16
37:8 44:23
45:8 46:16
49:5,18 52:2
54:9,10,19
55:25 56:23
58:1,6,7,9
59:10 70:19
73:21 74:3
75:14,17,24
76:17,20
78:10
82:1,4,19,25
84:15,17
86:15,24,25
87:2,7,9 88:9

90:13
93:11,22
94:20,22
95:1,13,23,24
97:13,20
103:6,8,9,11,13

**you're** 6:5
9:15 24:20
26:8 32:3
33:8 44:3
48:20,21,24
51:25 52:23
53:12 56:25
59:6 68:3,6
69:23
76:16,19 78:5
79:19,23 81:4
82:10
93:17,22

**yours** 17:7
66:5 90:25
103:15

**you've** 10:23
11:4 13:3,4,7
19:20 32:20
57:23 82:25

—————————
Z
—————————
**zoo** 49:14

**Zoom** 2:6,11
6:2



UNIVERSAL COURT REPORTING

877.291.3376
www.UCRinc.com