101958-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-cv-23021-KMW

EVELYN E. GUZMAN,

    Plaintiff,

vs.

HOLIDAY CVS, LLC,

    Defendant.
_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE THE EXPERT TESTIMONY OF DEFENDANT'S EXPERT WITNESS, ANGELA LEVITAN, PH.D.**

COMES NOW, Defendant, HOLIDAY CVS, LLC, by and through the undersigned counsel, and hereby files its Response in Opposition to Plaintiff's Motion to Strike the Expert Testimony of Defendant's Expert Witness, Angela Levitan, Ph.D. [DE 20], and in support thereof states as follows:

**INTRODUCTION**

The factual crux of this case is whether Plaintiff should have seen the water bottle endcap display at the end of aisle 16 in Defendant's store. Dr. Levitan concludes she should have. Plaintiff characterizes Dr. Levitan's methods as doing no more than what the jury can already do: imagining themselves in the shoes of the Plaintiff on November 8, 2020 while she was shopping at CVS. That assumption is unfounded. A brief glance at Dr. Levitan's report—along with Plaintiff's extensive deposition of Dr. Levitan—reveals that Dr. Levitan's opinions are not based on experiences common to lay people. Rather, Dr. Levitan's opinions are rooted in the testable methodology derived from her professional training, an extensive body of independent academic

CASE NO. 1:21-cv-23021-KMW

research, and an analysis of the facts in this case as the Plaintiff herself characterizes them. As such, Dr. Levitan's expert testimony should not be struck. After all, Dr. Levitan's specialized analysis of this case is helpful to the jury to give them an objective basis for knowing what Plaintiff should have been able to see and navigate.

**DISPOSITIVE FACTS**

This case arises out of Plaintiff's one-count Complaint for negligence against Defendant for personal injuries she allegedly suffered as a result of a trip and fall over a product endcap display while shopping for back massagers in aisle 16 of Defendant's CVS store on November 8, 2020. Defendant offers the testimony of Human Factors engineer, Angela Levitan, Ph.D., CPE,[1] to assist the jury in understanding—objectively—whether the product endcap display (1) was an avoidable condition, (2) was conspicuous, and (3) was able to have been seen by Plaintiff prior to tripping. *See* Defendant's Expert Witness Disclosures without Exhibits attached hereto as **Exhibit 1**, at p. 2 ¶ 3; *see also* **DE 20-1** at p. 9. "Human factors engineering is the application of human factors information to the design of tools, machines, systems, tasks, jobs, and environments for safe, comfortable, and effective human use." *Padula v. Carnival Corp.*, 16-23862-CIV, 2017 WL 7792714, at *5 (S.D. Fla. Oct. 13, 2017) (quoting Human Factors and Ergonomics Society, Educational Resources, Definitions of Human Factors and Ergonomics, https://www.hfes.org/ (last visited Sept. 5, 2017).).

Dr. Levitan has been a long-time student of the field of Human Factors engineering. In 1999, Dr. Levitan earned her M.S. in Industrial and Systems Engineering with a Human Factors Option and Safety Certificate. *Curriculum Vitae* of Angela Levitan, Ph.D., CPE, attached hereto

---

[1] A "CPE" is a Certified Professional Ergonomist. **DE 20-**1 at p. 1; **DE 20-2** at 20:14-22.

CASE NO. 1:21-cv-23021-KMW

as **Exhibit 2**, at p. 3. Then in 2003, Dr. Levitan earned her Ph.D. in Industrial and Systems Engineering with a Human Factors Option. **Exhibit 2** at p. 3. For the next decade, Dr. Levitan worked as a Research Scientist at the Center for Physical Ergonomics at the Liberty Mutual Research Institute for Safety. *See* **Exhibit 2** at pp. 1, 3. As a Research Scientist, Dr. Levitan "conducted research projects in human factors and occupational biomechanics, focusing on the prevention of slips, trips, and falls and determining causal factors." **Exhibit 2** at p. 3. Now in 2022, Dr. Levitan brings her training and experience to bear in examining the human factors involved in the Plaintiff's trip and fall in Defendant's store.

Under the Human Factors analysis, to determine if an object should have been seen by a person, the first step is to determine if the object is in the person's field of view. *See* **DE 20-2** at 62:17-63:18. To determine the person's field of view, Human Factors engineers refer to the determined human visual capabilities charts in the preeminent "Woodson handbook" paired with the data collected of the subject person's eye height, the dimensions of the subject person's environment, and the tasks being performed by the subject person. *See* **DE 20-2** at 63:19-67:6; **DE 20-1** at pp. 7-8, p. 7, n. 10 (citing W.E. Woodson, Human Factors Design Handbook (1992)). If the object is determined to be in a person's field of view, the next step in the analysis is to determine whether the object is visually conspicuous. **DE 20-2** at 62:17-63:13; *see also* **DE 20-1** at p.8. An object's conspicuousness may be evaluated by its size, distance from the person, contrast with the surrounding area, and the surrounding lighting conditions. **DE 20-2** at 62:17-63:13; *see also* **DE 20-1** at pp. 7-8. Given that "the visual sensory input is the primary sensory input" of a person's safe navigation of an environment, if an object is (1) in the person's field of view and (2) visually

CASE NO. 1:21-cv-23021-KMW

"conspicuous," then a person is better able to observe, perceive, react to, and avoid the object. *See* **DE 20-1** at pp. 6-7; **DE 20-2** at 86:14-87:8.

Dr. Levitan considered several data points in her analysis. First, Dr. Levitan considered the Plaintiff's own version of what she saw and how she tripped as construed in Plaintiff's deposition testimony. *See* **DE 20-1** at p. 3; **DE 20-2** at 25:12-22. Dr. Levitan also considered Plaintiff's medical records to the extent it indicated her height at the time of the incident. *See* **DE 20-1** at pp.7-8; **DE 20-2** at 87:21-88:6. Next, Dr. Levitan reviewed the photo Plaintiff took of the product endcap display 20 minutes after the incident for its position and appearance on the date of the incident. **DE 20-1** at p. 3; **DE 20-2** at 40:4-12; *see also* **DE 22-7** at p. 31 lines 1-11. When Dr. Levitan's Florida-based colleague Dr. Timothy Tresierras visited the store at Dr. Levitan's direction, Dr. Tresierras arranged the product endcap display to the same position it was in on the date of the incident. **DE 20-2** at 16:9-17:15; 37:22-38:25. Dr. Levitan FaceTimed Dr. Tresierras while he conducted the site inspection. **DE 20-2** at 17:10-25. And, at Dr. Levitan's specific direction, Dr. Tresierras took several measurements, photos, and videos over the course of the two to three hour site inspection. **DE 20-2** at 16:9-17:25; 30:17-31:11; *see also* **DE 20-1** at pp. 4-6.

With the data in hand, Dr. Levitan applied it to the analysis used in Human Factors engineering. First, Dr. Levitan determined the Plaintiff's field of view based on the size of the aisle and where Plaintiff could have been in the aisle. *See* **DE 20-1** at pp. 5-7; **DE 20-2** at 33:22-39:6, 66:4-68:14, 97:9-15. Dr. Levitan even considered the variables presented by the Plaintiff's head or eye movements, along with the presence of a mouth-nose, COVID-19 facemask. *See* **DE 20-1** at p. 7; **DE 20-2** at 66:4-68:14. Calculating that the product endcap display would have been in the Plaintiff's field of view while shopping in aisle 16 regardless of those variables, Dr. Levitan next

CASE NO. 1:21-cv-23021-KMW

considered whether the end cap display was objectively conspicuous. **DE 20-2** at 62:22-63:13, 98:17-22; **DE 20-1** at pp. 6-7. The product endcap display was about 4 feet by 40 inches on the ground and was about 6 inches high. **DE 20-2** at 63:5-13; **DE 20-1** at pp. 5-6. The product endcap display, with its wooden slats irregularly painted blue along with the black bordering, contrasted with the relatively uniform gray, carpeted floor. **DE 20-2** at 99:3-13; **DE 20-1** at pp. 6-7. The size and coloring attributes, set in the well-illuminated store, made the product endcap display "conspicuous." *See* **DE 20-2** at 99:3-13; **DE 20-1** at pp. 6-7. Further, in Plaintiff's deposition, Plaintiff said she had already been to that exact aisle of the store prior to her trip and fall. *See* **DE 20-2** at 34:5-22; **DE 22-7** at p. 20 line 23 to p. 23 line 19; **DE 22-7** at p. 22 lines 1-7 ("I made a right into the aisle, because I remember where the back massager was, because I had seen prior days before, and I didn't get it and I wanted to buy it. So I left that day without it, and I wanted to go back and get it, because I had it in the back in my mind that I wanted to buy it.").

With the data applied to the general rules of Human Factors engineering, Dr. Levitan gave her opinions. First, Plaintiff objectively could have seen the product endcap display because it was within her field of view based on the facts collected and applied to the human capabilities data in the Woodson handbook. **DE 20-1** at pp. 8-9. Second, the product endcap display was conspicuous because its position, size, and colors contrasted with the surrounding environment. **DE 20-1** at pp. 8-9. Third, the Plaintiff had already been to that exact part of the store on a prior occasion and would have been familiar with aisle 16's layout. **DE 22-7** at p. 20 line 23 to p. 23 line 19. Therefore, a "causative factor" in Plaintiff's trip and fall over the product endcap display was the Plaintiff's own "actions, or lack thereof." **DE 20-1** at p. 9. Dr. Levitan explains:

> [M]s. Guzman was performing the low workload task of walking with minimal distractions. Ultimately, a person's successful navigation through their

environment requires an adequate degree of cognitive attentiveness. . . . Based on the visual attributes of the pallet, if Ms. Guzman had been visually scanning her environment for potential obstructions within her travel path, she would have seen the blue pallet contrasted against the gray carpeted floor. . . . [S]he would have been able to observe, perceive, and avoid the pallet based on the size, color, and contrast. Therefore, if Ms. Guzman's fall was related to the pallet, which was part of the end cap display, her lack of attentiveness was a causative factor. The visual cues present would have been prevalent and conspicuous, so anyone who was walking in the area and being reasonably cautious should have observed, perceived, and reacted to the palletized end cap display and been able to avoid a fall related to interacting with it.

**DE 20-1** at pp. 8-9. Because Plaintiff could have and should have detected the product endcap display as a visual sensory input, which would have let Plaintiff navigate about it as she shopped, the product endcap display did not pose a dangerous condition. **DE 20-1** at pp. 8-9.

## MEMORANDUM OF LAW

This Court should not strike the expert testimony of Angela Levitan, Ph.D. because (1) Dr. Levitan is qualified in the field of Human Factors engineering, (2) she employed a reliable methodology, and (3) her opinions derived from this methodology will help the jury understand the evidence. Federal Rule of Evidence 702 allows experts from testifying in the form of an opinion when four prerequisites are met:

(a) the expert's . . . specialized knowledge will help [the jury] to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court engages in a three-part inquiry to ensure "speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). First, the court must consider whether the expert is qualified to testify

competently. *Id.* "[T]he proffered expert must be an expert in the subject matter that he proposes to testify about." *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1121 (S.D. Fla. 2014) (Williams, J.). Second, the court must evaluate whether the methodology the expert employed to reach the expert's conclusions is sufficiently reliable. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005). The Court's analysis of the expert's method considers a non-exhaustive list of factors, including:

(1) whether the expert's methodology can be, and has been, tested;

(2) whether the expert's scientific technique has been subjected to peer review and publication;

(3) whether the method employed has a known rate of error; and

(4) whether the technique is generally accepted in the scientific community.

*Carideo v. Whet Travel, Inc.*, 16-23658-CIV, 2018 WL 1367444 at *9 (S.D. Fla. Mar. 16, 2018). (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). Third, the court considers "whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue." *Carideo*, 16-23658-CIV, 2018 WL 1367444 at *8 (citing *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005)). While expert testimony that only "clarif[ies] facts and issues of common understanding that jurors are able to comprehend for themselves" will be excluded, if the expert testimony "concerns matters that are beyond the understanding of the average lay person," then the testimony is admissible. *Id.* at *10.

CASE NO. 1:21-cv-23021-KMW

### A. Dr. Levitan Is Qualified to Testify as a Human Factors Expert because She Has Extensive Training in the Field of Human Factors Engineering.

Dr. Levitan is highly qualified in the field of Human Factors engineering. Generally, "Human factors engineering is the application of human factors information to the design of tools, machines, systems, tasks, jobs, and environments for safe, comfortable, and effective human use." *Padula*, 2017 WL 7792714, at *5 (internal quotations omitted). A Human Factors engineering expert may opine on what a "reasonable person[ ] would have seen and how they would have reacted to it." *Id.*; *Snider-Hancox v. NCL Bahamas Ltd.*, 17-20942-CIV, 2019 WL 13020778, at *5 (S.D. Fla. Feb. 7, 2019) ("[A] human factors expert is generally qualified to testify regarding whether a person would have seen a condition and how they would have reacted to it.").

There is no dispute that Dr. Levitan is a Human Factors expert. Dr. Levitan earned her M.S. and Ph.D. in the field of Industrial and Systems Engineering—both with Human Factors options. **Exhibit 2** at p. 3. Then Dr. Levitan applied this education to her decade-long Research Scientist position at the Center for Physical Ergonomics, specifically researching "projects in human factors . . . focusing on the prevention of slips, trips, and falls and determining causal factors." **Exhibit 2** at p. 3. Therefore, Dr. Levitan is qualified to give the opinions contained in her report because they arise out of her training and experience as a Human Factors engineer.

### B. Unlike Plaintiff's Assertions, Dr. Levitan's Methodology Is Reliable Precisely because It Is Based On the Plaintiff's Version of Events, Objective Measurements, and the Research of Authorities in the Field of Human Factors Engineering.

Dr. Levitan's methodology for arriving at her opinions is reliable. Plaintiff lists several criticisms of Dr. Levitan's methodology, but each criticism highlights the reliability of Dr. Levitan's methodology. First, Plaintiff argues that Dr. Levitan's methodology is unreliable

CASE NO. 1:21-cv-23021-KMW

because Dr. Levitan relied on the Plaintiff's own account of the incident. **DE 20** at p. 3. Plaintiff argues:

> Dr. Levitan incorrectly claims that there is no evidence that there were any visual obstructions within the aisle.[3] This claim completely ignores the testimony from two CVS employees who claimed that the Plaintiff was pushing a cart. . . . [Dr. Levitan's] opinions are a guise to suggest the credibility of evidence and make factual determinations[.]
>
> [3] "There is no evidence that there were any visual obstructions within the aisle and based on Ms. Guzman's testimony, she was not carrying anything." Dr. Levitan Report at 7.

**DE 20** at pp. 3, 5. In other words, Plaintiff argues that Dr. Levitan's use of Plaintiff's testimony of the incident—that she was not using a cart—is unreliable because Defendant's employees testified that Plaintiff was using one. But Dr. Levitan agreed that the Plaintiff's recollection of the incident is one of the most important things for her to look at in the analysis. **DE 20-2** at 96:23-97:8. The irony should not be lost on the Plaintiff—Dr. Levitan's methodology is stronger precisely *because* she took the facts in the light most favorable to the Plaintiff by believing the Plaintiff's competing version of the incident.

Next, Plaintiff argues that Dr. Levitan's methodology is unreliable because "[s]he forms her opinions by using the research and studies of others . . . [and fails] to adequately explain how she used the research of others to reach her own conclusions." **DE 20** at p. 4. Yet, all throughout Dr. Levitan's report, replete with citation, and her deposition, Dr. Levitan explains that she relied on industry standard sources, including the "Woodson reference . . . that's out of the United States Military standard." *See* **DE 20-2** at 66:7-9; **DE 20-1** at pp. 6-8, nn. 1-18. With these external academic sources, Dr. Levitan calculated the Plaintiff's field of view with the input data of: the dimensions of the product endcap display (**DE 20-2** at 63:5-13; **DE 20-1** at pp. 5-6), the Plaintiff's height (*see* **DE 20-1** at pp.7-8; **DE 20-2** at 87:21-88:6), the Plaintiff's distance from the product

CASE NO. 1:21-cv-23021-KMW

endcap display (*see* **DE 20-2** at 35:18-13; *see also* **DE 20-1** at pp. 3-4), the position of the product endcap display (**DE 20-1** at p. 3; **DE 20-2** at 40:4-12; *see also* **DE 22-7** at p. 31 lines 1-11), the size of the aisle (**DE 20-**1 at pp. 4-6), *any* position the Plaintiff could have been in the aisle (*see* **DE 20-1** at pp. 4-7; **DE 20-2** at 33:22-37:7, 66:4-68:14, 97:9-15), and the fact she was wearing a mask (*See* **DE 20-1** at p. 7; **DE 20-2** at 66:4-68:14). The fact that Dr. Levitan used a standard calculation in the industry does not make Dr. Levitan's methodology unreliable: It demonstrates its objective and testable reliability.

Finally, Plaintiff emphasizes that there is little information known about the Plaintiff's location before her fall. **DE 20** at p. 5. Plaintiff points to the fact that where Plaintiff was standing in the aisle is unknown and her exact movements she made before the fall are unknown. **DE 20** at pp. 5-6. Dr. Levitan accounted precisely for that:

> A. . . . So, because I don't know exactly where she was and I don't know exactly what her head movements were, I looked at more of a parametric analysis to compare, well, what if she wasn't moving her head very much or what if she was only moving her eyes and not her head. **And so, we can look at all those different characteristics, and regardless, it still would've been in her field of view at multiple times during the incident.**
>
> [Mr. Jordi]: When you say parametric, what does that mean?
>
> A. So, it's basically **I'm not making one assumption.** I'm using, like, ranges, **I'm doing different factors at different levels** to be able to find answers that aren't specific to one pinpointed recreation that might be incorrect slightly.
>
> . . .
>
> [Mr. McCoy]: And you were also asked questions by Plaintiff's counsel whether Ms. Guzman was walking on the left or right side of aisle 16. Correct?
>
> A. Yes
>
> Q. And for your analysis, it doesn't matter which side she was walking in the aisle. Correct?

CASE NO. 1:21-cv-23021-KMW

> A. Yes.
>
> Q. You also received a lot of questions about the gait of the Plaintiff. Do you remember that?
>
> A. Yes.
>
> Q. The Plaintiff's gait would have no effect on your opinions in this case. Correct?
>
> A. Generally speaking, correct.
>
> Q. Okay.
>
> A. Specifics about the gait aren't relevant.

**DE 20-2** at 66:17-67:6, 97:9-23 (emphases added). The fact is Dr. Levitan did not gloss over variables that existed—her calculations took into account all of them head on. Importantly, none of varied data points input in the standard calculation changed the result: Plaintiff had the ability to see the product endcap display at the time of the incident no matter where she was in the aisle. This Court should not strike Dr. Levitan because her methodology was testable, able to be peer-reviewed, rooted in Human Factors engineering field standards, and accounted for the relevant data points and variables. Therefore, Dr. Levitan's methodology is reliable.

**C. Dr. Levitan's Opinions Help the Jury Understand the Evidence from Dr. Levitan's Quantitative Human Factors Engineering Analysis.**

Finally, this Court should not strike Dr. Levitan's expert testimony because her opinions help the jury understand the evidence from a quantitative standpoint. Again, if the expert testimony "concerns matters that are beyond the understanding of the average lay person," then the testimony is admissible. *Carideo*, 16-23658-CIV, 2018 WL 1367444 at *10. While the input data may be in the understanding of the average lay person, such as the appearance of the product endcap display, the testimony of the Plaintiff, or the size of the aisle, the Human Factor's analysis of that data is not. That is, the Human Factors analysis of the data determines the quantifiable range of a person's

ability to see an object when navigating a space. *See Padula*, 2017 WL 7792714, at *5 ; *Snider-Hancox*, 2019 WL 13020778, at *5 ("[A] human factors expert is generally qualified to testify regarding whether a person would have seen a condition and how they would have reacted to it."). A lay person can only speculate as to such abilities.

Dr. Levitan's opinions are not based on what she, Dr. Levitan the person, thinks Plaintiff could have seen but are based on the Human Factors calculation of what the Plaintiff should have *been able* to see and how well she was able to see it while navigating aisle 16. Dr. Levitan determined first that the product end cap display was mathematically in the Plaintiff's field of view no matter where the Plaintiff was in the aisle. **DE 20-**2 at 62:17-22, 66:17-67:6, 97:9-23. Then Dr. Levitan determined that the product endcap display was "conspicuous"—not by her own whim but by the factors relied on in the Human Factors engineering field like size, contrast, height, color, backdrop, and lighting. **DE 20-2** at 62:22-63:4, 98:17-99:13. And given that a person's visual inputs are the "primary sensory input" of the process of "safely navigat[ing] through an environment" through their role in providing "an accurate mental construct of the environment through which [a person is] walking in conjunction with the neuromuscular control of limb movements," the product endcap display's conspicuousness has significant meaning. **DE 20-**1 at pp. 6-7. In other words, if an object is in a person's field of view and it is visually conspicuous, then the object is able to be readily comprehended by the human body and easily navigable by a person unless the person is not paying attention. As Dr. Levitan explained:

> [I]t's my opinion that Ms. Guzman should have seen it because it was conspicuous, and all the other parameters there would've – she would've had the ability to see it, which is the observation, but also to perceive it, which in this case the perception is just that she is conscious of it. . . . People see something, they look ahead, they look out at their environment where they're going, they process it, they – I mean, it's human information processing theory, is you process it in the moment.

**DE 20-2** at 68:24-69:6; 86:19-23. Therefore, once it was established that the product endcap display was (1) in Plaintiff's field of view, (2) visually conspicuous, and (3) a person's body readily appreciates and reacts to conspicuous objects while navigating, then by process of elimination (a) the Plaintiff's acts and omissions were "a causative factor of the subject fall incident" and (b) the product endcap display was not dangerous to a human person. **DE 20**-1 at p. 9; **DE 20-2** at 70:13-74:1, 97:16-23. Dr. Levitan's analysis of the data and her conclusions in her report are helpful to the jury to understand the evidence from a quantitative standpoint, which is beyond the common understanding of the lay juror. *See Carideo*, 16-23658-CIV, 2018 WL 1367444 at *10. Therefore, this Court should not strike Dr. Levitan's expert opinions.

    **D. This Court Should Deny Plaintiff's Request for Hearing because Plaintiff Already Deposed Dr. Levitan Regarding Her Opinions and the Way She Formulated Them.**

    Finally, Plaintiff requests a second opportunity to question Dr. Levitan about her analysis. Plaintiff took Dr. Levitan's deposition on May 27, 2022, and it lasted for over two hours. *See* **DE 20-2** at Cover Page. Throughout the deposition, Plaintiff's counsel questioned Dr. Levitan about her report, about her methodology, and about her opinions. *See generally* **DE 20-2**. It was the purpose of the deposition. *See, e.g.*, **DE 20-2** at 57:20-25 ([Mr. Jordi:] "Doctor, we've discussed some of the opinions that you had in this case but I know we haven't discussed others. So what I'd like to do is I'd like to understand all of the opinions that you've generated in connection with this case, and I'd like to do those in order."). This Court should not give Plaintiff a second bite at the apple. After all, expert discovery closed on May 27, 2022. **DE 18** ("On or before May 27, 2022, the Parties shall complete all discovery, including expert discovery."). Accordingly, this Court should deny Plaintiff's request for an evidentiary hearing.

CASE NO. 1:21-cv-23021-KMW

## **CONCLUSION**

This Court should not strike the expert testimony of Angela Levitan, Ph.D., CPE. As demonstrated in both her report and in her deposition testimony, Dr. Levitan examined the relevant facts in this case and applied them to the standard Human Factors engineering rules and calculations. She took into account all of the relevant unknowns and variables in those calculations and the results remained unchanged. The jury should be made aware of this quantitative analysis. As a result, this Court should not strike Dr. Levitan's testimony under Rule 702.

WHEREFORE, Defendant, HOLIDAY CVS, LLC, respectfully requests this Honorable Court to deny Plaintiff's Motion to Strike the Expert Testimony of Defendant's Expert Witness, Angela Levitan, Ph.D. [DE 20] and to deny Plaintiff's Request for an Evidentiary Hearing.

Dated: 6/24/2022

Respectfully submitted,

*/s/ Jacob J. Liro*
Jacob J. Liro, Esquire (32720)
JLiro@wickersmith.com
Brian M. Peters, Jr., Esquire (1032210)
BPeters@wickersmith.com
WICKER SMITH O'HARA McCOY & FORD, P.A.
2800 Ponce de Leon Boulevard
Suite 800
Coral Gables, FL  33134
Telephone:    (305) 448-3939
Facsimile:     (305) 441-1745
*Attorneys for Holiday CVS, LLC*

CASE NO. 1:21-cv-23021-KMW

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system on June 24, 2022, and the foregoing document is being served this day on all counsel or parties of record on the Service List below, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

/s/ *Jacob J. Liro*
Jacob J. Liro, Esquire

## SERVICE LIST

Carlos Jordi, Esquire
Rubenstein Law, P.A.
9130 South Dadeland Boulevard
Penthouse Suite
Miami, Florida 33156
Telephone:    (305) 661-6000
Facsimile:    (305) 670-7555
cjordi@rubensteinlaw.com,
crios@rubensteinlaw.com,
eservice@rubensteinlaw.com